CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| GENBAND MANAGEMENT SERVICES CORPORATION, *Counter-Defendant*, | § § | 116th JUDICIAL DISTRICT |

## AMENDED LEVEL 3 SCHEDULING ORDER

In accordance with Rules 166, 190, and 192 of the Texas Rules of Civil Procedure, the Court makes the following amended order to control the schedule of the case.

1.      This case will be ready and is set for jury trial on **July 16, 2018**. If not reached as set, the case may be carried to the next week. Trial announcements must be made in accordance with Rule 3.02 of the Local Rules of the Civil Courts of Dallas County, Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a of the Texas Rules of Civil Procedure.

2.      Pretrial matters will be completed by the following dates:

| | |
|---|---|
| February 16, 2018 | **Deadline for filing amended pleadings asserting new claims or defenses or adding parties.** |
| March 30, 2018 | **Fact discovery closes.** All fact depositions shall be completed by this date, and all written discovery requests shall be served so that responses are due no later than this date. |
| April 6, 2018 | **Fact discovery motions deadline.** Any motion to compel responses to discovery (other than relating to factual |

| | matters arising after the end of fact discovery) must be filed by this date or such complaint is waived, except for the sanction of exclusion under Rule 193.6. |
|---|---|
| April 6, 2018 | **Expert designation deadline for party seeking affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| May 7, 2018 | **Expert designation deadline for party opposing affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| May 16, 2018 | **Deadline for amended pleadings other than those adding new claims, defenses, or parties.** Amended pleadings responsive to timely filed pleadings may be filed after the deadline if filed within 14 days after the pleading to which they respond. |
| May 21, 2018 | **Expert designation deadline for reply/rebuttal experts.** Any expert designation must include the information required by Rule 194.2(f). |
| May 25, 2018 | **Deadline to file motions for summary judgment.** Summary judgment motions must be heard no later than 30 days prior to trial. |
| May 31, 2018 | **Expert discovery closes.** |
| June 1, 2018 | **Deadline to file motions to exclude or limit expert testimony.** Such motions must be heard no later than 30 days prior to trial. |

The parties may by written agreement alter these deadlines. Except by agreement of the parties, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3. Each side may have 50 hours of oral depositions and 30 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

4. The parties shall mediate this case no later than May 23, 2018, unless otherwise provided by court order. Named parties shall be present during the entire mediation process, and

**AMENDED LEVEL 3 SCHEDULING ORDER - Page 2 of 4**

each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **The parties agree to mediate this case with Hon. Jeff Kaplan (Ret.) from JAMS Dallas. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation.**

5.    Fourteen days before the Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examinations, a list of exhibits, and copies of any exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten days before the Trial setting, the parties shall exchange in writing (a) their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and (b) their objections and any counter-designations to the opposing party's deposition designations. **On or before ten days before the Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreements on such matters.** By 4:00 p.m. on the Thursday before the Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4:00 p.m. the Thursday before the trial setting.

6.    A pre-trial conference shall be conducted from 8:00 a.m. to 9:00 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet

**AMENDED LEVEL 3 SCHEDULING ORDER - Page 3 of 4**

and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trail conference shall be scheduled the week before the Trial Setting.

If any parties are joined in this action, the party joining such additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

SIGNED on this 20th day of November , 2017.

HON. TONYA PARKER

This case is governed by the
Court's Policies and Procedures
and Dallas County Courts
Local Rules, available at
www.dallascounty.org

AGREED:

s/ Jonathan Rubenstein
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendant

s/ Tyler J. Bexley
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs

**AMENDED LEVEL 3 SCHEDULING ORDER - Page 4 of 4**

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

**COEFFICIENT, LLC AND TELEFFICIENT, LLC'S
FIRST AMENDED COUNTERCLAIM**

Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC file this First Amended Counterclaim against Counter-Defendants GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC (collectively, "GENBAND"), and respectfully state as follows:

**NATURE OF CLAIMS**

1. This is a case about GENBAND, a subsidiary of a multimillion-dollar public company, defrauding CoEfficient and TelEfficient, both startup companies, and using the proprietary information and expertise of those companies to close more than $100 million worth of deals. Among other things, GENBAND sells landline switches to telephone companies. Although upgrading these switches can save telephone companies millions of dollars in energy costs over a long period of time, the switches require a

**COEFFICIENT, LLC AND TELEFFICIENT, LLC'S FIRST AMENDED COUNTERCLAIM - Page 1 of 28**

221

significant upfront capital investment. In order to present attractive financing proposals that allow telephone companies to use energy cost savings to pay for switch upgrades over an extended period of time, GENBAND partnered with TelEfficient, a provider of special financial instruments designed to finance the capital costs of energy efficient projects in the telecommunications sector. TelEfficient is a subsidiary of CoEfficient, which pioneered the use of unique financial instruments to help companies pay for energy efficient projects.

2. GENBAND entered into a Teaming Agreement and Non-Disclosure Agreement with TelEfficient, under which TelEfficient agreed to present its proprietary financial models and expertise to potential GENBAND customers. GENBAND did not have the expertise or models to present the business case justifying the expense of its switches on its own, instead relying on TelEfficient's proprietary models and expertise.

3. Over the course of GENBAND's relationship with TelEfficient, GENBAND used TelEfficient's expertise and information to close well over $100 million in projects with telephone companies. Along the way, GENBAND consistently represented to TelEfficient that these projects would be financed with TelEfficient, which would have resulted in millions of dollars of revenue for TelEfficient. GENBAND made these representations so that TelEfficient would continue to provide its expertise and proprietary models to GENBAND's customers for a period of several years. But GENBAND's representations were false. While GENBAND closed numerous deals with telephone companies, none of them involved TelEfficient financing, despite an exclusivity agreement and non-disclosure agreement between GENBAND and TelEfficient. TelEfficient relied on

GENBAND's representations, resulting in millions of dollars of investment and debt spent to benefit GENBAND and its customers, with no return to TelEfficient.

4. To make matters worse, GENBAND loaned about $600,000 to CoEfficient and TelEfficient with the representations that (a) GENBAND's deals with customers would close with TelEfficient financing, enabling TelEfficient to make sufficient income to pay off the loans; and (b) GENBAND would continue to extend the maturity date of the loans until TelEfficient was earning sufficient income to pay of the balance. These representations also turned out to be false. After GENBAND had leveraged maximum value from TelEfficient's proprietary models and expertise, GENBAND called the loans (despite representing that it would not do so) and demanded payment from CoEfficient and TelEfficient. When CoEfficient and TelEfficient were unable to pay, GENBAND filed this lawsuit.

5. Based on GENBAND's unlawful conduct, Counter-Plaintiffs file this Counterclaim asserting causes of action of fraud, fraudulent inducement, negligent misrepresentation, breach of contract, and misappropriation of trade secrets. GENBAND's tortious conduct has caused millions of dollars of damage to CoEfficient and TelEfficient. Thus, Counter-Plaintiffs seek monetary relief of over $1,000,000.

## DISCOVERY LEVEL

6. Pursuant to Texas Rule of Civil Procedure 190, Counter-Plaintiffs intend to conduct discovery under Level 3.

## PARTIES

7.     Counter-Plaintiff CoEfficient, LLC is a California limited liability company with its principal place of business in Oakland, California.

8.     Counter-Plaintiff TelEfficient, LLC is a Maryland limited liability company with its principal place of business in Oakland, California.

9.     Counter-Defendant GENBAND Management Services Corporation ("GB Management") is a Delaware corporation with its principal place of business in Collin County, Texas.  GB Management has already appeared in this case and may be served through counsel.

10.     Counter-Defendant GENBAND Holdings Company ("GB Holdings") is a foreign company with its principal place of business in Collin County, Texas.  GB Holdings may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Inc., 211 E. 7th Street, Suite 620, Austin, Texas 78701.

11.     Counter-Defendant GENBAND US, LLC ("GB US") is a Delaware limited liability company with its principal place of business in Collin County, Texas.  GB US may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Inc., 211 E. 7th Street, Suite 620, Austin, Texas 78701.

12.     As a result of a merger effectuated in October 2017, the Counter-Defendants are now direct or indirect subsidiaries of a publicly traded company doing business as Ribbon Communications, Inc.  Ribbon Communications is the trade name of the new company formed after GENBAND merged with Sonus Networks, Inc.  Counter-Plaintiffs are informed and believe that GB Holdings is Cayman Islands holding company

that is wholly owned by Ribbon Communications (or a related merger subsidiary). Counter-Plaintiffs are informed and believe that GB Management and GB US are wholly owned by GB Holdings.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over the Counter-Defendants because they are entities with their principal places of business in Texas.

14.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy is within this Court's jurisdictional limits.

15.     Venue is proper in Dallas County because GENBAND Management initiated suit in this county.

## FACTUAL BACKGROUND

16.     CoEfficient was founded by Murat Armbruster in March 2012. Prior to founding CoEfficient, Mr. Armbruster spent three years as a senior advisor to the Carbon War Room, a nonprofit started by Richard Branson to focus on accelerating the adoption of business solutions that reduce carbon emissions. One of the Carbon War Room's central goals is to reduce the capital costs and market barriers that make energy efficient and low-carbon projects difficult for businesses.

17.     While at the Carbon War Room, Mr. Armbruster noticed that, despite the long-term cost savings that a business can enjoy from energy efficient upgrades, the upfront capital cost of such upgrades is often prohibitive. To address this problem, Mr. Armbruster developed a unique solution to give businesses access to financial instruments that enable them to unlock large-scale energy efficiency and the cost savings that come

COEFFICIENT, LLC AND TELEFFICIENT, LLC'S FIRST AMENDED COUNTERCLAIM - Page 5 of 28

with it. Although the intricacies of the financial instruments are complex, the general purpose is to replace a business's old, inefficient equipment with new, highly efficient equipment, and use the energy and other savings to pay for the program, thereby avoiding any upfront capital outlay by the business. To this end, the model was developed in conjunction with an investor group to ensure that the instruments being developed would have the necessary capital behind them. These financial instruments were unique and unlike anything offered in the market, enabling an entrepreneur like Mr. Armbruster to capitalize on his innovation while also promoting energy efficient and reducing carbon emissions.

18. Mr. Armbruster founded CoEfficient for the purpose of commercializing his innovative financial solutions and the know-how he developed relating to financing energy efficient projects. He envisioned that these financial solutions could be used to fund energy efficient projects across multiple industries. To facilitate the broad reach of the company, CoEfficient created several subsidiary companies to focus on different industries. One of those subsidiaries was TeleSwitch Finance, LLC, which CoEfficient incorporated in March 2012 to focus on financing energy efficient projects in the telecommunications sector. This company would eventually become TelEfficient.

19. One of Mr. Armbruster's colleagues from the Carbon War Room put him in contact with Aztek Networks, a company involved in switch consolidation and network migration solutions. One of Aztek's focuses was providing equipment and services related to the migration and upgrade of telephone companies' network switches. Mr. Armbruster discussed his ideas for alternative financing with Aztek's CEO, Steven Bruny, and Mr.

Bruny expressed interest in working with Mr. Armbruster. Mr. Bruny and Mr. Armbruster began discussing how TelEfficient could help Aztek's customers.

20. Shortly after these discussions, in April 2012, Aztek reached an agreement to be acquired by GENBAND. TelEfficient's contact at Aztek, Mr. Bruny, became a Vice President at GENBAND and, later, its Chief Operating Officer. After the acquisition closed, TelEfficient began working with GENBAND on a proposal for Hawaiian Telecom, one of GENBAND's customers. GENBAND also asked TelEfficient to collaborate on several additional proposals in order to present attractive financial solutions to GENBAND's customers.

21. In August 2012, TelEfficient and GENBAND entered into a Teaming Agreement recognizing that "they will benefit from working together so that GENBAND may secure Contracts with Clients for Projects as may be mutually agreed." The Teaming Agreement further recognized TelEfficient's value to GENBAND as a provider of financial solutions and consulting services that would "assist GENBAND in securing the Contracts."

22. The Teaming Agreement also recognized that the parties retained the rights to their respective proprietary information and intellectual property and referenced a Non-Disclosure Agreement between TelEfficient and GENBAND. In the Non-Disclosure Agreement, GENBAND agreed not to disclose or use any of TelEfficient's proprietary or confidential information for any purpose other than to carry out a commercial transaction with TelEfficient. GENBAND and TelEfficient also signed additional Non-Disclosure

COEFFICIENT, LLC AND TELEFFICIENT, LLC'S FIRST AMENDED COUNTERCLAIM - Page 7 of 28

Agreements with each GENBAND customer to whom TelEfficient provided its proprietary information and expertise.

23. On June 27, 2013, GENBAND and TelEfficient entered into an Amended and Restated Teaming Agreement. The amended agreement contained an exclusivity agreement, under which GENBAND was prohibited from working with other third party financing companies or offering financing services to any of the customers for whom TelEfficient prepared financing proposals, including Verizon, Hawaiian Telecom, Sprint, AT&T, and Optus, among others.

24. Over the next several months, TelEfficient partnered with GENBAND, at GENBAND's request, to work on financing proposals for several telecommunications projects, including switch removal and transformation projects for Verizon, AT&T, Bell Canada, CenturyLink, Vodafone, and others. Throughout the course of these projects, GENBAND maintained the relationship with each customer and was responsible for communicating with each customer. In fact, the Teaming Agreement specifically provided that "GENBAND will maintain sole responsibility for all aspects of the Projects, including without limitation, Contract negotiation, Client relationship management, and Project management." Thus, TelEfficient was forced to rely on GENBAND for information about the status of the projects and their need for TelEfficient's financial solutions.

25. From the beginning, TelEfficient brought significant value to GENBAND and its customers. Early on, TelEfficient installed monitoring equipment at Verizon's offices in Philadelphia to demonstrate the economic benefits Verizon would gain by replacing their old switches with GENBAND switches. For other customers, TelEfficient

provided value by creating complex energy and financial models that made the business cases that ultimately led GENBAND to close deals with those customers. TelEfficient built its financial models from the ground up, committing thousands of hours of analyst time and significant sums of money to the development of this proprietary information and expertise. Importantly, GENBAND did not have the ability to demonstrate these business cases and financial benefits to its customers without TelEfficient's proprietary data models and expertise. In fact, GENBAND would regularly request TelEfficient's involvement in proposals that were running into resistance and needed additional demonstration of value to the customer to increase the likelihood of closing the deal.

26. With TelEfficient's assistance, GENBAND closed deals for switch replacement with many customers, resulting in tens of millions of dollars in revenue for GENBAND. While GENBAND profited significantly from the value that TelEfficient brought to the table, TelEfficient did not. TelEfficient raised millions of dollars in debt and equity to finance its involvement in GENBAND projects but, ultimately, never made any income from those projects. Throughout this process, GENBAND led TelEfficient to believe that its efforts would eventually be rewarded, constantly representing that it had new deals that would require financing from TelEfficient. GENBAND made these representations because it needed the value TelEfficient brought to demonstrate the business case for GENBAND's switches and ultimately close deals.

27. One of the larger proposals in which TelEfficient was involved was for AT&T. This proposal involved hundreds of hours of time and hundreds of thousands of dollars in capital from TelEfficient. To ensure that TelEfficient had sufficient capital to

complete the proposal, GENBAND loaned TelEfficient $100,000 under a Revolving Credit Note dated April 1, 2014. In making this loan to TelEfficient, GENBAND represented that it expected to be repaid from proceeds paid to TelEfficient from an expected AT&T deal. In fact, the Note includes an acceleration date that is triggered by TelEfficient's receipt of funds from the expected AT&T deal. Additionally, prior to the execution of the Note, GENBAND consistently represented to TelEfficient that the AT&T deal was going to close and the TelEfficient would be included in the deal. Because GENBAND controlled the AT&T relationship and had primary contact with AT&T, TelEfficient relied on GENBAND's representations about the likelihood of closing the deal and the likelihood that AT&T would use TelEfficient to finance the project. TelEfficient relied on these representations in executing the Note and would not have agreed to the terms of the Note absent GENBAND's representations. TelEfficient also relied on these representations in raising funds from investors and incurring substantial operational debts to cover the costs of the AT&T project.

28. GENBAND also represented to TelEfficient on several occasions that if the AT&T deal was delayed or ran into problems, GENBAND would not call the Note and would continue to extend the Note until TelEfficient received funds to pay the debt. In fact, after reviewing a draft of the Note on March 28, 2014, Mr. Armbruster, the head of TelEfficient, emailed Mr. Bruny, who had become a Vice President at GENBAND, to express his concern that GENBAND could call the Note any time, stating that this term would not work for TelEfficient. On the same day, Mr. Bruny responded that this term was merely standard language and assured TelEfficient that GENBAND will not call the

Note. Mr. Bruny and others at GENBAND made similar representations verbally in connection with the Note. TelEfficient relied on these representations in executing the Note and would not have agreed to the terms of the Note absent GENBAND's representations.

29. Ultimately, GENBAND was successful in closing the AT&T deal to replace old switches with new GENBAND switches. On information and belief, the AT&T deal resulted in more than $40 million in revenue for GENBAND. TelEfficient, however, received no revenue from the AT&T deal because AT&T decided to finance the project itself without TelEfficient's involvement. Thus, TelEfficient invested hundreds of man-hours and substantial sums of money in the AT&T proposal and brought significant value to GENBAND to facilitate closing the deal but did not receive any compensation for its contribution. This was directly contrary to GENBAND's representations that AT&T was expected to close the deal using TelEfficient's financing. On information and belief, GENBAND knew that AT&T almost never used outside financing for deals such as this but withheld this information from TelEfficient and continued to tell TelEfficient that AT&T would use TelEfficient's financing because GENBAND needed TelEfficient's expertise and financial modeling to close the deal.

30. By July 2014, TelEfficient was in a difficult financial situation, with significant debt and little capital left for operations. Relying on GENBAND's representations that the AT&T deal was going to close with TelEfficient financing, TelEfficient had not secured additional funding because the AT&T deal would have been worth more than $1 million in revenue to TelEfficient. When the AT&T deal closed

without TelEfficient financing, TelEfficient was left with insufficient funds to continue operating.

31. GENBAND, however, needed TelEfficient's expertise and knowledge—this time for a project with Verizon—so GENBAND proposed an additional loan to TelEfficient in the amount of $300,000. Having relied on GENBAND's representations to its detriment, TelEfficient was left with no option but to accept GENBAND's loan proposal. This time, however, GENBAND decided that it wanted the Note to be with TelEfficient's parent company, CoEfficient. GENBAND leveraged its superior bargaining position and TelEfficient's financial problems to not only force CoEfficient to be the signor on a new Note, but also to agree to guarantee the Note executed by TelEfficient on April 1, 2014. With no real option but to acquiesce to GENBAND's demands, CoEfficient entered into a Promissory Note with GENBAND in the amount of $300,000 on August 8, 2014. The Promissory Note required CoEfficient to guarantee the April 1, 2014 Note and required TelEfficient to guarantee the August 8, 2014 Note.

32. In connection with the Promissory Note, GENBAND represented that the Verizon deal was going to close using TelEfficient financing. GENBAND also continued to tell TelEfficient and CoEfficient that AT&T was considering a deal to use TelEfficient financing even after the AT&T deal had already closed. CoEfficient, as borrower (and guarantor on the April 1, 2014 Note), and TelEfficient, as guarantor, relied on GENBAND's representations because GENBAND had primary contact with Verizon and AT&T and controlled the customer relationships. GENBAND also represented, once again, that if the Verizon deal was delayed or ran into problems, GENBAND would not

call the Note and would continue to extend the Note until TelEfficient/CoEfficient received funds to pay the debt. CoEfficient relied on these representations in executing the Promissory Note and agreeing to guarantee the April 1, 2014 Note and would not have agreed to these terms absent GENBAND's representations. TelEfficient relied on GENBAND's representations in agreeing to guarantee the August 8, 2014 Promissory Note and would not have agreed to the guaranty absent GENBAND's representations. TelEfficient also relied on GENBAND's representations in raising funds from investors and incurring substantial operational debts to cover the costs of the Verizon project.

33. After several months of working on the Verizon deal, TelEfficient had expended significant amounts of money and was running low on capital. Because TelEfficient was critical to GENBAND's success with the Verizon project, GENBAND agreed to loan CoEfficient (as TelEfficient's parent company) up to an additional $255,000, as memorialized in a December 18, 2014 Promissory Note, which TelEfficient also signed as a guarantor. The Promissory Note makes specific reference to the contemplated Verizon deal. In connection with this Promissory Note, GENBAND made the same representations that (a) the Verizon deal would close with TelEfficient financing; and (b) the Promissory Note would be extended until CoEfficient/TelEfficient received sufficient funds to pay the balance. CoEfficient relied on these representations in executing the Promissory Note, and TelEfficient relied on these representations in signing the guaranty.

34. GENBAND was ultimately successful in closing a deal with Verizon to replace its old switches with new GENBAND switches. On information and belief, the

Verizon deal resulted in more than $70 million in revenue for GENBAND. Once again, however, TelEfficient was left out of the deal, resulting in no compensation to TelEfficient for the substantial sums of money and hours TelEfficient poured into the Verizon project. TelEfficient's proprietary models and expertise were critical to the Verizon deal and enabled GENBAND to close the deal, but TelEfficient was left with nothing to show for its efforts other than substantial debt. TelEfficient had detrimentally relied on GENBAND's representations that the Verizon deal would close with TelEfficient financing, which turned out to be wrong. On information and belief, GENBAND knew that Verizon almost never used outside financing for deals such as this but withheld this information from TelEfficient and continued to tell TelEfficient that Verizon would use TelEfficient's financing because GENBAND needed TelEfficient's expertise and financial modeling to close the deal.

35. GENBAND made similar representations to TelEfficient for each of the proposals in which TelEfficient was involved. For example, GENBAND led TelEfficient to believe that deals with CenturyLink, Vodafone New Zealand, Telecom New Zealand, Claro Puerto Rico, and TelePacific would close with TelEfficient financing. But none of these deals—which collectively represented tens of millions of dollars of value to GENBAND—closed with TelEfficient financing; they either did not close at all or closed with some other method of financing. TelEfficient relied on GENBAND's representations, investing millions of dollars and incurring significant debt to assist GENBAND on these deals, only to receive no compensation for its efforts.

36.     As TelEfficient continued to invest substantial sums of money in these GENBAND projects, it needed additional funds to cover operational expenses. In late spring of 2015, TelEfficient requested an additional loan of $300,000 from GENBAND to cover these expenses. GENBAND indicated that the company would be able to make the $300,000 loan to TelEfficient. Then, in May 2015, GENBAND's Vice Chairman, Alex Russo, called Mr. Armbruster, and indicated that a loan in the amount of $300,000 would be a problem. Instead, Mr. Russo sought to take advantage of TelEfficient's precarious financial position by attempting to acquire both CoEfficient and TelEfficient for pennies on the dollar. Specifically, Mr. Russo proposed that GENBAND acquire CoEfficient (and all of its assets, including TelEfficient) in exchange for the forgiveness of the outstanding Notes. This would allow GENBAND to take all of the value TelEfficient brought to its deals without paying anything beyond the amounts already owed by CoEfficient and TelEfficient. Because this significantly undervalued the company, CoEfficient and TelEfficient declined. When CoEfficient and TelEfficient declined the offer, Mr. Russo refused to make the $300,000 loan that GENBAND had previously agreed to make.

37.     GENBAND instead agreed to make a smaller loan in the amount of $40,000 to CoEfficient. The loan is evidenced by a Promissory Note dated May 9, 2015, executed by CoEfficient as the borrower and TelEfficient as guarantor. As with the prior Notes, CoEfficient and TelEfficient executed the May 9, 2015 Promissory Note in reliance on GENBAND's representations that (a) the deals on which TelEfficient was working would close with TelEfficient financing; and (b) the Promissory Note would be extended until CoEfficient/TelEfficient received sufficient funds to pay the balance.

38.     In the end, none of the deals closed with TelEfficient financing.  TelEfficient and CoEfficient were left with more than $600,000 in principal debt to GENBAND and more than $3 million in equity investment, debt, and operational obligations incurred from TelEfficient's projects with GENBAND.  TelEfficient and CoEfficient relied on GENBAND's representations in raising these funds and incurring these debts and would not have done so if GENBAND had accurately portrayed the status of the various projects.  Because of this detrimental reliance on GENBAND, TelEfficient was in a precarious financial position in mid-2015.

39.     The Notes provided for a potential to extend the maturity date to August 8, 2015, which TelEfficient and CoEfficient requested and received.  In July 2015, TelEfficient and CoEfficient requested another extension of the Notes.  GENBAND, sensing an opportunity to leverage its bargaining position, demanded onerous concessions in exchange for considering an extension of the Notes.  For example, GENBAND asked TelEfficient to execute an amendment to the Teaming Agreement that would have required continued exclusivity on the part of TelEfficient but abandoned GENBAND's exclusivity obligations.  In other words, GENBAND sought an amendment that would have allowed it to have TelEfficient present its proprietary financial models and expertise to GENBAND customers and then use that information to secure financing from a third party behind TelEfficient's back.  Of course, TelEfficient could not agree to these unreasonable terms.

40.     Unable to extract these concessions, GENBAND refused to extend the maturity date of the Notes, despite its prior representations that it would not call the Notes and would extend them until a deal funded that enabled CoEfficient/TelEfficient to

repay the outstanding balance. Despite refusing the requested extension, GENBAND continued to engage TelEfficient and derive benefits from TelEfficient's knowledge and expertise even after the Notes matured in August 2015. For example, in September 2015, GENBAND's President of Global Sales, Mark Pugerude, represented that GENBAND was having "good meetings with AT&T" about another switch project and requested TelEfficient's assistance on the project. GENBAND continued to use TelEfficient for GENBAND's benefit throughout the rest of 2015 on several deals valued at more than $100 million to GENBAND.

41. In January 2016, while GENBAND was still using TelEfficient to present financial solutions to its customers, GENBAND's Chief Financial Officer, Daryl Raiford, sent a letter declaring the Notes in default and demanding immediate payment. Mr. Armbruster, the CEO of CoEfficient and head of TelEfficient, attempted to contact Mr. Raiford to discuss his letter, but Mr. Raiford never responded. Mr. Armbruster was able to reach Mr. Bruny, GENBAND's Chief Operating Officer, to discuss the letter. Mr. Bruny assured Mr. Armbruster that the letter was merely a formality and should not affect the ongoing work that TelEfficient was doing on behalf of GENBAND. Mr. Bruny also told Mr. Armbruster that he would speak with Mr. Raiford on behalf of TelEfficient and CoEfficient to avoid any further issues. Relying on Mr. Bruny's assurances, as well as his prior representations that GENBAND would not call the Notes and would continue to extend them, TelEfficient continued to work with GENBAND on several projects well into 2016. GENBAND even flew Mr. Armbruster to Puerto Rico twice in two weeks to meet with the CEO of one of GENBAND's potential customers in August 2016.

42. After years of stringing TelEfficient and CoEfficient along with misrepresentations and having leveraged maximum value from TelEfficient's proprietary financial models and expertise, GENBAND engaged outside counsel to send a demand letter on the Notes to TelEfficient and CoEfficient in August 2016. The letter came completely out of the blue, arriving shortly after Mr. Armbruster's trip to Puerto Rico to help GENBAND. Contrary to numerous representations by Mr. Bruny and other GENBAND employees that GENBAND would continue to extend the Notes and would not make demand on them, the August 2016 letter demanded immediate payment of the Notes and threatened suit if CoEfficient and TelEfficient failed to comply. When CoEfficient and TelEfficient were unable to comply, GENBAND filed this lawsuit.

## CAUSES OF ACTION

### COUNT I: FRAUD

43. Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

44. GENBAND made numerous misrepresentations to Counter-Plaintiffs over the course of the parties' relationship. GENBAND represented that deals with customers (including AT&T, Verizon, Hawaiian Telecom, CenturyLink, Vodafone, Telecom New Zealand, Claro Puerto Rico, TelePacific, and others) would close using TelEfficient financing. These representations were false. GENBAND's customers closed without using financing from TelEfficient, contrary to GENBAND's representations. GENBAND knew or should have known that its representations were false. For example, GENBAND was aware that AT&T and Verizon almost never used outside financing for projects like the

GENBAND switch deal, yet GENBAND never disclosed that fact to TelEfficient or CoEfficient and, in fact, continued to represent that these deals would close with TelEfficient financing.

45. GENBAND also represented that it would not call the Notes with TelEfficient and CoEfficient and that the Notes would be extended until deals had closed and funded with TelEfficient such that TelEfficient/CoEfficient had sufficient funds to pay the balance of the Notes. These representations were false. GENBAND reserved its right to call the Notes and, in fact, did call the Notes and refused to extend them without receiving onerous and unreasonable concessions from TelEfficient and CoEfficient. GENBAND never intended to honor the representation that it would extend the Notes, instead intending to call the Notes after extracting maximum value from TelEfficient's proprietary models and expertise.

46. GENBAND also withheld material facts from Counter-Plaintiffs, including information about the likelihood of deals closing with TelEfficient financing. GENBAND had a duty to disclose these material facts to Counter-Plaintiffs because (a) GENBAND created a false impression by making a partial disclosure of information; (b) GENBAND discovered new facts that made its prior representations misleading or untrue; (c) GENBAND voluntarily disclosed some information but failed to disclose the whole true; and/or (d) GENBAND had a duty to disclose material facts to Counter-Plaintiffs because GENBAND maintained the customer relationships and had primary communications with the customers.

47.  These misrepresentations and omissions were material in that they caused Counter-Plaintiffs to (a) continue working with GENBAND for the benefit of GENBAND and its customers; (b) invest substantial sums of money and man-hours in GENBAND projects; (c) incur millions of dollars in debt in connection with GENBAND projects; and (d) enter into Promissory Notes with GENBAND. Counter-Plaintiffs would not have performed these actions but for GENBAND's misrepresentations.

48.  Counter-Plaintiffs detrimentally relied on GENBAND's misrepresentations and omissions by undertaking the above-described actions. If Counter-Plaintiffs had known the truth, they would not have entered into the Promissory Notes or expended millions of dollars and thousands of hours in connection with GENBAND projects. Counter-Plaintiffs' reliance on GENBAND's misrepresentations and omissions was justifiable because, among other things GENBAND controlled the relationship with its customers and maintained primary contact with the customers.

49.  GENBAND's misrepresentations and omissions caused injury to Counter-Plaintiffs by causing them to take the above-described actions, including the expenditure of millions of dollars. Counter-Plaintiffs seek the actual damages, including consequential damages, caused by GENBAND's misrepresentations and omissions. Because Counter-Plaintiff's injuries were caused by GENBAND's fraud, Counter-Plaintiffs also are entitled to exemplary damages.

## COUNT II: FRAUDULENT INDUCEMENT

50.  Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

51.     GENBAND made numerous misrepresentations to Counter-Plaintiffs over the course of the parties' relationship. GENBAND represented that deals with customers (including AT&T, Verizon, Hawaiian Telecom, CenturyLink, Vodafone, Telecom New Zealand, Claro Puerto Rico, TelePacific, and others) would close using TelEfficient financing. These representations were false. GENBAND's customers closed without using financing from TelEfficient, contrary to GENBAND's representations. GENBAND knew or should have known that its representations were false. For example, GENBAND was aware that AT&T and Verizon almost never used outside financing for projects like the GENBAND switch deal, yet GENBAND never disclosed that fact to TelEfficient or CoEfficient and, in fact, continued to represent that these deals would close with TelEfficient financing.

52.     GENBAND also represented that it would not call the Notes with TelEfficient and CoEfficient and that the Notes would be extended until deals had closed and funded with TelEfficient such that TelEfficient/CoEfficient had sufficient funds to pay the balance of the Notes. These representations were false. GENBAND reserved its right to call the Notes and, in fact, did call the Notes and refused to extend them without receiving onerous and unreasonable concessions from TelEfficient and CoEfficient. GENBAND never intended to honor the representation that it would extend the Notes, instead intending to call the Notes after extracting maximum value from TelEfficient's proprietary models and expertise.

53.     These misrepresentations were material in that they caused Counter-Plaintiffs to (a) continue working with GENBAND for the benefit of GENBAND and its

customers; (b) invest substantial sums of money and man-hours in GENBAND projects; (c) incur millions of dollars in debt in connection with GENBAND projects; and (d) enter into Promissory Notes with GENBAND. Counter-Plaintiffs would not have performed these actions but for GENBAND's misrepresentations.

54.     Counter-Plaintiffs detrimentally relied on GENBAND's misrepresentations by entering into the Notes with GENBAND and incurring more than $600,000 in principal debt. GENBAND's misrepresentations caused Counter-Plaintiffs to enter into the Notes, which, according to GENBAND's pleadings, are binding contracts. If Counter-Plaintiffs had known the truth, they would not have entered into the Notes. Counter-Plaintiffs' reliance on GENBAND's misrepresentations was justifiable because, among other things GENBAND controlled the relationship with its customers and maintained primary contact with the customers.

55.     GENBAND's misrepresentations caused injury to Counter-Plaintiffs by causing them to incur more than $600,000 in principal debt that they would not have otherwise incurred. Counter-Plaintiffs seek the actual damages, including consequential damages, caused by GENBAND's misrepresentations. Because Counter-Plaintiff's injuries were caused by GENBAND's fraud, Counter-Plaintiffs also are entitled to exemplary damages.

### COUNT III: NEGLIGENT MISREPRESENTATION

56.     Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

57.     GENBAND made numerous misrepresentations to Counter-Plaintiffs in connection with GENBAND's business and various transactions in which GENBAND had an interest.  GENBAND represented that deals with customers (including AT&T, Verizon, Hawaiian Telecom, CenturyLink, Vodafone, Telecom New Zealand, Claro Puerto Rico, TelePacific, and others) would close using TelEfficient financing.  GENBAND made these representations to provide guidance and assurances to CoEfficient and TelEfficient in determining whether to enter into the Notes.   These representations were false. GENBAND's customers closed without using financing from TelEfficient, contrary to GENBAND's representations.    GENBAND failed to exercise reasonable care or competence in obtaining and communicating these representations.   For example, GENBAND was aware, or should have been aware, that AT&T and Verizon almost never used outside financing for projects like the GENBAND switch deal, yet GENBAND never disclosed that fact to TelEfficient or CoEfficient and, in fact, continued to represent that these deals would close with TelEfficient financing.

58.     GENBAND also represented that it would not call the Notes with TelEfficient and CoEfficient and that the Notes would be extended until deals had closed and funded with TelEfficient such that TelEfficient/CoEfficient had sufficient funds to pay the balance of the Notes.  GENBAND made these representations to provide guidance and assurances to CoEfficient and TelEfficient in determining whether to enter into the Notes. These representations were false.   GENBAND failed to exercise reasonable care or competence in obtaining and communicating these representations.  GENBAND reserved its right to call the Notes and, in fact, did call the Notes and refused to extend them

without receiving onerous and unreasonable concessions from TelEfficient and CoEfficient. GENBAND never intended to honor the representation that it would extend the Notes, instead intending to call the Notes after extracting maximum value from TelEfficient's proprietary models and expertise.

59. These misrepresentations were material in that they caused Counter-Plaintiffs to (a) continue working with GENBAND for the benefit of GENBAND and its customers; (b) invest substantial sums of money and man-hours in GENBAND projects; (c) incur millions of dollars in debt in connection with GENBAND projects; and (d) enter into Promissory Notes with GENBAND. Counter-Plaintiffs would not have performed these actions but for GENBAND's misrepresentations.

60. Counter-Plaintiffs detrimentally relied on GENBAND's misrepresentations by taking the above-described actions. In fact, Counter-Plaintiffs had no choice but to rely on GENBAND because GENBAND maintained the customer relationships and had primary communications with the customers. Based on this relationship, GENBAND had a duty to disclose material facts to Counter-Plaintiffs, which GENBAND failed to do. If Counter-Plaintiffs had known the truth, they would not have entered into the Promissory Notes or expended millions of dollars and thousands of hours in connection with GENBAND projects. Counter-Plaintiffs' reliance on GENBAND's misrepresentations was justifiable because, among other things GENBAND controlled the relationship with its customers and maintained primary contact with the customers.

61. GENBAND's misrepresentations caused injury to Counter-Plaintiffs by causing them to take the above-described actions, including the expenditure of millions of

dollars. Counter-Plaintiffs seek the actual damages, including consequential damages, caused by GENBAND's misrepresentations. Because Counter-Plaintiff's injuries were caused by GENBAND's fraud and malicious conduct, Counter-Plaintiffs also are entitled to exemplary damages.

<div align="center">COUNT IV: MISAPPROPRIATION OF TRADE SECRETS</div>

62.     Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

63.     Counter-Plaintiffs bring this claim for relief under the Texas Uniform Trade Secrets Act, Texas Civil Practice and Remedies Code §§ 134A.001, et seq. ("TUTSA").

64.     Counter-Plaintiffs' financial models and expertise are "trade secrets" under TUTSA. They comprise information, including a compilation, program, device, method, technique, process, or financial data by which Counter-Plaintiffs operate their business.

65.     Counter-Plaintiffs' trade secrets were the subject of efforts that were reasonable under the circumstances to maintain their secrecy, including that they were disclosed only to those individuals who needed the information to perform their duties, it was made known to these individuals that the information was to be kept confidential, and reasonable security and confidentiality measures were maintained to protect the trade secrets. Counter-Plaintiffs also executed non-disclosure agreements with GENBAND and with each customer to whom Counter-Plaintiffs disclosed their proprietary information.

66.     Counter-Plaintiffs' trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, Counter-Plaintiffs' competitors and others who can obtain economic

value from the use of the information. It would competitively harm Counter-Plaintiffs if their trade secrets were disclosed or otherwise made public.

67.     GENBAND was provided access to Counter-Plaintiffs' trade secrets under a Non-Disclosure Agreement but accessed and/or used Counter-Plaintiffs' trade secrets in violation of the Non-Disclosure Agreement. Counter-Plaintiffs have not effectively consented to nor received sufficient consideration for GENBAND's misappropriations. GENBAND knows or has reason to know that it acquired and/or used Counter-Plaintiffs' trade secrets by improper means, including misrepresentations and breach of a duty to maintain secrecy.

68.     GENBAND's misappropriation of Counter-Plaintiffs' trade secrets was willful and malicious. GENBAND knew that the trade secrets rightfully belonged to Counter-Plaintiffs, and yet misappropriated the trade secrets for its own material gain.

69.     As a direct and proximate result of GENBAND's misappropriation, Counter-Plaintiffs have already suffered, and will continue to suffer, injury and damages, while GENBAND enjoys ill-gotten profits. Because GENBAND's misappropriation of Counter-Plaintiffs' trade secrets was willful and malicious, Counter-Plaintiffs are entitled to exemplary damages of twice the amount of damages awarded for GENBAND's misappropriation. Additionally, Counter-Plaintiffs are entitled to their reasonable and necessary attorneys' fees pursuant to TUFTA.

## COUNT V: BREACH OF CONTRACT

70.     TelEfficient incorporates by reference the preceding paragraphs as if fully set forth herein.

71. TelEfficient and GB US entered into binding and enforceable contracts, including a Teaming Agreement and Non-Disclosure Agreement.

72. GB US breached the contracts by, among other things, disclosing TelEfficient's proprietary information and/or using TelEfficient's proprietary information outside of the scope contemplated in the contracts. Any use of or referral to any other financing company by GENBAND also is a breach of the parties' contracts.

73. GB US's breach of contracts caused injury to TelEfficient by depriving TelEfficient of the benefits of the contracts and disclosing and/or using TelEfficient's valuable proprietary information.

74. As a result of GB US's breach of contracts, Counter-Plaintiffs were required to engage counsel and file this action. Pursuant to the terms of the contracts and Texas Civil Practice and Remedies Code § 38.001, Counter-Plaintiffs are entitled to their reasonable and necessary attorneys' fees and costs incurred in prosecuting this action.

## CONDITIONS PRECEDENT

75. All conditions precedent to Counter-Plaintiffs' recovery of the relief requested herein have been performed, have occurred, or have been waived.

## JURY DEMAND

76. Counter-Plaintiffs demand a jury trial on all claims in this Counterclaim on which a jury trial is available.

## PRAYER

Counter-Plaintiffs respectfully requests that this Court:

    i.    award to Counter-Plaintiffs actual, consequential, and exemplary damages;

    ii.    require GENBAND to disgorge its wrongfully obtained profits;

    iii.    award to Counter-Plaintiffs pre- and post-judgment interest;

    iv.    award Counter-Plaintiffs their costs and attorneys' fees; and

    v.    award to Counter-Plaintiffs such further relief to which they are entitled.

    vi.

Respectfully submitted,

**REESE MARKETOS LLP**

By:   *s/ Tyler J. Bexley* _____
      Tyler J. Bexley
      State Bar No. 24073923
      tyler.bexley@rm-firm.com
      750 N. Saint Paul St., Suite 600
      Dallas, Texas 75201-3201
      214.382.9810 telephone
      214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS COEFFICIENT,
LLC and TELEFFICIENT, LLC**

### CERTIFICATE OF SERVICE

    I hereby certify that on January 9, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

        *s/ Tyler J. Bexley* _____
        Tyler J. Bexley

FILED
DALLAS COUNTY
1/10/2018 12:39 PM
FELICIA PITRE
DISTRICT CLERK
Manuel Rodriguez



RM  REESE · MARKETOS

Tyler Bexley
PARTNER
Tyler.Bexley@rm-firm.com
p (214) 382-9805
f (214) 501-0731

January 10, 2018

DC-16-12593

*Via efileTexas.gov*
Rosemary De La Cerda, Clerk
116th Judicial District Court
600 Commerce St. #640
Dallas, TX 75202

      Re:  No. DC-16-12593; *Genband Management Services Corporation v. CoEfficient, LLC., et al*, pending in the 116th Judicial District Court, Dallas County, Texas

Dear Clerk:

      On January 9, 2018, CoEfficient, LLC and TelEfficient, LLC's First Amended Counterclaim was filed in the above-referenced matter. Please issue citations on Counter-Defendants as follows:

| Genband Holdings Company | Genband US, LLC |
|---|---|
| c/o Corporation Service Company d/b/a CSC-Lawyers Inc., its registered agent | c/o Corporation Service Company d/b/a CSC-Lawyers Inc., its registered agent |
| 211 E. 7th St. #620 | 211 E. 7th St. #620 |
| Austin, TX 78701 | Austin, TX 78701 |

      Thank you for your assistance. Please contact me if you have any questions.

                      Respectfully submitted,

                      Tyler J. Bexley

TJB:alh

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

## AGREED PROTECTIVE ORDER

Upon motion of the parties and for good cause shown, the Court hereby enters the following Agreed Protective Order to govern the exchange of confidential materials in this action.

**IT IS HEREBY ORDERED** that:

1.  The terms and conditions of this Order shall govern the production and handling of documents, answers or responses to interrogatories, responses to requests for admission, depositions, and other discovery exchanged in the above-referenced litigation (this "Litigation"), including materials produced by third parties in response to discovery requests or subpoenas.

2.  **Definitions.** For purposes of this Protective Order, the term "Party" shall mean any party to this Litigation. The term "Producing Party" shall mean any Party to this Litigation who produces or discloses information or materials in the Litigation or whose witnesses give deposition testimony. The term "Producing Party" also shall include any non-party who agrees, in writing, to be bound by the terms of this Protective Order pursuant to Paragraph 9, *infra*, and produces or discloses information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to Paragraphs 4 and 5, *infra*, in the Litigation. The term "Receiving Party" shall mean any Party to whom information or materials are produced or disclosed in this Litigation, or who elicits deposition testimony from a Producing Party. The term "Receiving Party" also shall include any non-party who agrees, in writing, to be bound by the terms of this Protective Order pursuant to Paragraph 9, *infra*, and receives information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to Paragraphs 4 and 5,

1

*infra*, in the Litigation. The term "Confidential Material" means any documents or information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to the terms herein. The words "document" and "documents" shall mean all written or electronic documents, data, materials, videotapes, and other tangible items, and all information contained therein or that can be derived therefrom.

3. **Designation of Confidential Documents.** A Producing Party may designate as CONFIDENTIAL any document or information (including discovery responses or portions thereof), not in the public domain, which that Party reasonably deems to set forth proprietary, non-public, commercial, or trade secret information with respect to the Producing Party, or confidential information belonging to non-parties. All such designations shall be made reasonably and in good faith. The Producing Party shall make such designation at the time of delivery of a copy of the document or information to the Receiving Party. The designation CONFIDENTIAL shall be made by stamping or writing the word "CONFIDENTIAL" on the face of the copy of the document or information so designated in a manner so as not to obscure the contents of the document.

4. **Designation of Attorney's Eyes Only Documents.** A Producing Party may designate as ATTORNEY'S EYES ONLY any document or information (including discovery responses or portions thereof) that meet the definition of CONFIDENTIAL, *supra*, and also is highly sensitive such that if disclosed to persons other than outside counsel would reveal significant technical or business advantages of the Producing Party or a non-party, which could reasonably be expected to result in injury to the Producing Party or non-party. All such designations shall be made reasonably and in good faith. A document should not be designated ATTORNEY'S EYES ONLY if the designation of CONFIDENTIAL would protect any Party's or non-party's interest. The Producing Party shall make such designation at the time of delivery of a copy of the document or information to the Receiving Party. The designation ATTORNEY'S EYES ONLY shall be made by stamping or writing the words "ATTORNEY'S EYES ONLY" on the face of the copy of the document or information so designated in a manner so as not to obscure the contents of the document.

5. **Designation of Confidential or Attorney's Eyes Only Deposition Testimony**. A Producing Party may, on the record of a deposition, or within 10 days after receipt of the transcript(s) from such deposition, designate in good faith any portion or portions of such transcript(s), including exhibits and videotape, as CONFIDENTIAL or ATTORNEY'S EYES ONLY if it qualifies for either such designation. When doing so, the party seeking the confidentiality designation must provide the page and line numbers of the testimony deemed CONFIDENTIAL or ATTORNEY'S EYES ONLY and exhibits by exhibit number. After the expiration of 10 days, if no confidentiality designation is made, the entire deposition transcript will then be deemed non-confidential.

6. Notwithstanding any provision in this agreement to the contrary, all documents produced in this case shall only be used for purposes of this litigation.

7. Non-parties, including retained experts and parties responding to subpoenas, may accept and agree to be bound by the terms of this Protective Order, provided that each such non-

2

party first shall execute an acknowledgment and agreement, in the form attached hereto as Exhibit A. A non-party to this Litigation that agrees to be bound by the terms of this Protective Order may designate as CONFIDENTIAL or ATTORNEY'S EYES ONLY as defined in Paragraphs 5 and 6, *supra*, any discoverable documents or information being produced by the non-party, by means of the procedures described in Paragraphs 5 and 6, *supra*. All documents or information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY by a non-party in accordance with the terms of this Protective Order shall be treated by the Parties as Confidential Material.

8.    Notwithstanding the foregoing, a Party's or non-party's inadvertent failure to designate a document or information as Confidential Material as set forth herein, shall not constitute a waiver of any claim that the inadvertently disclosed material is entitled to protection under this Protective Order. Upon learning of an inadvertent failure to designate a document or information as Confidential Material, a Party or non-party may so designate a document or information as CONFIDENTIAL or ATTORNEY'S EYES ONLY, with the effect that the designated document or information thereafter shall be subject to the protections of this Protective Order.

9.    **Permitted Use and Disclosure of Confidential Documents.** Information designated as "CONFIDENTIAL" shall be used solely for the purpose of this Litigation and shall not be used for any other purpose, including without limitation, any business, proprietary, or commercial purpose. Confidential Material may be disclosed, summarized, described, characterized, or otherwise communicated or made available in whole or in part only to the following persons:

A.    Parties to this Litigation and counsel for the Parties to this Litigation, including their employees, officers, and agents;

B.    The Court, any Special Masters, or Mediators appointed by the Court;

C.    Stenographic personnel, court reporters, videographers, graphic support, photocopying, document imaging, or database services providing services in the Litigation;

D.    Potential or actual experts, contractors, or consultants retained by a Party for purposes of the Litigation, provided that each such expert, contractor or consultant executes an acknowledgment in the form attached as Exhibit A, agreeing to be bound by the provisions of this Protective Order;

E.    Any person who prepared, permissibly received, or reviewed the Confidential Material prior to its production or prior to testimony in this case and who executes an acknowledgment in the form attached as Exhibit A; and

F.    Persons who, in addition to those identified above, are permitted access by order of the Court or upon stipulation of the Producing Party.

10.    **Permitted Use and Disclosure of Attorney's Eyes Only Documents.** Information designated as "ATTORNEY'S EYES ONLY" shall be used solely for the purpose of this

3

Litigation and shall not be used for any other purpose, including without limitation, any business, proprietary, or commercial purpose. Attorney's Eyes Only Documents may be disclosed or made available in whole or in part only to the following persons:

A.     Outside counsel of record for the Parties to this Litigation, including their employees, officers, and agents;

B.     The Court, any Special Masters, or Mediators appointed by the Court;

C.     Stenographic personnel, court reporters, videographers, graphic support, photocopying, document imaging, or database services providing services in the Litigation;

D.     Potential or actual experts, contractors, or consultants retained by a Party specifically for purposes of the Litigation, provided that each such expert, contractor or consultant executes an acknowledgment in the form attached as Exhibit A, agreeing to be bound by the provisions of this Protective Order;

E.     Any person who prepared, permissibly received, or reviewed the document prior to its production or prior to testimony in this case and who executes an acknowledgment in the form attached as Exhibit A;

F.     Persons who, in addition to those identified above, are permitted access by order of the Court or upon stipulation of the Producing Party.

11.     **Notice of Use and Disclosure of Confidential or Attorney's Eyes Only Documents.** Prior to review of Confidential or Attorney's Eyes Only Documents by persons identified in Paragraphs 9D, 9E, 10D or 10E of this Protective Order, a Party must provide notice to the Producing Party. Upon receipt of such notice, a Producing Party may challenge the release of Confidential or Attorney's Eyes Only Documents to the persons identified in Paragraphs 9D, 9E, 10D or 10E within (5) business days. The Producing Party shall state the objection by letter to counsel of record for the requesting Party and copy all counsel of record in this Litigation. After providing this notice of objection, the Parties shall confer within five (5) calendar days in an attempt to resolve the dispute regarding the release of the documents or information. If the Parties are unable to resolve the dispute, the requesting Party may move the Court to allow the person identified in Paragraphs 9D, 9E, 10D or 10E of this Protective Order to review the Confidential or Attorney's Eyes Only Documents subject to the other conditions of this Protective Order. In resolving any such motion, the Producing Party shall have the burden of demonstrating that the benefit of allowing the person to review the document or information at issue does not outweigh the potential harm to the Producing Party. Until the Court rules on the motion, the relevant documents or information shall continue to be treated by each Party or participating non-party as designated.

12.     Nothing in this Protective Order shall bar or otherwise restrict outside counsel from rendering advice to his or her client with respect to this Litigation and, in the course thereof, from discussing in a general way Confidential Material.

13.  Counsel of record for the Parties shall employ reasonable protective measures to ensure that the information and documents governed by this Protective Order are used only for the purposes specified herein, and disclosed only to authorized persons.  All Confidential Material shall be kept in a secure manner by each Party and by those who are authorized to have access to such material.

14.  **Filing Under Seal.** The Producing Party seeking to protect any Confidential Material shall have the burden to request that the Court seal any filed Confidential Material in this Litigation pursuant to Texas Rule of Civil Procedure 76a.  The Party seeking to file any papers with or otherwise use any Highly Confidential or Confidential Discovery Material in open court shall provide reasonable notice to the Producing Party in advance of such use.  If the Producing Party desires for such Confidential Material to be filed under seal, the filing Party shall use the e-filing designation "Contains Sensitive Material" to initially file the Confidential Material.  The Producing Party shall then have the burden to file a motion for the Court to maintain the material under seal.

15.  If a Party or participating non-party that has obtained Confidential Material pursuant to this Protective Order: (a) is subpoenaed in another proceeding; (b) is served with a demand in another action to which it is a party; (c) is served with any other legal process by one not a Party to this Litigation; or (d) is otherwise required to provide material to a regulatory entity or body; and in any such case, the subpoena, demand, legal process, or requirement to produce would require disclosure of Confidential Material produced or provided in this Litigation by another Party or non-party, the Party or participating non-party shall give prompt written notice of its receipt of such subpoena, demand, legal process, or requirement to produce to all counsel of record so as to allow any Party or Producing Party at least ten (10) days, or such lesser time as such subpoena, demand, legal process, or other requirement to produce specifies for production, to intercede and protect its rights.  Provided that such notice is given, nothing herein shall be construed as requiring any Party or anyone else covered by this Protective Order to challenge or appeal any order requiring production of any Confidential Material, or to subject itself to any penalties for non-compliance with any subpoena, demand or legal process or to seek any related relief from this or any Court.  In the event that a regulatory entity or body requires a Party or participating non-party to disclose to it Confidential Material subject to this Protective Order before the Party or participating non-party can practicably provide written notice to of the requirement to counsel of record for the Party who provided the Confidential Material, the Party or participating non-party may comply with the requirements of the regulatory entity or body, provided that the Party or participating non-party so required to disclose Confidential Material to a regulatory entity or body shall notify counsel of record for the Party that provided the Confidential Material immediately, but in no event more than four (4) business days thereafter.

16.  Nothing in this Protective Order is intended to determine or affect, in any way, the admissibility of Confidential Material.  Furthermore, nothing herein shall be deemed to restrict in any manner any Party's dissemination or use of its own Confidential Material.

17.  In the event any Confidential Material is, either intentionally or inadvertently, disclosed to someone not authorized to receive such material under this Protective Order, or, if a

person so authorized breaches any of his or her obligations under this Protective Order, counsel of record for the Party involved immediately shall disclose the unauthorized disclosure or breach to the Producing Party's counsel of record, and also shall use his or her best efforts to obtain the return of all copies of the Confidential Material and to prevent any further disclosures of the same.

18. **Challenge to Confidential and/or Attorney's Eyes Only Designations.** A Party may challenge a Producing Party's designation at any time. If any Party objects to the designation by a Producing Party of any document or information as CONFIDENTIAL or ATTORNEY'S EYES ONLY, the Party so objecting shall state the objection by letter to counsel of record for the Producing Party and copy all counsel of record in this Litigation. If the designation is made at or during a deposition, any objection to designation may be alternatively made on the record. After providing this notice of objection, the Parties and any other Producing Party or its counsel shall confer within five (5) calendar days in an attempt to resolve the dispute regarding the designation of the documents or information. If the Parties are unable to resolve the dispute, the objecting Party may move the Court to remove the designation of CONFIDENTIAL or ATTORNEY'S EYES ONLY after in camera review. In resolving any such motion, the Producing Party shall have the burden of demonstrating that the document or information at issue constitutes CONFIDENTIAL or ATTORNEY'S EYES ONLY material in accordance with Paragraphs 5 and 6. Until the Court rules on the motion, the relevant documents or information shall continue to be treated by each Party or participating non-party as designated.

19. **Inadvertent Production.** Inadvertent production of any document that a party or non-party later claims should not have been produced because of a privilege, including but not limited to the attorney-client privilege or work product doctrine ("Inadvertently Produced Privileged Document"), will not be deemed to waive any privilege, provided that the Producing Party shall promptly notify the Receiving Party in writing of such inadvertent production. The Producing Party may request the return of any Inadvertently Produced Privileged Document. A request for the return of an Inadvertently Produced Privileged Document shall identify the document inadvertently produced and the basis for withholding such document from production. If a Party or non-party requests the return, pursuant to this paragraph, of any Inadvertently Produced Privileged Document then in the custody of another Party or non-party, such other party shall within five (5) business days (a) return to the requesting Party or non-party the Inadvertently Produced Privileged Document and copies thereof; (b) destroy all notes or other work product reflecting the content of such Inadvertently Produced Privileged Documents; and (c) delete any such Inadvertently Produced Privileged Documents from any litigation-support database or any other means of electronically storing information. The party returning such material may then move the Court for an order compelling production of the material, but that party shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production. Once information is determined to be Inadvertently Produced Privileged Documents and subject to this paragraph, the Receiving Party shall not disclose or use any Inadvertently Produced Privileged Documents in this Litigation or for any other purpose, unless and until the Court orders otherwise.

20.     Nothing herein shall preclude any Party or non-party seeking an order from the Court that any portion of the evidence be taken in camera, with all related testimony and Confidential Material sealed and withheld from the general public.

21.     In the event anyone subject to the terms of this Protective Order shall violate or threaten to violate the terms of this Protective Order, the aggrieved Party immediately may apply to obtain injunctive relief against any such person violating or threatening to violate any of the terms of this Protective Order, and in the event that the aggrieved Party does so, the responding Party subject to the provisions of this Protective Order shall not employ as a defense thereto the claim that the aggrieved Party possesses an adequate remedy at law.


SIGNED: _____, 2018.


_____

HON. TONYA PARKER


AGREED:


 _s/ Jonathan Rubenstein_____
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendants


 _s/ Tyler J. Bexley_____
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs


7

256

**Exhibit A**

CAUSE NO.  DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

I, _____, do hereby certify that I have read and agree to be bound by and subject to that certain Agreed Protective Order dated _____, 2018, entered in the above-referenced action, and I subject myself to the jurisdiction and venue in the above-referenced Court, for purposes of enforcement of such Agreed Protective Order.  I understand that all documents produced in this case may only be used for purposes of this litigation and that I am bound by the Agreed Protective Order not to disclose the documents or otherwise share the information I review.

This _____ day of _____, 2018.


_____

Printed Name


_____

Signature

8

FILED
DALLAS COUNTY
8/7/2018 10:57 AM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

### JOINT MOTION FOR ENTRY OF AGREED PROTECTIVE ORDER

Plaintiff/Counter-Defendant GENBAND Management Services Corporation, Defendants/Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC, and Counter-Defendants GENBAND Holdings Company and GENBAND US, LLC file this Joint Motion and respectfully request that the Court enter the contemporaneously filed Agreed Protective Order. The parties anticipate that they will exchange documents and information in discovery that is confidential and proprietary. Accordingly, pursuant to the Texas Rules of Civil Procedure, there is good cause for the Court to enter the Agreed Protective Order to govern the exchange of confidential information.

---

**JOINT MOTION FOR ENTRY OF AGREED PROTECTIVE ORDER—Page 1 of 3**

Respectfully submitted,


By:  _s/ Jonathan Rubenstein_
     Jonathan Rubenstein
      jonathan.rubenstein@bakerbotts.com
      Texas Bar No. 24037403
     Susan Kennedy
      susan.kennedy@bakerbotts.com
      Texas Bar No. 24051663
     Amy C. Heard
      amy.heard@bakerbotts.com
      Texas Bar No. 24097818

     BAKER BOTTS L.L.P.
     2001 Ross Avenue
     Dallas, Texas 75201
     Telephone: (214) 953-6500

**ATTORNEYS FOR PLAINTIFF AND
COUNTER-DEFENDANTS**


By:  _s/ Tyler J. Bexley_
     Tyler J. Bexley
      State Bar No. 24073923
      tyler.bexley@rm-firm.com
     **REESE MARKETOS LLP**
     750 N. Saint Paul St., Suite 600
     Dallas, Texas 75201-3201
     214.382.9810 telephone
     214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS AND
COUNTER-PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

_s/ Tyler J. Bexley_
Tyler J. Bexley

FILED
DALLAS COUNTY
8/22/2018 4:12 PM
FELICIA PITRE
DISTRICT CLERK

Cause No. DC-16-12593

| | | |
|---|---|---|
| GENBAND Management Services Corporation, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| v. | § § | |
| CoEfficient, LLC; TelEfficient, LLC. | § § | DALLAS COUNTY, TEXAS |
| Defendants/ Defendants, | § § § | |
| v. | § § § | |
| GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC, Counter-Defendants | § § § § | 116th JUDICIAL DISTRICT |

## GENBAND MANAGEMENT SERVICES CORPORATION'S, GENBAND HOLDINGS COMPANY'S, AND GENBAND US, LLC'S ORIGINAL ANSWER TO DEFENDANTS' FIRST AMENDED COUNTERCLAIM

GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC (collectively "GENBAND") file this Original Answer to the First Amended Counterclaim filed by Defendants/Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC (collectively, "Defendants").

## INTRODUCTION

Defendants' First Amended Counterclaim ("Counterclaim") includes five causes of action, all stemming from a relationship between the parties memorialized by a Teaming Agreement, a Revolving Credit Note, and three Promissory Notes. Defendants allege that GENBAND improperly used Defendants' trade secrets to close deals that did not benefit Defendants, in violation of the contracts between the parties. GENBAND denies these

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**                    - 1 -

allegations, and specially excepts to several aspects of the Counterclaim.

As to GENBAND Management Services Corporation, the Counterclaim fails to give fair and adequate notice as to the Misappropriation of Trade Secrets claim and the Breach of Contract claim (to the extent it is asserted against GENBAND Management Services) because the Counterclaim fails to plead the trade secret with sufficient particularity to provide GENBAND notice of the harm alleged. Not only is the trade secret not defined sufficiently for GENBAND to know *what* it has allegedly misappropriated, the Counterclaim makes no allegations as to *how* or *when* the "trade secrets" were misappropriated. The pleading is insufficient on at least those grounds.

As to GENBAND US, LLC, the Counterclaim similarly fails to give fair and adequate notice as to the Misappropriation of Trade Secrets and the Breach of Contract claims because the Counterclaim fails to plead the trade secret with sufficient particularity to provide GENBAND notice of the harm alleged. Not only is the trade secret not defined sufficiently for GENBAND to know *what* it has allegedly misappropriated, the Counterclaim makes no allegations as to *how* or *when* the "trade secrets" were misappropriated or how GENBAND allegedly used the purported trade secrets in violation of a contract between the parties. The pleading is insufficient on at least those grounds.

Furthermore, as to GENBAND Holdings Company ("GENBAND Holdings"), Defendants fail to plead any facts that would support imposing liability on it for fraud, fraudulent inducement, negligent misrepresentation, trade secret misappropriation, or breach of contract causes of action, as Defendants' own allegations establish that GENBAND Holdings was not a party to any of the agreements at issue, including the Teaming Agreement, NDA, Revolving Credit Note or any of the three Promissory Notes. Moreover, the Counterclaim does not include

any allegations that anyone acting on behalf of GENBAND Holdings took any actions – related to the alleged trade secrets or otherwise – in connection with this dispute, let alone any of the alleged misconduct.

The defects in the specially-excepted causes of actions against GENBAND Holdings cannot be cured with further amendment and therefore require dismissal of the Counterclaim as to these claims.

The Counterclaim also fails to specify the maximum amount of damages Defendants seek. Pursuant to Texas Rule of Civil Procedure 47, the Court is requested to require Defendants to do so.

# GENERAL DENIAL

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC each generally denies each and every allegation in Defendants' First Amended Counterclaim, and any amendment or supplement thereto, and demands that Defendants strictly prove each claim by a preponderance of the credible evidence or other applicable burden of proof. GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC further demand proof of exemplary damages by clear and convincing evidence.

GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC reserve the right to amend and/or supplement this original answer at a future time and in conformity with the Texas Rules of Civil Procedure.

# SPECIAL EXCEPTIONS

## Argument and Authorities

"When a plaintiff's pleading does not give 'fair and adequate notice of the facts upon

which the pleader bases his claim,' then the defendant may file special exceptions to obtain a more definite statement of the plaintiff's claim." *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 865 (Tex. 2005) (quoting *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982)). Special exceptions are used to point out a "defect, omission, obscurity, duplicity, generality, or other insufficiency in the allegations" contained in the excepted-to pleadings. TEX. R. CIV. P. 91. If the pleading defect cannot be cured by amendment, a court may dismiss the case with prejudice without giving the plaintiffs an opportunity to amend. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (per curiam) (dismissing plaintiff's breach of contract claim and granting special exceptions because plaintiff could not have corrected his defects by repleading); *see also Wagner ex rel. Nationwide Mut. Tex. Emps. v. Nationwide Lloyds*, No. 03-07-00292-CV, 2008 WL 537484, at *3–4 (Tex. App.—Austin Feb. 27, 2008, no pet.) (mem. op.) (holding that because the plaintiffs "failed to state a cause of action and such defect could not be cured by amending their pleadings, the trial court did not err in dismissing [plaintiffs'] claims with prejudice").

**Special Exception No. 1: GENBAND Holdings, Counts I, II, III, and V**

GENBAND Holdings specially excepts to Defendants' common law fraud (Count I), fraudulent inducement (Count II), negligent misrepresentation (Count III), and breach of contract (Count V) (to the extent that cause of action is asserted against GENBAND Holdings) causes of action against it generally, and paragraphs 44-49, 51-55, 57-61, and 70-74 specifically, because the Counterclaim fails to allege any facts that would make the alleged causes of action applicable to GENBAND Holdings.

The Counterclaim fails to allege how Defendants could have relied on any statement made by GENBAND Holdings, as it has not alleged that anyone working on behalf of

ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM                    - 4 -

GENBAND Holdings took any action or made any statements. GENBAND Holdings is not a party to any of the agreements at issue in this dispute, and Defendants have not alleged any misrepresentation or omission made by anyone acting on behalf of GENBAND Holdings on which Defendants relied or could have relied that led to the alleged injury. Reliance is an element required for Defendants' common law fraud (Count I), fraudulent inducement (Count II), and negligent misrepresentation (Count III) causes of action, and the pleading is devoid of any allegation of at least that element. *See, e.g., Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam) (common law fraud requires reliance on a misrepresentation); TEX. BUS. & COM. CODE ANN. § 27.01 (West 2015) (requiring reliance on a misrepresentation as an element of statutory fraud); *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001) (clarifying that the reliance element for fraud is heightened in fraudulent inducement cases); *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (negligent misrepresentation requires reliance on a misrepresentation).

Defendants have failed to give fair and adequate notice as to Counts I, II, III, and V against GENBAND Holdings. Defendants should be required to amend their pleading to cure these fatal deficiencies and, if they are unable to do so, Defendants' claims against GENBAND Holdings for fraud, fraudulent inducement, negligent misrepresentation, and breach of contract (to the extent it is asserted against GENBAND Holdings) should be dismissed with prejudice.

**Special Exception No. 2: GENBAND Holdings, Count IV**

GENBAND Holdings specially excepts to Defendants' misappropriation of trade secrets cause of action (Count IV) against it generally, and paragraphs 63-69 specifically, because the Counterclaim fails to allege any facts that would make the alleged cause of action applicable to GENBAND Holdings.

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**

The Counterclaim alleges that "GENBAND was provided access to Counter-Plaintiffs' trade secrets under a Non-Disclosure Agreement," but GENBAND Holdings was not a party to the agreement and nowhere does the Counterclaim explain when or how GENBAND Holdings would have otherwise "accessed and/or used [TelEfficient's] trade secrets" (¶ 67). Defendants therefore fail to allege that GENBAND Holdings has acquired the purported trade secrets. Furthermore, Defendants have not alleged that any such acquisition occurred by improper means.

The Counterclaim fails to allege *any* facts regarding the trade secrets claim other than a boilerplate recitation of the elements of the cause of action. But regardless of any factual allegations that can be read or amended to assert a misappropriation of trade secrets claim, Defendants have not alleged any facts describing any action taken by any person on behalf of GENBAND Holdings, let alone any that could give rise to a misappropriation of trade secrets claim. The Counterclaim fails to plead the claim with reasonable particularity to give GENBAND Holdings sufficient information to prepare a defense. *Odela Group, LLC v. Double-R Walnut Mgmt., L.L.C.*, 2017 WL 1360209, at *4 (Tex. App.—Dallas Apr. 12, 2017, no pet.) ("The purpose of the fair notice requirement is to provide the opposing party with sufficient information to enable him to prepare a defense.")

Defendants have failed to give fair and adequate notice as to Count IV against GENBAND Holdings. Defendants should be required to amend their pleading to cure these fatal deficiencies and, if they are unable to do so, Defendants' claim against GENBAND Holdings for misappropriation of trade secrets should be dismissed with prejudice.

**Special Exception No. 3: GENBAND, US, LLC Count V**

GENBAND US, LLC specially excepts to the Counterclaim in its entirety and the breach of contract claim (Count V) paragraphs 72-74 specifically because the Counterclaim fails to

plead necessary information with reasonable particularity to give GENBAND US, LLC sufficient information to prepare a defense. *See Odela Group*, 2017 WL 1360209, at *4.

The Counterclaim fails to allege *any* facts regarding the breach of contract claim other than a boilerplate recitation of the elements of the cause of action stating that GENBAND disclosed proprietary information in violation of a contract. The Counterclaim refers to "a unique solution," complex "financial instruments," and a "model" but never alleges what the proprietary information is with enough specificity for GENBAND U,S LLC to know what it is accused of having disclosed outside the scope of the contracts (¶ 17). The Counterclaim also never alleges how GENBAND US, LLC used the proprietary information, much less how that use exceeded the scope of the contracts (¶ 17). Finally, the Counterclaim fails to plead *when* or *to whom* GENBAND US, LLC breached either the Teaming Agreement or the NDA.

Defendants have failed to give fair and adequate notice as to Count V against GENBAND US, LLC. Defendants should be required to amend their pleading to cure these fatal deficiencies and, if they are unable to do so, Defendants' claims against GENBAND for breach of contract should be dismissed with prejudice.

**Special Exception No. 4: GENBAND, Count II**

GENBAND specially excepts to the Counterclaim in its entirety and paragraph 54 specifically due to Defendants' failure to plead the required element of a fraudulent inducement cause of action that the Notes are binding agreements. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001) ("Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim."). GENBAND respectfully requests that Defendants be required to replead their claim to cure the identified pleading defect. GENBAND further requests that, if the Court orders Defendants to replead and Defendants do not or cannot cure the pleading defects, the Court dismiss Defendant's fraudulent inducement claim against GENBAND with prejudice.

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**          - 7 -

**Special Exception No. 5: GENBAND, Count IV**

GENBAND specially excepts to the Counterclaim in its entirety and the misappropriation of trade secrets claim (Count IV) paragraph 64 specifically, because the Counterclaim fails to plead the trade secret with reasonable particularity to give GENBAND sufficient information to prepare a defense. *Odela Group, LLC v. Double-R Walnut Mgmt., L.L.C.*, 2017 WL 1360209, at *4 (Tex. App.—Dallas Apr. 12, 2017, no pet.) ("The purpose of the fair notice requirement is to provide the opposing party with sufficient information to enable him to prepare a defense.")

The Counterclaim fails to allege *any* facts regarding the trade secrets claim other than a boilerplate recitation of the elements of the cause of action. Without more, GENBAND cannot know *what* information it is accused of having misappropriated. The Counterclaim also fails to plead *how* GENBAND misappropriated the trade secret with reasonable particularity to give GENBAND sufficient information to prepare a defense. Finally, the Counterclaim fails to plead *when* GENBAND misappropriated the trade secret.

Defendants have failed to give fair and adequate notice as to Count IV against GENBAND. Defendants should be required to amend their pleading to cure these fatal deficiencies and, if they are unable to do so, Defendants' claims against GENBAND for misappropriation of trade secrets should be dismissed with prejudice.

**Special Exception 6: GENBAND – Damages**

GENBAND specially excepts to the Counterclaim in its entirety and paragraphs 49, 55, 61, 68, 74, and 76 under Texas Rule of Civil Procedure 47, and request that Defendants be required to amend their pleading to specify the maximum amount of damages claimed against GENBAND Management Services Corporation, GENBAND Holdings Company and GENBAND US, LLC.

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**

- 8 -

<u>**AFFIRMATIVE DEFENSES**</u>

**Defendants' Counterclaims are Barred by the Notes.**

In the August 8, 2014, December 18, 2014, and May 9, 2015 Promissory Notes (collectively, "the Promissory Notes," and with the April 1, 2014 Revolving Credit Note, "the Notes"), TelEfficient agreed to "waive[] any setoff, defense, or counterclaim that [CoEfficient] may have" against GENBAND. Furthermore, in the August 8, 2014 Promissory Note, CoEfficient agreed to "waive[] any setoff, defense, or counterclaim that [TelEfficient] may have" against GENBAND under the Revolving Credit Note. Each of Defendants' Counterclaims has thus been waived contractually with respect to all the Notes.

**Defendants' Fault Contributed to their Injury.**

Defendants' own acts or omissions caused their alleged injury of the alleged "expenditure of millions of dollars." Defendants' Counterclaim ¶¶ 45, 57. Defendants represented to GENBAND that TelEfficient's proprietary financial model would provide value to GENBAND's customers and make switch upgrades more cost-effective. Pursuant to this claim, Defendants negotiated the Notes and used the funds received under the Notes' terms, allegedly to support the financial model and demonstrate its value to GENBAND customers. GENBAND exercised no control over how Defendants ran, marketed, or budgeted their business, and Defendants' inability to obtain financing agreements is ultimately due to their own acts or omissions. GENBAND is not responsible for Defendants' actions.

**Defendants Ratified each Note by their Continued Negotiation of Essential Terms and Acceptance of Further Loans.**

When the August 8, 2014 Note was executed, Defendants had knowledge that despite GENBAND's alleged representations to the contrary, the AT&T deal was not going to use TelEfficient financing. Defendants' Counterclaim ¶ 27. Despite this knowledge, Defendants

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**                                   - 9 -

entered into the August 8, 2014 Promissory Note with GENBAND. Furthermore, CoEfficient agreed to guarantee the Revolving Credit Note, despite actual knowledge of GENBAND's alleged prior misrepresentations and the result of AT&T's financing decisions. *Id.* These actions ratified the Revolving Credit Note.

When the May 9, 2015 Note was executed, Defendants had actual knowledge that the AT&T deal had not used TelEfficient financing, despite GENBAND's alleged representations that it would, and that the Verizon deal was not going to use TelEfficient financing, despite GENBAND's alleged representations that it would. Defendants' Counterclaim ¶¶ 27, 31. Nonetheless, Defendants entered into an additional promissory note with GENBAND. This action ratified the Revolving Credit Note, August 8, 2014 Note and December 18, 2014 Note.

On January 15, 2015, Defendants requested an extension of the maturity date of the Revolving Credit Note, the August 8, 2014 Promissory Note and the December 18, 2014 Promissory Note. Defendants' Counterclaim ¶ 36. This conduct recognizes that the contracts were binding, and ratifies the Revolving Credit Note, the August 8, 2014 Promissory Note and the December 18, 2014 Promissory Note.

In July 2015, Defendants requested further extension of the maturity date of the Notes. Defendants' Counterclaim ¶ 36. This conduct recognizes that the contracts were binding, and ratifies the Revolving Credit Note, the August 8, 2014 Promissory Note and the December 18, 2014 Promissory Note.

**Defendants' Counterclaims are Barred by the Statute of Frauds.**

To the extent Defendants allege GENBAND made oral misrepresentations that were extraneous to the Notes, such oral agreements are unenforceable and any fraud, fraudulent inducement or negligent misrepresentation claim arising from them is barred by the statute of frauds.

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**                    **- 10 -**

Such allegations are further barred by the Notes, which specify that "no amendment, modification or waiver of any provision of this Note nor consent to any departure by the Borrower therefrom shall be effective, irrespective of any course of dealing, unless the same shall be in writing and signed by the Lender. . . .This Note cannot be changed or terminated orally or by estoppel or waiver or by any alleged oral modification."

**Defendants' Fraud and Negligent Misrepresentation Counterclaims are Barred by their Breach of Contract.**

Defendants cannot support a claim for negligent misrepresentation because the Teaming Agreement and the Notes are enforceable contracts between the parties. The injury alleged in this action is related to the subject matter of the contracts, and Texas law bars the recovery of tort damages for injuries sounding in contract.

**Defendants' Counterclaims are Barred by Estoppel by Contract.**

To the extent Defendants seek to avoid repayment of the valid and fully executed Notes, such an action is barred by estoppel by contract. Defendants are estopped to deny facts set forth in the contract, including the loan amount, interest rate and maturity date.

**Defendants' Counterclaims are Barred by the Doctrine of Promissory Estoppel.**

To the extent Defendants allege misrepresentations outside the scope of the contract, their claims are barred by promissory estoppel. Defendants represented that the cost benefit of their proprietary financing model would be attractive to companies like AT&T and Verizon if Defendants had enough capital to demonstrate the cost efficiencies of the switch upgrade and proprietary financing model. GENBAND reasonably and substantially relied on that promise to its detriment. Defendants should have known that refusing to repay the Notes would cause GENBAND definite and substantial injury. Injustice can be avoided only by enforcing the Notes.

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**

**Defendants' Counterclaims are Barred by the Doctrine of Quasi-Estoppel.**

To the extent Defendants allege misrepresentations outside the scope of the contract, their claims are barred by the doctrine of quasi-estoppel. Defendants accepted the benefit of the bargain in the form of $610,000 in principal. Their present position is inconsistent with the agreements made to repay that principal at negotiated interest rates. It would be unconscionable to allow the Defendants to now avoid repaying the money they accepted, and would disadvantage GENBAND, who has lost $610,000 and the associated time-value of that sum.

**Defendants do Not Have Standing to Bring a Misappropriation of Trade Secrets Claim**

To the extent any trade secrets exist, Defendants do not have standing to bring a misappropriation of trade secrets claim because they do not own those trade secrets. Intellectual property developed while employed to develop intellectual property becomes the employer's intellectual property. *See Brown v. Alcatel USA*, Inc., 2004 WL 1434521, at *1 (Tex. App.—Dallas June 28, 2004, pet. denied) (granting summary judgment for employer awarded intellectual property rights to methodology conceived of by former employee during the term of his employment). Carbon War Room is a "think tank" with a purpose to "reduce the capital costs and market barriers that make energy efficient and low-carbon projects difficult for businesses"—precisely the sort of business solution Mr. Armbruster is now claiming as his personal intellectual property. (First Amended Counterclaim ¶ 17). Defendants' pleadings state that Mr. Armbruster "developed a unique solution" to address a problem he noticed *while at the Carbon War Room*. (First Amended Counterclaim ¶ 17). The Counterclaim goes on to state that after conceiving of the model while at the Carbon War Room, Mr. Armbruster went on to develop the model "in conjunction with an investor group." *Id*. Given those pleaded facts, any trade secrets at issue belong to the Carbon War Room or the investors who backed the development of the alleged trade secret. Without ownership of the trade secrets at issue,

Defendants cannot claim they were injured by any alleged misappropriation. Without injury there is no personal stake in the litigation, and thus no standing. *The M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 707–08 (Tex. 2001) ("His lack of any actual or threatened injury prevents him from being "personally aggrieved" such that he has any personal stake in the litigation.")

### CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons and as to all of the above specific Special Exception Nos. 1-6, GENBAND requests that the Court set a hearing, and after such hearing, sustain each special exception. As to Special Exception Nos. 3-6, GENBAND requests that the Court require Defendants to replead their Counterclaim in accordance with this special exception or have Defendants' claims dismissed. Additionally, as to Special Exception 1-2, GENBAND Holdings requests that the Court dismiss the excepted-to claims, with a finding that these defects cannot be cured. GENBAND Holdings respectfully requests that the Court then enter judgment that Defendants take nothing as to the excepted-to claims.

As to Defendants' misappropriation of trade secrets claim, GENBAND respectfully requests this Court award attorney's fees as provided under the Texas Uniform Trade Secrets Act for claims made in bad faith, as Defendants do not have ownership of the trade secret for which they seek recovery.

GENBAND further requests that the Court grant any other relief to which it may be justly or equitably entitled under the law.

Dated: February 2, 2018                           Respectfully submitted,

                                                  */s/ Jonathan Rubenstein*

**ORIGINAL ANSWER TO DEFENDANTS' AMENDED COUNTERCLAIM**                           - 13 -

Jonathan Rubenstein
jonathan.rubenstein@bakerbotts.com
Texas Bar No. 24037403
Susan Kennedy
susan.kennedy@bakerbotts.com
Texas Bar No. 24051663
Amy C. Heard
amy.heard@bakerbotts.com
Texas Bar No. 24097818

BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Telephone:     (214) 953-6500

**ATTORNEYS FOR PLAINTIFF
GENBAND MANAGEMENT
SERVICES CORPORATION,
GENBAND HOLDINGS COMPANY,
and GENBAND US, LLC**

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was served on the following counsel

of record pursuant to the Texas Rules of Civil Procedure:

Tyler J. Bexley
tyler.bexley@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3202
Telephone:      (214) 382-9810
Facsimile:      (214) 501-0731

ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS
COEFFICIENT, LLC AND TELEFFICIENT, LLC

*/s/ Amy C. Heard*
Amy C. Heard

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § | 116th JUDICIAL DISTRICT |

## AGREED PROTECTIVE ORDER

Upon motion of the parties and for good cause shown, the Court hereby enters the following Agreed Protective Order to govern the exchange of confidential materials in this action.

**IT IS HEREBY ORDERED** that:

1.  The terms and conditions of this Order shall govern the production and handling of documents, answers or responses to interrogatories, responses to requests for admission, depositions, and other discovery exchanged in the above-referenced litigation (this "Litigation"), including materials produced by third parties in response to discovery requests or subpoenas.

2.  **Definitions.** For purposes of this Protective Order, the term "Party" shall mean any party to this Litigation. The term "Producing Party" shall mean any Party to this Litigation who produces or discloses information or materials in the Litigation or whose witnesses give deposition testimony. The term "Producing Party" also shall include any non-party who agrees, in writing, to be bound by the terms of this Protective Order pursuant to Paragraph 9, *infra*, and produces or discloses information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to Paragraphs 4 and 5, *infra*, in the Litigation. The term "Receiving Party" shall mean any Party to whom information or materials are produced or disclosed in this Litigation, or who elicits deposition testimony from a Producing Party. The term "Receiving Party" also shall include any non-party who agrees, in writing, to be bound by the terms of this Protective Order pursuant to Paragraph 9, *infra*, and receives information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to Paragraphs 4 and 5,

1

*infra*, in the Litigation. The term "Confidential Material" means any documents or information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to the terms herein. The words "document" and "documents" shall mean all written or electronic documents, data, materials, videotapes, and other tangible items, and all information contained therein or that can be derived therefrom.

3. **Designation of Confidential Documents.** A Producing Party may designate as CONFIDENTIAL any document or information (including discovery responses or portions thereof), not in the public domain, which that Party reasonably deems to set forth proprietary, non-public, commercial, or trade secret information with respect to the Producing Party, or confidential information belonging to non-parties. All such designations shall be made reasonably and in good faith. The Producing Party shall make such designation at the time of delivery of a copy of the document or information to the Receiving Party. The designation CONFIDENTIAL shall be made by stamping or writing the word "CONFIDENTIAL" on the face of the copy of the document or information so designated in a manner so as not to obscure the contents of the document.

4. **Designation of Attorney's Eyes Only Documents.** A Producing Party may designate as ATTORNEY'S EYES ONLY any document or information (including discovery responses or portions thereof) that meet the definition of CONFIDENTIAL, *supra*, and also is highly sensitive such that if disclosed to persons other than outside counsel would reveal significant technical or business advantages of the Producing Party or a non-party, which could reasonably be expected to result in injury to the Producing Party or non-party. All such designations shall be made reasonably and in good faith. A document should not be designated ATTORNEY'S EYES ONLY if the designation of CONFIDENTIAL would protect any Party's or non-party's interest. The Producing Party shall make such designation at the time of delivery of a copy of the document or information to the Receiving Party. The designation ATTORNEY'S EYES ONLY shall be made by stamping or writing the words "ATTORNEY'S EYES ONLY" on the face of the copy of the document or information so designated in a manner so as not to obscure the contents of the document.

5. **Designation of Confidential or Attorney's Eyes Only Deposition Testimony.** A Producing Party may, on the record of a deposition, or within 10 days after receipt of the transcript(s) from such deposition, designate in good faith any portion or portions of such transcript(s), including exhibits and videotape, as CONFIDENTIAL or ATTORNEY'S EYES ONLY if it qualifies for either such designation. When doing so, the party seeking the confidentiality designation must provide the page and line numbers of the testimony deemed CONFIDENTIAL or ATTORNEY'S EYES ONLY and exhibits by exhibit number. After the expiration of 10 days, if no confidentiality designation is made, the entire deposition transcript will then be deemed non-confidential.

6. Notwithstanding any provision in this agreement to the contrary, all documents produced in this case shall only be used for purposes of this litigation.

7. Non-parties, including retained experts and parties responding to subpoenas, may accept and agree to be bound by the terms of this Protective Order, provided that each such non-

party first shall execute an acknowledgment and agreement, in the form attached hereto as Exhibit A. A non-party to this Litigation that agrees to be bound by the terms of this Protective Order may designate as CONFIDENTIAL or ATTORNEY'S EYES ONLY as defined in Paragraphs 5 and 6, *supra*, any discoverable documents or information being produced by the non-party, by means of the procedures described in Paragraphs 5 and 6, *supra*. All documents or information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY by a non-party in accordance with the terms of this Protective Order shall be treated by the Parties as Confidential Material.

8.   Notwithstanding the foregoing, a Party's or non-party's inadvertent failure to designate a document or information as Confidential Material as set forth herein, shall not constitute a waiver of any claim that the inadvertently disclosed material is entitled to protection under this Protective Order. Upon learning of an inadvertent failure to designate a document or information as Confidential Material, a Party or non-party may so designate a document or information as CONFIDENTIAL or ATTORNEY'S EYES ONLY, with the effect that the designated document or information thereafter shall be subject to the protections of this Protective Order.

9.   **Permitted Use and Disclosure of Confidential Documents.** Information designated as "CONFIDENTIAL" shall be used solely for the purpose of this Litigation and shall not be used for any other purpose, including without limitation, any business, proprietary, or commercial purpose. Confidential Material may be disclosed, summarized, described, characterized, or otherwise communicated or made available in whole or in part only to the following persons:

A.   Parties to this Litigation and counsel for the Parties to this Litigation, including their employees, officers, and agents;

B.   The Court, any Special Masters, or Mediators appointed by the Court;

C.   Stenographic personnel, court reporters, videographers, graphic support, photocopying, document imaging, or database services providing services in the Litigation;

D.   Potential or actual experts, contractors, or consultants retained by a Party for purposes of the Litigation, provided that each such expert, contractor or consultant executes an acknowledgment in the form attached as Exhibit A, agreeing to be bound by the provisions of this Protective Order;

E.   Any person who prepared, permissibly received, or reviewed the Confidential Material prior to its production or prior to testimony in this case and who executes an acknowledgment in the form attached as Exhibit A; and

F.   Persons who, in addition to those identified above, are permitted access by order of the Court or upon stipulation of the Producing Party.

10.  **Permitted Use and Disclosure of Attorney's Eyes Only Documents.** Information designated as "ATTORNEY'S EYES ONLY" shall be used solely for the purpose of this

3

Litigation and shall not be used for any other purpose, including without limitation, any business, proprietary, or commercial purpose. Attorney's Eyes Only Documents may be disclosed or made available in whole or in part only to the following persons:

A.   Outside counsel of record for the Parties to this Litigation, including their employees, officers, and agents;

B.   The Court, any Special Masters, or Mediators appointed by the Court;

C.   Stenographic personnel, court reporters, videographers, graphic support, photocopying, document imaging, or database services providing services in the Litigation;

D.   Potential or actual experts, contractors, or consultants retained by a Party specifically for purposes of the Litigation, provided that each such expert, contractor or consultant executes an acknowledgment in the form attached as Exhibit A, agreeing to be bound by the provisions of this Protective Order;

E.   Any person who prepared, permissibly received, or reviewed the document prior to its production or prior to testimony in this case and who executes an acknowledgment in the form attached as Exhibit A;

F.   Persons who, in addition to those identified above, are permitted access by order of the Court or upon stipulation of the Producing Party.

11.  **Notice of Use and Disclosure of Confidential or Attorney's Eyes Only Documents.** Prior to review of Confidential or Attorney's Eyes Only Documents by persons identified in Paragraphs 9D, 9E, 10D or 10E of this Protective Order, a Party must provide notice to the Producing Party. Upon receipt of such notice, a Producing Party may challenge the release of Confidential or Attorney's Eyes Only Documents to the persons identified in Paragraphs 9D, 9E, 10D or 10E within (5) business days. The Producing Party shall state the objection by letter to counsel of record for the requesting Party and copy all counsel of record in this Litigation. After providing this notice of objection, the Parties shall confer within five (5) calendar days in an attempt to resolve the dispute regarding the release of the documents or information. If the Parties are unable to resolve the dispute, the requesting Party may move the Court to allow the person identified in Paragraphs 9D, 9E, 10D or 10E of this Protective Order to review the Confidential or Attorney's Eyes Only Documents subject to the other conditions of this Protective Order. In resolving any such motion, the Producing Party shall have the burden of demonstrating that the benefit of allowing the person to review the document or information at issue does not outweigh the potential harm to the Producing Party. Until the Court rules on the motion, the relevant documents or information shall continue to be treated by each Party or participating non-party as designated.

12.  Nothing in this Protective Order shall bar or otherwise restrict outside counsel from rendering advice to his or her client with respect to this Litigation and, in the course thereof, from discussing in a general way Confidential Material.

4

13.    Counsel of record for the Parties shall employ reasonable protective measures to ensure that the information and documents governed by this Protective Order are used only for the purposes specified herein, and disclosed only to authorized persons. All Confidential Material shall be kept in a secure manner by each Party and by those who are authorized to have access to such material.

14.    **Filing Under Seal.** The Producing Party seeking to protect any Confidential Material shall have the burden to request that the Court seal any filed Confidential Material in this Litigation pursuant to Texas Rule of Civil Procedure 76a. The Party seeking to file any papers with or otherwise use any Highly Confidential or Confidential Discovery Material in open court shall provide reasonable notice to the Producing Party in advance of such use. If the Producing Party desires for such Confidential Material to be filed under seal, the filing Party shall use the e-filing designation "Contains Sensitive Material" to initially file the Confidential Material. The Producing Party shall then have the burden to file a motion for the Court to maintain the material under seal.

15.    If a Party or participating non-party that has obtained Confidential Material pursuant to this Protective Order: (a) is subpoenaed in another proceeding; (b) is served with a demand in another action to which it is a party; (c) is served with any other legal process by one not a Party to this Litigation; or (d) is otherwise required to provide material to a regulatory entity or body; and in any such case, the subpoena, demand, legal process, or requirement to produce would require disclosure of Confidential Material produced or provided in this Litigation by another Party or non-party, the Party or participating non-party shall give prompt written notice of its receipt of such subpoena, demand, legal process, or requirement to produce to all counsel of record so as to allow any Party or Producing Party at least ten (10) days, or such lesser time as such subpoena, demand, legal process, or other requirement to produce specifies for production, to intercede and protect its rights. Provided that such notice is given, nothing herein shall be construed as requiring any Party or anyone else covered by this Protective Order to challenge or appeal any order requiring production of any Confidential Material, or to subject itself to any penalties for non-compliance with any subpoena, demand or legal process or to seek any related relief from this or any Court. In the event that a regulatory entity or body requires a Party or participating non-party to disclose to it Confidential Material subject to this Protective Order before the Party or participating non-party can practicably provide written notice to of the requirement to counsel of record for the Party who provided the Confidential Material, the Party or participating non-party may comply with the requirements of the regulatory entity or body, provided that the Party or participating non-party so required to disclose Confidential Material to a regulatory entity or body shall notify counsel of record for the Party that provided the Confidential Material immediately, but in no event more than four (4) business days thereafter.

16.    Nothing in this Protective Order is intended to determine or affect, in any way, the admissibility of Confidential Material. Furthermore, nothing herein shall be deemed to restrict in any manner any Party's dissemination or use of its own Confidential Material.

17.    In the event any Confidential Material is, either intentionally or inadvertently, disclosed to someone not authorized to receive such material under this Protective Order, or, if a

5

person so authorized breaches any of his or her obligations under this Protective Order, counsel of record for the Party involved immediately shall disclose the unauthorized disclosure or breach to the Producing Party's counsel of record, and also shall use his or her best efforts to obtain the return of all copies of the Confidential Material and to prevent any further disclosures of the same.

18. **Challenge to Confidential and/or Attorney's Eyes Only Designations.** A Party may challenge a Producing Party's designation at any time. If any Party objects to the designation by a Producing Party of any document or information as CONFIDENTIAL or ATTORNEY'S EYES ONLY, the Party so objecting shall state the objection by letter to counsel of record for the Producing Party and copy all counsel of record in this Litigation. If the designation is made at or during a deposition, any objection to designation may be alternatively made on the record. After providing this notice of objection, the Parties and any other Producing Party or its counsel shall confer within five (5) calendar days in an attempt to resolve the dispute regarding the designation of the documents or information. If the Parties are unable to resolve the dispute, the objecting Party may move the Court to remove the designation of CONFIDENTIAL or ATTORNEY'S EYES ONLY after in camera review. In resolving any such motion, the Producing Party shall have the burden of demonstrating that the document or information at issue constitutes CONFIDENTIAL or ATTORNEY'S EYES ONLY material in accordance with Paragraphs 5 and 6. Until the Court rules on the motion, the relevant documents or information shall continue to be treated by each Party or participating non-party as designated.

19. **Inadvertent Production.** Inadvertent production of any document that a party or non-party later claims should not have been produced because of a privilege, including but not limited to the attorney-client privilege or work product doctrine ("Inadvertently Produced Privileged Document"), will not be deemed to waive any privilege, provided that the Producing Party shall promptly notify the Receiving Party in writing of such inadvertent production. The Producing Party may request the return of any Inadvertently Produced Privileged Document. A request for the return of an Inadvertently Produced Privileged Document shall identify the document inadvertently produced and the basis for withholding such document from production. If a Party or non-party requests the return, pursuant to this paragraph, of any Inadvertently Produced Privileged Document then in the custody of another Party or non-party, such other party shall within five (5) business days (a) return to the requesting Party or non-party the Inadvertently Produced Privileged Document and copies thereof; (b) destroy all notes or other work product reflecting the content of such Inadvertently Produced Privileged Documents; and (c) delete any such Inadvertently Produced Privileged Documents from any litigation-support database or any other means of electronically storing information. The party returning such material may then move the Court for an order compelling production of the material, but that party shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production. Once information is determined to be Inadvertently Produced Privileged Documents and subject to this paragraph, the Receiving Party shall not disclose or use any Inadvertently Produced Privileged Documents in this Litigation or for any other purpose, unless and until the Court orders otherwise.

6

20.     Nothing herein shall preclude any Party or non-party seeking an order from the Court that any portion of the evidence be taken in camera, with all related testimony and Confidential Material sealed and withheld from the general public.

21.     In the event anyone subject to the terms of this Protective Order shall violate or threaten to violate the terms of this Protective Order, the aggrieved Party immediately may apply to obtain injunctive relief against any such person violating or threatening to violate any of the terms of this Protective Order, and in the event that the aggrieved Party does so, the responding Party subject to the provisions of this Protective Order shall not employ as a defense thereto the claim that the aggrieved Party possesses an adequate remedy at law.

SIGNED: _Feb. 5_____, 2018.

HON. TONYA PARKER

AGREED:


_s/ Jonathan Rubenstein_____
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendants



_s/ Tyler J. Bexley_____
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs

7

## Exhibit A

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § § | 116th JUDICIAL DISTRICT |

I, _____, do hereby certify that I have read and agree to be bound by and subject to that certain Agreed Protective Order dated _____, 2018, entered in the above-referenced action, and I subject myself to the jurisdiction and venue in the above-referenced Court, for purposes of enforcement of such Agreed Protective Order. I understand that all documents produced in this case may only be used for purposes of this litigation and that I am bound by the Agreed Protective Order not to disclose the documents or otherwise share the information I review.

This _____ day of _____, 2018.

_____
Printed Name

_____
Signature

8

283

FILED
DALLAS COUNTY
3/14/2018 4:04 PM
FELICIA PITRE
DISTRICT CLERK

Cause No. DC-16-12593

| | | |
|---|---|---|
| GENBAND Management Services, Corporation, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| CoEfficient, LLC; TelEfficient, LLC. | § § | DALLAS COUNTY, TEXAS |
| Defendants/ Counter-Plaintiff, | § § § | |
| v. | § § | |
| GENBAND Management Services, Corporation, GENBAND Holdings Company, and GENBAND US, LLC, Counter-Defendants | § § § § | 116th JUDICIAL DISTRICT |

## GENBAND'S JURY DEMAND

Plaintiff/Counter-Defendant GENBAND Management Services, Corporation along with Counter-Defendants GENBAND Holdings Company, and GENBAND US, LLC demand a jury trial on all of the allegations in Plaintiff's Second Amended Petition, and all amendments and supplements thereto, and all of the defenses and counterclaims in Defendants' Amended Answer and Counterclaims, and all supplements and amendments thereto. A jury fee is being filed contemporaneously with the filing of this Jury Demand.

Dated: March 14, 2018                    Respectfully submitted,

                                         /s/Jonathan Rubenstein

                                         Jonathan Rubenstein
                                         jonathan.rubenstein@bakerbotts.com
                                         Texas Bar No. 24037403
                                         Susan Kennedy
                                         susan.kennedy@bakerbotts.com
                                         Texas Bar No. 24051663

Active 37445140.1                         1

Amy C. Heard
amy.heard@bakerbotts.com
Texas Bar No. 24097818

BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Telephone:     (214) 953-6500

**Attorneys for Plaintiff/Counter-
Defendant GENBAND
Management Services Corporation
and Counter-Defendants
GENBAND Holdings Company
and GENBAND US, LLC**

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was served on the following counsel

of record pursuant to the Texas Rules of Civil Procedure:

Tyler J. Bexley
tyler.bexley@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3202
Telephone:     (214) 382-9810
Facsimile:     (214) 501-0731

ATTORNEYS FOR DEFENDANTS/
COUNTER-GENBANDS
COEFFICIENT, LLC AND TELEFFICIENT, LLC

*/s/ Amy C. Heard*
Amy C. Heard

2

## CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| GENBAND MANAGEMENT SERVICES CORPORATION, *Counter-Defendant*, | § § § | 116th JUDICIAL DISTRICT |

### SECOND AMENDED LEVEL 3 SCHEDULING ORDER

In accordance with Rules 166, 190, and 192 of the Texas Rules of Civil Procedure, the Court makes the following amended order to control the schedule of the case.

1.     This case will be ready and is set for jury trial on **September 24, 2018**.  If not reached as set, the case may be carried to the next week.  Trial announcements must be made in accordance with Rule 3.02 of the Local Rules of the Civil Courts of Dallas County, Texas.  When no announcement is made for defendant, defendant will be presumed ready.  If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a of the Texas Rules of Civil Procedure.

2.     Pretrial matters will be completed by the following dates:

| | |
|---|---|
| May 31, 2018 | **Fact discovery closes.** All fact depositions shall be completed by this date, and all written discovery requests shall be served so that responses are due no later than this date. |
| June 7, 2018 | **Fact discovery motions deadline.**  Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed by this date or such complaint is waived, except for the sanction of exclusion under Rule 193.6. |

1

| June 7, 2018 | **Expert designation deadline for party seeking affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
|---|---|
| July 6, 2018 | **Expert designation deadline for party opposing affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| July 13, 2018 | **Deadline for amended pleadings other than those adding new claims, defenses, or parties.** Amended pleadings responsive to timely filed pleadings may be filed after the deadline if filed within 14 days after the pleading to which they respond. |
| July 20, 2018 | **Expert designation deadline for reply/rebuttal experts.** Any expert designation must include the information required by Rule 194.2(f). |
| July 20, 2018 | **Deadline to file motions for summary judgment.** Summary judgment motions must be heard no later than 30 days prior to trial. |
| August 1, 2018 | **Expert discovery closes.** |
| August 10, 2018 | **Deadline to file motions to exclude or limit expert testimony.** Such motions must be heard no later than 30 days prior to trial. |

The parties may by written agreement alter these deadlines. Except by agreement of the parties, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3. Each side may have 50 hours of oral depositions and 30 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

4. The parties shall mediate this case no later than July 20, 2018, unless otherwise provided by court order. Named parties shall be present during the entire mediation process, and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **The parties agree to mediate this case with Hon. Jeff**

2

**Kaplan (Ret.) from JAMS Dallas. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation.**

5.     Fourteen days before the Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examinations, a list of exhibits, and copies of any exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten days before the Trial setting, the parties shall exchange in writing (a) their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and (b) their objections and any counter-designations to the opposing party's deposition designations. **On or before ten days before the Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreements on such matters.** By 4:00 p.m. on the Thursday before the Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4:00 p.m. the Thursday before the trial setting.

6.     A pre-trial conference shall be conducted from 8:00 a.m. to 9:00 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trail conference shall be scheduled the week before the Trial Setting.

If any parties are joined in this action, the party joining such additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

SIGNED on this _____ day of _____, 2018.

_____

HON. TONYA PARKER

AGREED:

_s/_____Jonathan Rubenstein_____
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendants

_s/_____Tyler J. Bexley_____
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs

4

FILED
DALLAS COUNTY
9/5/2018 4:47 PM
FELICIA PITRE
DISTRICT CLERK

**CAUSE NO. DC-16-12593**

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff,* | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs,* | § § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants.* | § § § § § § | 116th JUDICIAL DISTRICT |

**SECOND JOINT MOTION FOR CONTINUANCE OF TRIAL SETTING AND ENTRY OF AMENDED LEVEL 3 SCHEDULING ORDER**

Plaintiff/Counter-Defendants and Defendants/Counter-Plaintiffs file this Second Joint Motion for Continuance of Trial Setting and Entry of Amended Level 3 Scheduling Order.

**PROCEDURAL HISTORY**

1.     Plaintiff filed its Original Petition on September 23, 2016. Plaintiff filed a First Amended Petition on October 4, 2016 and a Second Amended Petition on October 27, 2016.

2.     Defendants filed their Original Answer on November 18, 2016.

3.     On May 2, 2017, the Court entered a Level 3 Scheduling Order setting the case for trial on April 2, 2018.

4.     On October 20, 2017, Defendants filed an Amended Answer and a Counterclaim.

5.     On November 20, 2017, the Court entered an Amended Level 3 Scheduling Order setting the case for trial on July 16, 2018.

6.     On January 9, 2018, Defendants filed an Amended Counterclaim, adding additional parties and claims to this case.

7.     In the last four months, the parties have served multiple sets of written discovery and responses to that written discovery. The parties are in the process of producing a substantial volume of documents and scheduling multiple depositions spread out across the country.

## ARGUMENT

8.     The parties respectfully request that the Court continue the current trial setting to September 24, 2018 and enter the Second Amended Level 3 Scheduling Order filed contemporaneously with this Motion. The parties request a continuance of the trial setting because (a) the case has expanded to include new parties and new claims added since the Court's entry of the First Amended Level 3 Scheduling Order; (b) the parties have exchanged and are in the process of continuing to exchange a substantial volume of documents in response to written discovery requests; and (c) the parties are in the process of scheduling several depositions at locations throughout the country, which involves coordinating multiple schedules of witnesses and counsel.

9.     Texas Rule of Civil Procedure 247 allows the parties to agree to continue the trial setting of a case. Additionally, Texas Rule of Civil Procedure 251 permits the Court to grant a motion for continuance when all of the parties have consented to the continuance.

10.     Here, the parties all agree to a continuance of the current trial setting of this case. The parties' agreement is evidenced by signatures from each party's corporate representative below, as required by the Local Rules.

11.     This continuance is not sought for purposes of delay, but so that justice may be done.

## CONCLUSION

Plaintiff and Defendants respectfully request that the Court continue the trial setting in this case to September 24, 2018 and enter the Second Amended Level 3 Scheduling Order filed with this Motion.

## CONSENT OF GENBAND MANAGEMENT SERVICES CORPORATION

The undersigned, who is an authorized representative of GENBAND Management Services Corporation, hereby consents on behalf of GENBAND Management Services Corporation to the continuance requested in this Joint Motion.

_____
Signature

_____
Title

_____
Date

## CONSENT OF COEFFICIENT, LLC AND TELEFFICIENT, LLC

The undersigned, who is an authorized representative of CoEfficient, LLC and TelEfficient, LLC, hereby consents on behalf of CoEfficient and TelEfficient to the continuance requested in this Joint Motion.

_____
Signature

_____
CEO, CoEfficient, Managing Member, TelEfficient
Title

_____
Date

### CONSENT OF GENBAND MANAGEMENT SERVICES CORPORATION

The undersigned, who is an authorized representative of GENBAND Management Services Corporation, hereby consents on behalf of GENBAND Management Services Corporation to the continuance requested in this Joint Motion.

_____
Signature

_____
Title

_____
Date

### CONSENT OF COEFFICIENT, LLC AND TELEFFICIENT, LLC

The undersigned, who is an authorized representative of CoEfficient, LLC and TelEfficient, LLC, hereby consents on behalf of CoEfficient and TelEfficient to the continuance requested in this Joint Motion.

_____
Signature

CEO, CoEfficient, Managing Member, TelEfficient
Title

3/5/18
_____
Date

---

**SECOND JOINT MOTION FOR CONTINUANCE OF TRIAL SETTING—Page 4 of 6**

Respectfully submitted,


By: _s/ Jonathan Rubenstein_____
        Jonathan Rubenstein
         jonathan.rubenstein@bakerbotts.com
         Texas Bar No. 24037403
        Susan Kennedy
         susan.kennedy@bakerbotts.com
         Texas Bar No. 24051663
        Amy C. Heard
         amy.heard@bakerbotts.com
         Texas Bar No. 24097818

        BAKER BOTTS L.L.P.
        2001 Ross Avenue
        Dallas, Texas 75201
        Telephone: (214) 953-6500

**ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANTS**


By: _s/ Tyler J. Bexley_____
        Tyler J. Bexley
         State Bar No. 24073923
         tyler.bexley@rm-firm.com
        **REESE MARKETOS LLP**
        750 N. Saint Paul St., Suite 600
        Dallas, Texas 75201-3202
        214.382.9810 telephone
        214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/ COUNTER-PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

_s/ Tyler J. Bexley_
Tyler J. Bexley

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| GENBAND MANAGEMENT SERVICES CORPORATION, *Counter-Defendant*, | § § | 116th JUDICIAL DISTRICT |

**SECOND AMENDED LEVEL 3 SCHEDULING ORDER**

In accordance with Rules 166, 190, and 192 of the Texas Rules of Civil Procedure, the Court makes the following amended order to control the schedule of the case.

1. This case will be ready and is set for ~~jury~~ trial [Non-Jury] on **September 24, 2018**. If not reached as set, the case may be carried to the next week. Trial announcements must be made in accordance with Rule 3.02 of the Local Rules of the Civil Courts of Dallas County, Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a of the Texas Rules of Civil Procedure.

2. Pretrial matters will be completed by the following dates:

| | |
|---|---|
| May 31, 2018 | **Fact discovery closes.** All fact depositions shall be completed by this date, and all written discovery requests shall be served so that responses are due no later than this date. |
| June 7, 2018 | **Fact discovery motions deadline.** Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed by this date or such complaint is waived, except for the sanction of exclusion under Rule 193.6. |

1

| June 7, 2018 | **Expert designation deadline for party seeking affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| July 6, 2018 | **Expert designation deadline for party opposing affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| July 13, 2018 | **Deadline for amended pleadings other than those adding new claims, defenses, or parties.** Amended pleadings responsive to timely filed pleadings may be filed after the deadline if filed within 14 days after the pleading to which they respond. |
| July 20, 2018 | **Expert designation deadline for reply/rebuttal experts.** Any expert designation must include the information required by Rule 194.2(f). |
| July 20, 2018 | **Deadline to file motions for summary judgment.** Summary judgment motions must be heard no later than 30 days prior to trial. |
| August 1, 2018 | **Expert discovery closes.** |
| August 10, 2018 | **Deadline to file motions to exclude or limit expert testimony.** Such motions must be heard no later than 30 days prior to trial. |

The parties may by written agreement alter these deadlines. Except by agreement of the parties, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.    Each side may have 50 hours of oral depositions and 30 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

4.    The parties shall mediate this case no later than July 20, 2018, unless otherwise provided by court order. Named parties shall be present during the entire mediation process, and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **The parties agree to mediate this case with Hon. Jeff**

2

**Kaplan (Ret.) from JAMS Dallas. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation.**

5. Fourteen days before the Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examinations, a list of exhibits, and copies of any exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten days before the Trial setting, the parties shall exchange in writing (a) their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and (b) their objections and any counter-designations to the opposing party's deposition designations. **On or before ten days before the Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreements on such matters.** By 4:00 p.m. on the Thursday before the Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4:00 p.m. the Thursday before the trial setting.

6. A pre-trial conference shall be conducted from 8:00 a.m. to 9:00 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trail conference shall be scheduled the week before the Trial Setting.

3

If any parties are joined in this action, the party joining such additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

SIGNED on this _____ day of _____, 2018.

HON. TONYA PARKER

AGREED:

This case is governed by the Court's Policies and Procedures and Dallas County Courts Local Rules, available at www.dallascounty.org

s/        Jonathan Rubenstein
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendants

s/        Tyler J. Bexley
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs

4

300

FILED
DALLAS COUNTY
3/9/2018 1:04 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO.  DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

## <u>DEFENDANTS/COUNTER-PLAINTIFFS' JURY DEMAND</u>

Defendants/Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC hereby demand a jury trial on all claims and defenses for which a jury trial is available. Contemporaneous with this filling, Defendants/Counter-Plaintiffs tender the required jury fee.

JURY DEMAND - Page 1 of 2

Respectfully submitted,

**REESE MARKETOS LLP**


By:  *s/ Tyler J. Bexley*
        Tyler J. Bexley
        State Bar No. 24073923
        tyler.bexley@rm-firm.com
        750 N. Saint Paul St., Suite 600
        Dallas, Texas 75201-3201
        214.382.9810 telephone
        214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS COEFFICIENT,
LLC and TELEFFICIENT, LLC**


## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.


      *s/ Tyler J. Bexley*
      Tyler J. Bexley

4/16/2018 9:48 AM FILED
DALLAS COUNTY
FELICIA PITRE
DISTRICT CLERK

**RM**  REESE · MARKETOS

Tyler J. Bexley
**PARTNER**

Tyler.Bexley@rm-firm.com
p (214) 382-9805
f (214) 501-0731

April 10, 2018

*Via email (jonathan.rubenstein@bakerbotts.com)*
Jonathan Rubenstein
Baker Botts LLP
2001 Ross Avenue
Dallas, Texas 75201

Re: *GENBAND Management Services Company v. CoEfficient, LLC*, Cause No.
DC-16-12593 , 116th Judicial District Court, Dallas County, Texas

Dear Jonathan:

This will confirm that you have agreed that the parties will treat communications between retained experts and counsel the same way such communications are treated under the Federal Rules of Civil Procedure.

If you are in agreement, please sign below, and I will file this as our Rule 11 agreement.

Sincerely,



Tyler J. Bexley

AGREED:

_____
Counsel for GENBAND Parties

**Cause No. DC-16-12593**

| | | |
|---|---|---|
| GENBAND Management Services, Corporation, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| CoEfficient, LLC; TelEfficient, LLC. | § § | DALLAS COUNTY, TEXAS |
| Defendants/ Counter-Plaintiff, | § § § | |
| v. | § § | |
| GENBAND Management Services, Corporation, GENBAND Holdings Company, and GENBAND US LLC, Counter-Defendants | § § § | 116th JUDICIAL DISTRICT |

## PROTECTIVE ORDER

This Court, having considered Plaintiffs' Motion for Protective Order in the above-styled lawsuit, and after hearing arguments of counsel has determined that the Motion has merit, and shall be and is in all respects **GRANTED.**

It is therefore **ORDERED** that the deposition of David Walsh shall not take place.

SIGNED this ___ day of _____, 2018.

_____
JUDGE PRESIDING

ORDER ON MOTION FOR PROTECTION                                      Solo Page

FILED
DALLAS COUNTY
5/1/2018 4:51 PM
FELICIA PITRE
DISTRICT CLERK

Lafonda Sims

Cause No. DC-16-12593

| | | |
|---|---|---|
| GENBAND Management Services, Corporation, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| CoEfficient, LLC; TelEfficient, LLC. | § § | DALLAS COUNTY, TEXAS |
| Defendants/ Counter-Plaintiffs, | § § § | |
| v. | § § | |
| GENBAND Management Services, Corporation, GENBAND Holdings Company, and GENBAND US, LLC, Counter-Defendants | § § § § | 116th JUDICIAL DISTRICT |

## NOTICE OF HEARING

PLEASE TAKE NOTICE that GENBAND's Motion for Protective Order is set for oral hearing at **3:15 p.m.** on Wednesday **May 16, 2018**, in the 116th District Court of Dallas County, Texas.

Dated: May 1, 2018

Respectfully submitted,

*/s/ Amy C. Heard*

Jonathan Rubenstein
jonathan.rubenstein@bakerbotts.com
Texas Bar No. 24037403
Susan Kennedy
susan.kennedy@bakerbotts.com
Texas Bar No. 24051663

Amy C. Heard
amy.heard@bakerbotts.com
Texas Bar No. 24097818

BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Telephone:     (214) 953-6500

ATTORNEYS FOR PLAINTIFF/COUNTER-
DEFENDANT GENBAND MANAGEMENT
SERVICES CORPORATION AND COUNTER-
DEFENDANTS GENBAND HOLDINGS
COMPANY AND GENBAND US LLC

## CERTIFICATE OF SERVICE

This certifies that on May 1, 2018 a copy of the above and foregoing was served on the

following counsel of record pursuant to the Texas Rules of Civil Procedure:

Tyler J. Bexley
tyler.bexley@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3202
Telephone:     (214) 382-9810
Facsimile:     (214) 501-0731

ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS
COEFFICIENT, LLC AND TELEFFICIENT, LLC

*/s/ Amy C. Heard*
Amy C. Heard

FILED
DALLAS COUNTY
8/3/2018 5:41 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

## DEFENDANTS' MOTION TO COMPEL AND
## REQUEST FOR RULING ON DISCOVERY OBJECTIONS

Defendants/Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC file this motion seeking (1) a ruling on Plaintiff GENBAND Management Services Corporation's objections to Defendants' First Set of Requests for Production, First Set of Interrogatories, and Second Set of Interrogatories; and (2) an order compelling GENBAND to produce responsive documents and fully respond to the interrogatories.

### SUMMARY

This case arises from a partnership between GENBAND and TelEfficient. GENBAND sells landline switches to telephone companies. Although upgrading switches can save telephone companies millions of dollars over time, the switches are expensive and require substantial upfront investment. To entice telephone companies to capitalize on the savings that come from the switch upgrades without having to front the high costs,

GENBAND partnered with TelEfficient, a provider of special financial instruments designed to finance the capital costs of energy efficient projects in the telecommunications industry.

Over the course of the parties' relationship, GENBAND made loans to TelEfficient and its parent company, CoEfficient, representing that such loans could be repaid from the proceeds of multimillion-dollar deals that were imminent. And while these multimillion-dollar deals materialized for GENBAND—thanks, in part, to TelEfficient's expertise and proprietary financial models—TelEfficient was never paid a dime for its work to help close these deals. After GENBAND was finished using TelEfficient's expertise, GENBAND sued Defendants to collect the loans, and Defendants filed a counterclaim asserting that GENBAND defrauded Defendants, breached contracts with Defendants, and misappropriated TelEfficient's proprietary financial models and expertise.

This discovery dispute relates, in part, to the contracts between the parties. One of the contracts is a Teaming Agreement that contains an exclusivity agreement under which GENBAND was prohibited from working with other third party financing companies. Thus, Defendants served requests for production to obtain agreements or communications relating to GENBAND's work with other financing companies in violation of this exclusivity agreement. GENBAND objected. GENBAND also objected to dozens of other requests for production and interrogatories. And although GENBAND responded to these other discovery requests "subject to" its objections, Defendants are left to guess whether GENBAND's discovery responses are comprehensive or are incomplete based on some

objection. Indeed, GENBAND's document production is missing critical documents relating to the Notes on which GENBAND sued and misrepresentations made by GENBAND during the course of the parties' dealings. Despite several conferences between counsel, the parties have been unable to resolve these issues, and thus, Defendants present them to the Court for resolution.

## ARGUMENT

The Texas Rules of Civil Procedure provide that a party may seek a ruling on objections to discovery requests and an order compelling a complete response to written discovery. Tex. R. Civ. P. 193.4, 215.1. The rules also define the general scope of discovery to include any non-privileged matter that is relevant to the subject matter of the action. Tex. R. Civ. P. 192.3(a). The material sought need not be admissible at trial so long as it is reasonably calculated to lead to the discovery of admissible evidence. *Id.* The party objecting to discovery bears the burden of proving that the requested discovery is improper. *In re Univar USA, Inc.*, 311 S.W.3d 175, 180 (Tex. App.—Beaumont 2010, orig. proceeding). To object to a discovery request, the responding party must make a timely objection in writing and "state specifically the legal or factual basis for the objection and the extent to which the party is refusing to comply with the request." *In re Fisher & Paykel Appliances, Inc.*, 420 S.W.3d 842, 847 (Tex. App.—Dallas 2014, orig. proceeding [mand. denied]).

GENBAND asserted objections to dozens of discovery requests from Defendants and, with regard to three requests for production (RFP Nos. 24, 25, and 26), refused to produce responsive documents. Defendants seek an order compelling GENBAND to

produce documents in response to those three requests. Defendants also request that the Court overrule GENBAND's objections to Defendants' other discovery requests and order GENBAND to fully respond to the discovery without objection.

1. **The Court should overrule GENBAND's objections to RFP Nos. 24-26 and order GENBAND to produce responsive documents.**

RFP Nos. 24-26 seek documents relating to GENBAND's dealings with financing companies that compete with TelEfficient:

- No. 24: "All contracts between you and any company in the business of providing loans or other instruments to finance switch sales and/or upgrades."

- No. 25: "All communications between you and any company in the business of providing loans or other instruments to finance switch sales and/or upgrades."

- No. 26: "All internal GENBAND communications relating to any company in the business of providing loans or other instruments to finance switch sales and/or upgrades."

(Ex. 2, Nos. 24-26.) In response to all three requests, GENBAND asserted the same objection:

> GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "any company in the business of providing loans or other instruments to finance switch sales and/or upgrades" is vague and overbroad.
>
> GENBAND further objects to this Request to the extent it seeks documents protected by confidentiality agreements to which Defendants are not parties.
>
> In accord with these objections and the General Objections stated above, GENBAND will not produce any documents in response to this Request as it is currently constructed.

In conferring on these objections, GENBAND's counsel expressed that it was unclear what the requests were seeking. (Ex. 6, Rubenstein/Bexley Email

Correspondence.) In an effort to address GENBAND's concern, Defendants' counsel provided the following detailed clarification of each request:

—No. 24: All teaming agreements and similar contractual arrangements between you and any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

—No. 25: All communications between you and any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

—No. 26: All internal Genband communications relating to any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

(*Id.*) In response, GENBAND's counsel stated, "We have not withheld any teaming agreements, contractual arrangements or communications between GENBAND and any company, or any internal communications in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient." (Ex. 7, Heard Email.) Yet, one week later, GENBAND served amended responses to Defendants' requests for production continuing to assert the same objections to RFP Nos. 24-26 and the statement that "GENBAND will not produce any documents in response to this Request as it is currently constructed." (Ex. 2, Nos. 24-26.)

Although it remains unclear whether GENBAND stands by these objections, the Court should overrule them. If GENBAND is not withholding any documents based on these objections, then they are prophylactic and, thus, improper under the Texas Rules of Civil Procedure. *See In re Park Cities Bank*, 409 S.W.3d 859, 878 (Tex. App.—Tyler 2013, orig. proceeding) ("[P]rophylactic objections are now prohibited by the rules of procedure."). Regardless, the objections are unfounded. RFP Nos. 24-26 seek relevant documents that go to the heart of one of the disputed issues in this case—namely, whether

GENBAND has worked with TelEfficient's competitors in violation of the exclusivity provision in the parties' Teaming Agreement.[1] Additionally, there is no ambiguity surrounding the meaning of "any company in the business of providing loans or other instruments to finance switch sales and/or upgrades," and to avoid any doubt, Defendants' counsel clarified that this meant companies "providing financial instruments similar to those provided by CoEfficient and/or TelEfficient." (Ex. 6, Bexley Email.)[2] The Court should overrule GENBAND's objections to RFP Nos. 24-26 and order GENBAND to produce all responsive documents.

2.    **The Court should overrule GENBAND's objections to Defendants' other discovery requests and order GENBAND to fully respond to the discovery.**

In addition to RFP Nos. 24-26, Defendants seek a ruling on GENBAND's objections to the following discovery requests pursuant to Rule 193.4:

- Defendants' First Requests for Production, Nos. 5, 7-23, and 27-31;

- Defendants' First Set of Interrogatories, Nos. 1, 3, and 7-11; and

- Defendants' Second Set of Interrogatories, Nos. 1 and 3-5.[3]

In conferring on these objections, GENBAND's counsel stated that GENBAND is not withholding any information based on the objections. (Ex. 6, Rubenstein/Bexley Email Correspondence.) If that is the case, the Court should overrule the objections without further review because they are prophylactic objections that are expressly prohibited by

---

[1] *See* Am. Countercl. ¶ 23 ("The [Teaming Agreement] contained an exclusivity agreement, under which GENBAND was prohibited from working with other third party financing companies or offering financing services to any of the customers for whom TelEfficient prepared financing proposals.").

[2] GENBAND also asserts a confidentiality objection, but there is an Agreed Protective Order in this case that expressly applies to non-party information. (Ex. 10, ¶ 3.)

[3] GENBAND's complete responses and objections to these requests are attached as Exhibits 2-4.

Texas law. *See* Tex R. Civ. P. 193.2(a) (providing that a response to a request for production "must state the legal or factual basis for the objection and ***the extent to which the party is refusing to comply with the request***" (emphasis added)); *In re Park Cities Bank*, 409 S.W.3d at 878.

The objections also lack merit. GENBAND's objections to the disputed discovery requests can be divided into four categories: (1) relevance, burden, breadth, and/or vagueness; (2) that documents are equally available to Defendants; (3) attorney-client privilege; and (4) confidentiality of the requested documents. The Court should overrule all of these objections.[4]

> Relevance/Burden/Vague/Overbroad [RFP Nos. 5, 10, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 27, 28, 29, and 30; First Interrogatories Nos. 1, 3, 7, 8, 9, 10, and 11; Second Interrogatories Nos. 1, 3, 4, and 5]

In response to numerous requests for production and interrogatories, GENBAND objected on the grounds that the requests were vague, overbroad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. For example, GENBAND objects to the vagueness and breadth of terms like "relating to," "regarding," and "mentioning." (Ex. 2.) But these terms are commonly used in discovery, and there can be

---

[4] In response to two individual requests, GENBAND asserts two additional objections. For RFP No. 28, GENBAND objects that the requested documents are "outside the possession, custody, or control of GENBAND." (Ex. 2, No. 28.) Although GENBAND only has an obligation to produce documents in its possession, custody, or control, the fact that documents may exist outside of GENBAND's possession does not make a request objectionable. *See Duarte v. St. Paul Fire & Marine Ins. Co.*, No. EP-14-CV-305-KC, 2015 WL 7709433, at *5 (W.D. Tex. Sept. 15, 2015) (rejecting "argument that possession, custody, or control is an objection"). In any event, GENBAND informed Defendants that it has requested and produced responsive documents from custodians within GENBAND's present control. (Ex. 8, Heard Email.) For RFP No. 29, GENBAND objected that the request asks the GENBAND parties to "marshal all of their evidence for trial." (Ex. 2, No. 29.) But there is no such objection to a request for production under Texas law. *See In re Sting Soccer Grp., LP*, No. 05-17-00317-CV, 2017 WL 5897454, at *7 (Tex. App.—Dallas Nov. 30, 2017, orig. proceeding) ("'Marshalling the evidence' is not considered a valid objection to a request for production.").

no genuine confusion regarding the meaning of these terms. Nor does the use of these terms make discovery requests unduly broad. *See Sting Soccer*, 2017 WL 5897454, at *7 ("[R]equests for production may properly ask a party to provide 'all,' 'each,' or 'every' document pertaining to a relevant, narrow subject of the litigation."). The other terms that GENBAND calls vague and overbroad—*e.g.*, "CoEfficient or TelEfficient documents," "potential customer," "revenue generated," "value," and "relating to deals in which TelEfficient was involved" (Ex. 2)—are similarly clear and do not provide an excuse for GENBAND to avoid producing documents. The Court should overrule these unfounded objections.

> Equally Available [RFP Nos. 7, 8, 11, and 15; First Interrogatories Nos. 3, 8, 9, 10, and 11; Second Interrogatories No. 5]

For Defendants' requests that seek documents and information that were sent to or created by Defendants, GENBAND objects that the requests seek "information to which Defendants have equal access." (Exs. 2-4.) This is not a valid objection under Texas law. In a mandamus proceeding decided just a few months ago, the Dallas Court of Appeals held that a party's "objection that the information sought is equally available is an invalid objection." *Sting Soccer*, 2017 WL 5897454, at *7. The court explained:

> Texas law does not allow a party to evade discovery requests by simply asserting that the other party already has the information. Not only do such requests ensure that the parties have the same basic documents, requiring your opponent to produce certain documents enables the party seeking discovery to activate the automatic authentication rights provided by Rule 193.7.

*Id.* (citations omitted). Because GENBAND's objection is not valid under Texas law, it should be overruled.

Privilege [RFP No. 7, 9, 10, 12, 13, 16, 19, 20, 21, 22, 23, 30, and 31]

Similarly, GENBAND's objection that certain requests seek documents protected by the attorney-client privilege or work production doctrine is also invalid under Texas law. Rule 193.2 provides that "[a] party should not object to a request for written discovery on the grounds that it calls for production of material or information that is privileged but should instead comply with rule 193.3." Tex. R. Civ. P. 193.2(f). Rule 193.3, in turn, requires a withholding statement identifying the privilege and the specific requests to which such privilege is asserted. Tex. R. Civ. P. 193.3(a). The Court therefore should overrule any privilege "objections" GENBAND has asserted.

Confidentiality [RFP Nos. 17 and 18]

Finally, GENBAND objects to some requests on the grounds that they seek confidential documents, particularly "documents protected by confidentiality agreements to which Defendants are not parties." (Ex. 2.) The Court should overrule this objection because there is an Agreed Protective Order in this case that protects confidential documents. (Ex. 10.) GENBAND is free to designate documents that it believes are confidential as such under the Protective Order, which expressly protects third-party information. (*See id.* at ¶ 3 (providing that producing party can designate "confidential information belonging to non-parties").) Because the Protective Order adequately protects GENBAND and any third parties about which it is concerned, confidentiality is not a basis for GENBAND to withhold documents.

* * *

In short, GENBAND's objections are prophylactic and have no basis in the law. The Court should overrule the objections.

**3. The Court should order GENBAND to produce all responsive documents and fully respond to all interrogatories.**

With the exception of RFP Nos. 24-26, GENBAND answered the disputed discovery "subject to" its objections. GENBAND claims that it has not withheld responsive documents or information based on these prophylactic objections, but answering discovery requests "subject to" objections suggests otherwise. In a seminal case on this issue from the Northern District of Texas, Judge David Horan explained the problem with such an approach to discovery:

> The practice of responding to interrogatories and documents requests "subject to" and/or "without waiving" objections is manifestly confusing (at best) and misleading (at worse), and has no basis at all in the Federal Rules of Civil Procedure. . . . [W]hen a party respond[s] to [a] discovery request, subject to or without waiving such objection, [s]uch objection and answer . . . leaves the requesting [p]arty uncertain as to whether the question has actually been fully answered or whether only a portion of the question has been answered.

*Heller v. City of Dallas*, 303 F.R.D. 466, 486–87 (N.D. Tex. 2014) (citations and internal quotation marks omitted).

Moreover, the parties' respective document productions make clear that GENBAND has not produced all responsive documents. Defendants produced more than 23,000 documents in this case, compared to GENBAND's production of about 6,000 documents. (Ex. 1, Bexley Aff. ¶ 3.) Although this disparity alone is not dispositive, a review of Defendants' document production reveals dozens of documents that were sent

or received by GENBAND employees, yet were absent from GENBAND's production.

The following are a few examples:

- TEL_085383: January 9, 2015 email correspondence between TelEfficient's Murat Armbruster and GENBAND's Steven Bruny in which Mr. Armbruster asks about the status of the "promissory note extension and the legal team's review of the latest round of documents" and Mr. Bruny discusses having another GENBAND employee "champion this" to the GENBAND CEO. These communications are related to the Notes on which GENBAND's claims are based.

- TEL_086372: January 28, 2015 email correspondence between TelEfficient's Murat Armbruster and GENBAND's Steven Bruny regarding whether GENBAND would extend additional funding to TelEfficient—an issue that is directly relevant to TelEfficient's fraud counterclaim.

- TEL_030023: March 28, 2014 email correspondence between GENBAND's Steven Bruny and TelEfficient's Murat Armbruster relating to the Note on which GENBAND's claims are based. Mr. Armbruster expressed concern that "GB can call the note any time before the year is up," and Mr. Bruny responded that "the[y] won't." This relates directly to TelEfficient's fraudulent inducement claim and defense.

- TEL_037508: March 10, 2015 email correspondence between TelEfficient's Murat Armbruster and GENBAND's Mark Pugerude and Steven Bruny relating to a dispute about whether GENBAND would provide a "comfort letter" to one of TelEfficient's investors.

- TEL_034433: November 19, 2014 email correspondence between TelEfficient's Murat Armbruster and several GENBAND employees, including CEO David Walsh, Mark Pugerude, and Steven Bruny, regarding GENBAND's potential work with a New York public entity engaged in the business of energy efficiency.

- TEL_085438: January 13, 2015 email correspondence between TelEfficient's Murat Armbruster and GENBAND's Mark Pugerude and Steven Bruny referencing a phone call in which Mr. Pugerude reassured Mr. Armbruster that "it shouldn't be a problem to extend" the Notes at issue in this case—one of the bases for TelEfficient's fraudulent inducement claim and defense.[5]

---

[5] These documents are attached as Exhibit 5. In conferring on this motion, GENBAND's counsel stated that GENBAND "conducted a diligent search and produced what we found" and suggested that "discrepancies

These are just a few examples of the documents that GENBAND should have in its possession but did not produce in this case—there are numerous similar documents that GENBAND should have produced but did not. (Ex. 1, Bexley Aff. ¶ 4.) The fact that these documents are in GENBAND's possession but were not produced means either (a) GENBAND withheld the documents based on an objection; or (b) GENBAND's document collection failed to capture the complete universe of responsive documents. Either way, GENBAND should be ordered to produce these documents and any other responsive documents that were not previously produced.[6]

Likewise, Defendants are left to guess whether GENBAND has fully responded to the disputed interrogatories that it answered "subject to" its objections. *See Heller*, 303 F.R.D. at 486–87. After overruling these objections, the Court should order GENBAND to fully respond to the interrogatories.[7]

## REQUESTED RELIEF

GENBAND has asserted improper objections and has not produced all documents and information responsive to Defendants' discovery requests. Defendants respectfully request the following relief:

---

may be due to flaws in your search protocol or human error." (Ex. 8, Heard Email.) Although GENBAND claims not to have withheld these documents based on any objection, the absence of such critical documents from GENBAND's production indicates an issue that GENBAND should be required to address. Indeed, GENBAND has not offered any valid explanation for why these documents are absent from its production.

[6] The fact that Defendants already have these documents does not excuse GENBAND from producing them. *See Sting Soccer*, 2017 WL 5897454, at *7 ("Texas law does not allow a party to evade discovery requests by simply asserting that the other party already has the information."). Additionally, the absence of these documents from GENBAND's production casts doubt on the entire production, including whether there are additional internal documents that were not produced.

[7] This includes providing a complete narrative answer or identifying specific bates numbers in response to interrogatories that GENBAND has answered by referring generally to documents, which GENBAND has agreed to do. (Ex. 9, Rubenstein Email.)

1.   An order overruling GENBAND's objections to (a) Defendants' First Requests for Production, Nos. 5 and 7-31; (b) Defendants' First Set of Interrogatories, Nos. 1, 3, and 7-11; and (c) Defendants' Second Set of Interrogatories, Nos. 1 and 3-5.

2.   An order compelling GENBAND to produce documents responsive to RFP Nos. 24-26.

3.   An order compelling GENBAND to confirm that it has produced documents responsive to all other requests for production, including those documents in Defendants' production that are missing from GENBAND's.

4.   An order compelling GENBAND to provide complete responses to all of Defendants' interrogatories.

Respectfully submitted,

**REESE MARKETOS LLP**

By: _/s/ Tyler J. Bexley_
        Tyler J. Bexley
          State Bar No. 24073923
          tyler.bexley@rm-firm.com
        750 N. Saint Paul St., Suite 600
        Dallas, Texas 75201-3201
        214.382.9810 telephone
        214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS COEFFICIENT,
LLC and TELEFFICIENT, LLC**

## <u>CERTIFICATE OF CONFERENCE</u>

Counsel for movant and counsel for respondent have personally conducted conferences at which there was a substantive discussion of the items presented to the Court in this motion, and despite best efforts, the counsel have not been able to resolve those matters presented. Specifically, counsel conferred by telephone on January 23, 2018 and May 2, 2018 and in various emails that are attached to this motion.

*/s/ Tyler J. Bexley*
Tyler J. Bexley

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

*/s/ Tyler J. Bexley*
Tyler J. Bexley

**EXHIBIT 1**

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF TYLER BEXLEY</u>

BEFORE ME, the undersigned authority, on this day personally appeared Tyler Bexley, who being duly sworn, stated as follows:

1.    My name is Tyler Bexley. I am over 21 years old, and I am competent to make this Affidavit in all respects. The facts stated in this Affidavit are true and correct.

2.    I am lead counsel to Defendants/Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC in this action. I have been involved in all aspects of this matter, including the discovery process and correspondence with GENBAND's counsel regarding discovery. I have personal knowledge of the matters set forth below.

3.    In this matter, Defendants have produced more than 23,700 documents. GENBAND has produced approximately 6,000 documents.

4.    With the help of a legal assistant, I compared some of the documents produced by Defendants with the documents produced by GENBAND. We undertook

1

this comparison by running text searches through our document review system. Attached to Defendants' Motion to Compel as Exhibit 5 are sample emails that we located in Defendants' production but not in GENBAND's production. In addition to the sample documents in Exhibit 5, we located numerous additional documents that were sent or received by GENBAND employees in email correspondence with TelEfficient employees but were not in GENBAND's production.

     5.    Attached to Defendants' motion as Exhibits 2 through 4 are true and correct copies of discovery responses served by GENBAND.

     6.    Attached hereto as Exhibits 6 through 9 are true and correct copies of email correspondence between GENBAND's counsel and me relating to discovery issues in this case.

_____
Tyler Bexley

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF DALLAS | § |

     SUBSCRIBED AND SWORN TO BEFORE ME on this the 3rd day of May, 2018, to certify which witness my hand and seal of office.



_____
Notary Public for the State of Texas

ANN HALL
Notary ID # 5162940
My Commission Expires
June 5, 2020

My commission expires: ___6-5-2020___

2

# EXHIBIT 2

Cause No. DC-16-12593

| | | |
|---|---|---|
| | § | |
| GENBAND Management Services | § | IN THE DISTRICT COURT OF |
| Corporation, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CoEfficient, LLC; TelEfficient, LLC. | § | DALLAS COUNTY, TEXAS |
| | § | |
| Defendants/ | § | |
| Counter-Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| GENBAND Management Services, | § | 116th JUDICIAL DISTRICT |
| Corporation, GENBAND Holdings | § | |
| Company, and GENBAND US, LLC, | § | |
| Counter-Defendants | | |

## GENBAND MANAGEMENT SERVICES CORPORATION'S AMENDED RESPONSES TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION

GENBAND Management Services Corporation ("GENBAND") responds and objects to the First Requests for Production ("Requests") served by CoEfficient, LLC and TelEfficient, LLC (together, "Defendants") as follows:

### PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

GENBAND will withhold any responsive documents that may be protected by attorney-client privilege, the work-product doctrine, or any other applicable privilege or protection pursuant to the Texas Rules of Civil Procedure. GENBAND will comply with its obligations under the Texas Rules of Civil Procedure and objects to the Requests to the extent they seek to impose obligations that differ from or exceed those Rules.

GENBAND reserves the right to amend and/or supplement these responses and objections at a later date.

**OBJECTIONS TO REQUESTS FOR PRODUCTION**

**Request No. 1:**

Any chart or other document showing the corporate structure of the various GENBAND entities.

**Response:**

GENBAND will produce responsive documents to the extent such documents exist.

**Request No. 2:**

Any organization chart showing the executive management of GENBAND.

**Response:**

GENBAND will produce responsive documents to the extent such documents exist.

**Request No. 3:**

All documents and communications that mention CoEfficient, TelEfficient, Murat Armbruster, or Hao Lam.

**Response:**

GENBAND will produce responsive, non-privileged documents and communications to the extent such documents exist.

**Request No. 4:**

All documents you received from CoEfficient or TelEfficient.

**Response:**

GENBAND objects that by definition, this request seeks information to which Defendants have equal access.

GENBAND will produce responsive documents to the extent such documents exist.

**Request No. 5:**

All communications providing CoEfficient or TelEfficient documents to any third parties (other than your counsel).

**Response:**

GENBAND objects that this Request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the term "CoEfficient or TelEfficient documents" is vague and overbroad.

Subject to these objections, GENBAND will produce responsive communications to the extent such documents exist.

## Request No. 6:

All communications with any third parties (other than your counsel) relating to CoEfficient, TelEfficient, or this lawsuit.

**Response:**

GENBAND will produce responsive communications to the extent such communications exist.

## Request No. 7:

All contracts between you and Counter-Plaintiffs, including any drafts and any notes or summaries relating to such contracts.

**Response:**

GENBAND objects that by definition, this request seeks information to which Defendants have equal access. GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

## Request No. 8:

All communications between you and Counter-Plaintiffs regarding any contracts with TelEfficient or CoEfficient.

**Response:**

GENBAND objects that by definition, this request seeks information to which Defendants have equal access.

GENBAND will produce responsive documents to the extent such documents exist.

## Request No. 9:

All internal GENBAND communications regarding any contracts with Counter-Plaintiffs.

**Response:**

GENBAND objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged

communications to the extent such documents exist.

**Request No. 10:**

All documents relating to the Notes, including but not limited to any draft copies of the Notes or meeting minutes or summaries regarding the Notes.

**Response:**

GENBAND objects that "relating to" is vague and overbroad. GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**Request No. 11:**

All communications between you and Counter-Plaintiffs regarding the Notes, including but not limited to communications relating to the negotiations of the Notes, the execution of the Notes, and any requested extension of the Notes.

**Response:**

GENBAND objects that by definition, this request seeks information to which Defendants have equal access.

GENBAND will produce responsive documents to the extent such documents exist.

**Request No. 12:**

All internal GENBAND communications regarding the Notes, including but not limited to communications relating to the negotiations of the Notes, the decision to issue the Notes, the execution of the Notes, any requested extension of the Notes, and the decision to demand payment on the Notes.

**Response:**

GENBAND objects that this Request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the phrase "regarding the Notes" is vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**<u>Request No. 13:</u>**

Any business plans, prospectuses, pitch materials, presentations, or similar documents that mention the use of third-party financing to pay for switches.

**Response:**

GENBAND objects that the term "mention the use" is vague and overbroad. GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**<u>Request No. 14:</u>**

All communications between you and any customer or potential customer relating to the use of third-party financing to pay for switches.

**Response:**

GENBAND objects that the terms "potential customer" and "relating to" are vague and overbroad.

Subject to these objections, GENBAND will produce relevant, non-privileged documents to the extent such documents exist.

**<u>Request No. 15:</u>**

All communications between you and Counter-Plaintiffs regarding the financing of deals involving AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil.

**Response:**

GENBAND objects that by definition, this request seeks information to which Defendants have equal access.

GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**<u>Request No. 16:</u>**

All internal GENBAND communications regarding third-party financing of deals involving AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil.

**Response:**

GENBAND objects that this Request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as all communications "regarding third-party financing of deals" is not sufficiently limited to the subject matter of this lawsuit.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**Request No. 17:**

All contracts with customers relating to deals in which TelEfficient was involved, including but not limited to deals with AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil.

**Response:**

GENBAND objects that the terms "relating to deals" and "in which TelEfficient was involved" are vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.

GENBAND further objects to this Request to the extent it seeks documents protected by confidentiality agreements to which Defendants are not parties.

Subject to ehse objections, GENBAND will produce responsive documents to the extent such documents exist.

**Request No. 18:**

All documents relating to the revenue generated and income earned by GENBAND from any deal in which TelEfficient was involved, including but not limited to deals with AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "relating to …any deal," "revenue generated," and "in which TelEfficient was involved" are vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by confidentiality agreements to which Defendants are not parties.

Subject to these objections, GENBAND will produce responsive documents to the extent such documents exist.

**Request No. 19:**

All documents and communications relating to financing any deals in which TelEfficient was involved, including but not limited to deals with AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "relating to" and "in which TelEfficient was involved" are vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents and communications to the extent such documents exist.

**Request No. 20:**

All documents and communications relating to the likelihood that any deal would close with TelEfficient financing.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "relating to" is vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents and communications to the extent such documents exist.

**Request No. 21:**

All documents and communications relating to the likelihood that any deal would close with third-party financing.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "any deal", "relating to" and "third-party financing" are vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents and communications to the extent such documents exist.

**Request No. 22:**

All documents and communications relating to the value TelEfficient provided to GENBAND.

**Response:**

GENBAND objects that this Request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "relating to," "value," and "provided to" are vague.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents and communications to the extent such documents exist.

**Request No. 23:**

All documents and communications relating to GENBAND potentially acquiring TelEfficient or CoEfficient.

**Response:**

GENBAND objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents and communications to the extent such documents exist.

**Request No. 24:**

All contracts between you and any company in the business of providing loans or other instruments to finance switch sales and/or upgrades.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "any company in the business of providing loans or other instruments to finance switch sales and/or upgrades" is vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by

confidentiality agreements to which Defendants are not parties.

In accord with these objections and the General Objections stated above, GENBAND will not produce any documents in response to this Request as it is currently constructed.

## Request No. 25:

All communications between you and any company in the business of providing loans or other instruments to finance switch sales and/or upgrades.

## Response:

GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "any company in the business of providing loans or other instruments to finance switch sales and/or upgrades" is vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by confidentiality agreements to which Defendants are not parties.

In accord with these objections and the General Objections stated above, GENBAND will not produce any documents in response to this Request as it is currently constructed.

## Request No. 26:

All internal GENBAND communications relating to any company in the business of providing loans or other instruments to finance switch sales and/or upgrades.

## Response:

GENBAND objects that this Request is unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as the terms "any company in the business of providing loans or other instruments to finance switch sales and/or upgrades" is vague and overbroad.

GENBAND further objects to this Request to the extent it seeks documents protected by confidentiality agreements to which Defendants are not parties.

In accord with these objections and the General Objections stated above, GENBAND will not produce any documents in response to this Request as it is currently constructed.

## Request No. 27:

All communications between you and any of the following customers discussing third-party financing of switch sales and/or upgrades: AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil.

**Response:**

GENBAND objects that the term "discussing third-party financing of switch sales and/or upgrades" is vague and overbroad, and duplicative of Request No. 14.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**Request No. 28:**

All personal emails and text messages from any accounts of the following custodians relating to or mentioning CoEfficient, TelEfficient, or Murat Armbruster: David Walsh, Steven Bruny, Alex Russo, Daryl Raiford, and Mark Pugerude.

**Response:**

GENBAND objects that this Request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as "relating to" and "mentioning" are not sufficiently limited to the subject matter of this lawsuit. GENBAND further objects to this Request to the extent it seeks information outside the possession, custody, or control of GENBAND.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**Request No. 29:**

All documents you intend to use to support any claim or defense, including any impeachment documents.

**Response:**

GENBAND objects to this Request as overbroad, unduly burdensome, and an improper request for the GENBAND parties to marshal all of their evidence for trial at this early stage of the case.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent such documents exist.

**Request No. 30:**

All documents you review, rely upon, or reference in any response to any interrogatory or request for admission.

GENBAND Management Services Corporation's Amended Responses to Defendants' First Set of RFPs    Page 10
**DEFENDANT'S MOTION TO COMPEL AND REQUEST FOR RULING ON**
**DISCOVERY OBJECTIONS - Page 28 of 101**

334

**Response:**

GENBAND objects to this Request as overbroad and unduly burdensome.

GENBAND further objects to this Request to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents to the extent any such documents exist.

## Request No. 31:

Documents supporting the attorneys' fees you are seeking, including non-privileged fee invoices documenting the fees you are seeking.

**Response:**

GENBAND objects to this Request as overbroad and to the extent it seeks documents protected by attorney-client privilege or the work-product doctrine.

Subject to these objections, GENBAND will produce responsive, non-privileged documents at an appropriate later date.

Dated: April 25, 2018           Respectfully submitted,

                         */s/Jonathan Rubenstein*

                         Jonathan Rubenstein
                         jonathan.rubenstein@bakerbotts.com
                         Texas Bar No. 24037403
                         Susan Kennedy
                         susan.kennedy@bakerbotts.com
                         Texas Bar No. 24051663
                         Amy C. Heard
                         amy.heard@bakerbotts.com
                         Texas Bar No. 24097818

                         BAKER BOTTS L.L.P.
                         2001 Ross Avenue
                         Dallas, Texas 75201
                         Telephone:    (214) 953-6500

                         **ATTORNEYS FOR PLAINTIFF**
                         **GENBAND MANAGEMENT**
                         **SERVICES CORPORATION**

GENBAND Management Services Corporation's Amended Responses to Defendants' First Set of RFPs    Page 12
**DEFENDANT'S MOTION TO COMPEL AND REQUEST FOR RULING ON**
**DISCOVERY OBJECTIONS - Page 30 of 101**    336

## <u>CERTIFICATE OF SERVICE</u>

      This certifies that a copy of the above and foregoing was served on the following counsel

of record pursuant to the Texas Rules of Civil Procedure:

Tyler J. Bexley
tyler.bexley@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3202
Telephone:    (214) 382-9810
Facsimile:    (214) 501-0731

ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS
COEFFICIENT, LLC AND TELEFFICIENT, LLC

*/s/ Amy C. Heard*
      Amy C. Heard

**EXHIBIT 3**

Cause No. DC-16-12593

| | | |
|---|---|---|
| | § | |
| GENBAND Management Services Corporation, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| CoEfficient, LLC; TelEfficient, LLC. | § § | DALLAS COUNTY, TEXAS |
| Defendants/ Counter-Plaintiffs, | § § § | |
| v. | § § | |
| GENBAND Management Services, Corporation, GENBAND Holdings Company, and GENBAND US, LLC, Counter-Defendants | § § § § | 116th JUDICIAL DISTRICT |

## GENBAND MANAGEMENT SERVICES CORPORATION'S AMENDED RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

GENBAND Management Services Corporation ("GENBAND") responds and objects to the First Set of Interrogatories ("Interrogatories") served by CoEfficient, LLC and TelEfficient, LLC (together, "Defendants") as follows:

### PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

GENBAND will withhold information protected by attorney-client privilege, the work-product doctrine, or any other applicable privilege or protection pursuant to the Texas Rules of Civil Procedure. GENBAND will comply with its obligations under the Texas Rules of Civil Procedure and objects to the Requests to the extent they seek to impose obligations that differ from or exceed those Rules.

GENBAND objects to the Interrogatories to the extent they seek information outside the time period of the parties' relationship. GENBAND will answer such Interrogatories as to the

time period from March 2012 to present.

GENBAND specifically reserves the right to amend and/or supplement these responses and objections at a later date.

<div align="center">OBJECTIONS TO INTERROGATORIES</div>

**<u>Interrogatory No. 1:</u>**

Explain your corporate structure, and identify GENBAND's place in the corporate hierarchy and GENBAND US, LLC's place in the corporate hierarchy. Your answer should include the ultimate parent company of each of those entities.

**Response:**

GENBAND objects that this Interrogatory is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

Pursuant to Texas Rule of Civil Procedure 197.2(c), GENBAND has produced or will produce documents from which the answer to this interrogatory can be ascertained.

**<u>Interrogatory No. 2:</u>**

State the legal name of the entity or entities that employ or employed David Walsh, Steven Bruny, Daryl Raiford, and Mark Pugerude.

**Response:**

GENBAND objects that this Interrogatory is vague and overbroad as it does not specify a time period of employment.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

At all times relevant to this dispute, David Walsh, David Walsh, Steven Bruny, Daryl Raiford, and Mark Pugerude were employed by GENBAND Management Services Corporation.

**<u>Interrogatory No. 3:</u>**

Identify each GENBAND customer to whom you introduced TelEfficient.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence as the terms "GENBAND

customer" and "introduced" are vague and overbroad. GENBAND further objects that this Request seeks information to which Defendants have equal access.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

GENBAND introduced TelEfficient to AT&T, Verizon, CenturyLink, Level(3), VodaFone NewZealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom, Deutsche Telekom, Frontier, Telefonica Brasil, Hawaii Telecom, Sprint, Optus, XO Communications, Bell Canada, and Windstream.

## Interrogatory No. 4:

For each customer you identified in response to Interrogatory No. 3, state whether you closed a deal to sell, remove, and/or upgrade switches and, if so, state the date each deal closed.

## Response:

GENBAND objects that this Request is not reasonably calculated to lead to the discovery of admissible evidence as the phrase "closed a deal to sell, remove, and/or upgrade switches" does not describe the standard course of dealing between GENBAND and its customers and therefore cannot be succinctly answered. In most cases, GENBAND has master agreements with customers who issue purchase orders for goods and services over varying periods of time when needed and do not ordinarily execute discrete contracts for specific orders except in exceptional cases. Most customers do not routinely engage in total switch replacements or large-scale upgrades, but rather purchase component parts of switches or individual switches as their needs demand. There are also many kinds of switches, so our understanding of the term is that it means large scale core processing systems used by carriers in their central offices for the connection of calls with subscribers. Therefore, there is not a precise date "a deal closed" for "switch upgrades" as the question is phrased. GENBAND has made a good faith effort to answer this interrogatory by giving ranges of dates during which the relevant customers submitted purchase orders or requested parts or maintenance for their switches. For further information, we refer counsel to the contracts GENBAND will produce according to the protective order between the parties.

Subject to the foregoing explanation, GENBAND responds as follows:

GENBAND had an existing customer relationship with AT&T and was already in the process of completing an initial phase of a switch upgrade project for AT&T prior to GENBAND's relationship with TelEfficient. GENBAND reached an agreement with AT&T to handle an additional phase of the switch upgrade project in June of 2014. AT&T has continued with an incremental upgrade of its switches since June of 2014.

GENBAND had a series of ongoing projects with Verizon prior to GENBAND's business relationship with TelEfficient. Those projects required funding approval from Verizon each year to continue, and some of those approvals came after the time that TelEfficient was introduced to Verizon. But those approvals related to projects that were started prior to TelEfficient's introduction. Verizon has purchased switches or parts of switches from

GENBAND since 2012.

GENBAND had an existing customer relationship with CenturyLink. GENBAND was doing business with CenturyLink prior to the beginning of GENBAND's relationship with TelEfficient. CenturyLink acquired Level(3) in November of 2017. GENBAND sold the combined company a switch in April 2017.

GENBAND had an existing customer relationship with VodaFone New Zealand prior to the beginning of GENBAND's relationship with TelEfficient. No deals for switch upgrade projects were closed with VodaFone New Zealand after TelEfficient was introduced.

GENBAND had an existing customer relationship with Claro Puerto Rico prior to the beginning of GENBAND's relationship with TelEfficient. A deal was closed with Claro Puerto Rico in late 2017 for an Emergency Recovery project consisting of a switch network upgrade to replace 2 TDM switches that were damaged by Hurricanes Irma and Maria.

No deals for switch upgrade projects were closed with TelePacific after TelEfficient was introduced.

GENBAND had an existing customer relationship with British Telecom prior to GENBAND's relationship with TelEfficient. GENBAND made sales to British Telecom in January of 2016, June of 2016, and October of 2017.

GENBAND had an existing customer relationship with Portugal Telecom prior to GENBAND's relationship with TelEfficient. No deals for switch upgrade projects were closed with Portugal Telecom after TelEfficient was introduced.

GENBAND had an existing customer relationship with Deutsche Telekom prior to GENBAND's relationship with TelEfficient. No deals for switch upgrade projects were closed with Deutsche Telekom after TelEfficient was introduced.

GENBAND sold Frontier a C15 switch for use in the lab in December 2017.

GENBAND had an existing customer relationship with Telefonica Brasil prior to GENBAND's relationship with TelEfficient. No deals for switch upgrade projects were closed with Telefonica Brasil after TelEfficient was introduced.

GENBAND had an existing customer relationship with Hawaii Telecom prior to GENBAND's relationship with TelEfficient. Hawaii Telecom began incrementally converting CS2K switches to C20 switches throughout 2017.

GENBAND had an existing customer relationship with Sprint prior to GENBAND's relationship with TelEfficient. No deals for switch upgrade projects were closed with Sprint after TelEfficient was introduced. Pursuant to a Master Purchase Agreement between GENBAND and Sprint, Sprint has incrementally purchased replacement parts.

GENBAND and Optus signed a Master Purchase Agreement in Fall 2015. Pursuant to that agreement, Optus has purchased replacement parts and maintenance services.

GENBAND had an existing customer relationship with XO Communications prior to GENBAND's relationship with TelEfficient. GENBAND and XO Communications reached an agreement for network transformation in December 2015, but after XO Communications was acquired by Verizon in 2016, the transformation contract was abandoned.

GENBAND had an existing customer relationship with Bell Canada prior to GENBAND's relationship with TelEfficient. Bell Canada purchased updates and enhancements in March 2018.

GENBAND had an existing customer relationship with Windstream prior to GENBAND's relationship with TelEfficient. Windstream purchased a switch in November 2016.

**Interrogatory No. 5:**

For each customer you identified in response to Interrogatory No. 4, state whether the customer paid with its own funds at closing or used third-party financing.

**Response:**

Each customer in each deal listed in Interrogatory No. 4 paid with its own funds at closing. To GENBAND's knowledge, none of the parties listed in Interrogatory No. 4 used any third-party financing in connection with any of the deals listed in Interrogatory No. 4.

**Interrogatory No. 6:**

State whether you have closed a deal to sell, remove, and/or upgrade switches for any of the following companies from March 2012 to present: AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil. For any of companies with which you have closed a deal, state the date each deal closed.

**Response:**

See response to Interrogatory No. 4.

**Interrogatory No. 7:**

State whether you have closed a deal with any of the following companies from March 2012 to present that involved third-party financing: AT&T, Verizon, CenturyLink, Vodafone New Zealand, Claro Puerto Rico, TelePacific, British Telecom, Portugal Telecom Deuteches Telecom, Level 3, Frontier, or Telefonica Brazil. For any of companies with which you have closed a deal involving third-party financing, state the name of the company that provided the financing.

**Response:**

GENBAND objects that this Request is unduly burdensome, not relevant or reasonably

calculated to lead to the discovery of admissible evidence as the terms "a deal" and "involved third-party financing" are vague and overbroad.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

GENBAND has not reached an agreement that utilized a third-party financing company to finance a switch upgrade project for any of the listed companies.

## Interrogatory No. 8:

Identify each company in the business of providing loans or other instruments to finance switch sales and/or upgrades with whom you have worked from March 2012 to present.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence as the term "company in the business of providing loans or other instruments to finance switch sales and/or upgrades" is vague and overbroad.  GENBAND further objects to this Request to the extent it seeks information to which Defendants have equal access.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

GENBAND has not worked with any company in the business of providing loans or other instruments to finance switch sales and/or upgrades from March 2012 to present other than TelEfficient.

## Interrogatory No. 9:

Identify each statement (by speaker, recipient, approximate date, and content of statement) in which a GENBAND employee or representative discussed whether GENBAND would extend the maturity date of the Notes.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence as the term "discussed" is vague and overbroad. GENBAND further objects to this Request to the extent it seeks information to which Defendants have equal access.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

Pursuant to Texas Rule of Civil Procedure 197.2(c), GENBAND has produced or will produce any documents that may exist from which the answer to this interrogatory can be ascertained.

**Interrogatory No. 10:**

Identify each statement (by speaker, recipient, approximate date, and content of statement) in which a GENBAND employee or representative discussed the likelihood of closing a deal with TelEfficient financing.

**Response:**

GENBAND objects that this Request is unduly burdensome and not relevant or reasonably calculated to lead to the discovery of admissible evidence as the terms "discussed," and "closing a deal with TelEfficient financing" are vague and overbroad. GENBAND further objects to this Request to the extent it seeks information to which Defendants have equal access.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

Pursuant to Texas Rule of Civil Procedure 197.2(c), GENBAND will produce any documents that may exist from which the answer to this interrogatory can be ascertained.

**Interrogatory No. 11:**

Identify each person or entity (other than your counsel), including but not limited to any investors, merger partners, or potential merger partners, with whom you have discussed this lawsuit or your relationship with Counter-Plaintiffs.

**Response:**

GENBAND objects that this Request is unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence as the term "relationship with Counter-Plaintiffs" is vague and overbroad. GENBAND further objects to this Request ot the extent it seeks information to which Defendants have equal access.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

GENBAND and all related entities recently merged with Sonus Networks, Inc. to form Ribbon Communications, Inc. After that merger, counsel for GENBAND discussed this lawsuit with the legal department of the newly-formed company. GENBAND did not discuss this lawsuit or its relationship with Defendants prior to the merger, and has not discussed this lawsuit or its relationship with Defendants with anyone other than counsel since the merger.

GENBAND's Amended Responses to Defendants' First Set of Interrogatories — Page 7
**DEFENDANT'S MOTION TO COMPEL AND REQUEST FOR RULING ON DISCOVERY OBJECTIONS - Page 39 of 101**

345

Dated: April 25, 2018

Respectfully submitted,

*/s/Jonathan Rubenstein*

Jonathan Rubenstein
jonathan.rubenstein@bakerbotts.com
Texas Bar No. 24037403
Susan Kennedy
susan.kennedy@bakerbotts.com
Texas Bar No. 24051663
Amy C. Heard
amy.heard@bakerbotts.com
Texas Bar No. 24097818

BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Telephone:     (214) 953-6500

**ATTORNEYS FOR PLAINTIFF
GENBAND MANAGEMENT
SERVICES CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was served on the following counsel

of record pursuant to the Texas Rules of Civil Procedure:

Tyler J. Bexley
tyler.bexley@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3202
Telephone:     (214) 382-9810
Facsimile:     (214) 501-0731

ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS
COEFFICIENT, LLC AND TELEFFICIENT, LLC

*/s/ Amy C. Heard*
Amy C. Heard

# EXHIBIT 4

Cause No. DC-16-12593

| | | |
|---|---|---|
| | § | |
| GENBAND Management Services Corporation, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CoEfficient, LLC; TelEfficient, LLC. | § | DALLAS COUNTY, TEXAS |
| | § | |
| Defendants/ Counter-Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC, Counter-Defendants | § | 116th JUDICIAL DISTRICT |

## GENBAND MANAGEMENT SERVICES CORPORATION'S RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES

GENBAND Management Services Corporation ("GENBAND") responds and objects to the Second Set of Interrogatories ("Interrogatories") served by CoEfficient, LLC and TelEfficient, LLC (together, "Defendants") as follows:

### PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

GENBAND will withhold information protected by attorney-client privilege, the work-product doctrine, or any other applicable privilege or protection pursuant to the Texas Rules of Civil Procedure. GENBAND objects to the Interrogatories to the extent they seek to impose obligations that differ from or exceed those imposed by the Texas Rules of Civil Procedure. GENBAND will comply with its obligations under those Rules. GENBAND specifically reserves the right to amend and/or supplement these responses and objections at a later date.

<center>OBJECTIONS TO INTERROGATORIES</center>

**Interrogatory No. 1:**

State whether Sonus Networks, Inc. or Ribbon Communications, Inc. (or any parent company or subsidiary of either) assumed the liabilities of any GENBAND entity. If so, identify the entity that is presently responsible for the liabilities of GENBAND Management Services Corporation, GENBAND US, LLC, and GENBAND Holdings Company.

**Response:**

GENBAND objects that this Interrogatory is not relevant or reasonably calculated to lead to the discovery of admissible evidence, particularly to the extent this interrogatory seeks information regarding GENBAND entities that are not relevant to this lawsuit.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

GENBAND Management Services has merged into Sonus Networks, Inc. GENBAND US, LLC and GENBAND Holdings Company remain independent entities. In addition, pursuant to Texas Rule of Civil Procedure 197.2(c), GENBAND has produced or will produce documents from which the answer to this interrogatory can be ascertained.

**Interrogatory No. 2:**

State whether each of the following individuals is currently employed by or affiliated with GENBAND: David Walsh, Steven Bruny, Daryl Raiford, Mark Pugerude, and Alexander Russo. For any that are no longer employed by or affiliated with GENBAND, state the reason and the approximate date when their employment or affiliation ended.

**Response:**

GENBAND responds as follows:

David Walsh is currently employed by Sonus Networks, Inc.

Steven Bruny is currently employed by Sonus Networks, Inc.

Daryl Raiford is currently employed by Sonus Networks, Inc.

Mark Pugerude is no longer employed by GENBAND Management Services Corporation. His employment ended January 15, 2016.

Alexander Russo has never been an employee of any GENBAND, Sonus, or Ribbon entity.

**Interrogatory No. 3:**

Identify by bates number any TelEfficient financial model currently in your possession.

**Response:**

GENBAND objects that this Request is vague as it does not define the term "financial model."

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

Pursuant to Texas Rule of Civil Procedure 197.2(c), GENBAND has produced or will produce documents from which the answer to this interrogatory can be ascertained.

**Interrogatory No. 4:**

Identify by bates number any documents that use or incorporate information from any TelEfficient financial model.

**Response:**

GENBAND objects that this Request is vague and overbroad as it does not define the terms "use" or "financial model."

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

Pursuant to Texas Rule of Civil Procedure 197.2(c), GENBAND has produced or will produce documents from which the answer to this interrogatory can be ascertained.

**Interrogatory No. 5:**

Identify any third party with whom you have shared any TelEfficient financial model, and for each party, state the approximate date when such information was shared and with whom.

**Response:**

GENBAND objects that this Request is vague, overbroad, unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence as it does not define the terms "shared" or "financial model." GENBAND further objects that this Request seeks information to which Defendants have equal access.

Subject to and without waiving the foregoing objections, GENBAND responds as follows:

Pursuant to Texas Rule of Civil Procedure 197.2(c), GENBAND has produced or will produce documents from which the answer to this interrogatory can be ascertained.

Dated: February 9, 2018

Respectfully submitted,

*/s/Jonathan Rubenstein*

Jonathan Rubenstein
jonathan.rubenstein@bakerbotts.com
Texas Bar No. 24037403
Susan Kennedy
susan.kennedy@bakerbotts.com
Texas Bar No. 24051663
Amy C. Heard
amy.heard@bakerbotts.com
Texas Bar No. 24097818

BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Telephone:     (214) 953-6500

**ATTORNEYS FOR PLAINTIFF
GENBAND MANAGEMENT
SERVICES CORPORATION AND
COUNTER-DEFENDANTS GENBAND
HOLDINGS COMPANY AND
GENBAND US, LLC**

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was served on the following counsel

of record pursuant to the Texas Rules of Civil Procedure:

Tyler J. Bexley
tyler.bexley@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3202
Telephone:     (214) 382-9810
Facsimile:     (214) 501-0731

ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS
COEFFICIENT, LLC AND TELEFFICIENT, LLC

*/s/ Amy C. Heard*
Amy C. Heard

**EXHIBIT 5**

**TEL_085383-TEL_085384**

| | |
|---|---|
| From: | Murat Armbruster |
| Sent: | Friday, January 9, 2015 2:57 PM CST |
| To: | Steven Bruny |
| CC: | Hao Lam-TEL |
| Subject: | Re: Promissory Note Extension & GB Legal Review Status |

Should we have Tracy on the call? She'll be more familiar with the contract than I.

Sent from my iPhone

On Jan 9, 2015, at 12:26 PM, Steven Bruny <Steven.Bruny@genband.com> wrote:

> I would call Mark re extension and let him champion. Also, internal call went well and team asked Justin and I to followup. Can we schedule a call with you two on Monday morning…most anytime but 7:30-8:30 PST good with me.
> --
> **Steven Bruny**
> Sr. Vice President
> Major Accounts
>
> 2801 Network Boulevard
> Suite 300
> Frisco, TX 75034, USA
> www.genband.com
> mobile +1.303.669.6185
> steven.bruny@genband.com

**From:** Murat Armbruster <murat@telefficientllc.com>
**Date:** Friday, January 9, 2015 1:03 PM
**To:** Steven Bruny <steven.bruny@genband.com>
**Cc:** Hao Lam-TEL <hao@telefficientllc.com>
**Subject:** Promissory Note Extension & GB Legal Review Status

Dear Steven,

Hao and I are very curious to hear how the conversation with your executive team went around the promissory note extension and the legal team's review of the latest round of documents.

Please let us know when you get a chance. Also should I just call Daryl and ask him for the extension or is it best to have you and Mark champion this to David?

Thanks,

356

CONFIDENTIAL

TEL_085383

Murat

PS Let us know if you need anything else for the GSS.

---

**Murat A. Armbruster**

CEO
CoEfficient, LLC

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:   +1-415-944-3491
mobile: +1-617-905-3924
Skype:   muratarmbruster

901 Mission Street, Suite 105
San Francisco,  CA  94103

---

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail. This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of TelEfficient, LLC.

---

CONFIDENTIAL

# TEL_086372-TEL_086374

| | |
|---|---|
| From: | Murat Armbruster |
| Sent: | Wednesday, January 28, 2015 1:54 PM CST |
| To: | Steven Bruny |
| Subject: | Re: Daryl |

Maybe also feel him out for the next $25,000 for M&V and $40,000 for our operations, if he is thinking this won't be a problem to get it to us in a timely fashion….

Really appreciate it! Thank you,

Murat

---

## Murat A. Armbruster

CEO
CoEfficient, LLC

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:   +1-415-944-3491
mobile: +1-617-905-3924
Skype:   muratarmbruster

2323 Broadway
Oakland, CA  94612

---

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail.  This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of TelEfficient, LLC.

---

CONFIDENTIAL                                                                                                     TEL_086372

On Jan 28, 2015, at 11:46 AM, Steven Bruny <Steven.Bruny@genband.com> wrote:

I left him a message last night and email this morning, I expect to talk to him this afternoon as I have some other subjects as well.

--
**Steven Bruny**
Sr. Vice President
Major Accounts

2801 Network Boulevard
Suite 300
Frisco, TX 75034, USA
www.genband.com
mobile +1.303.669.6185
steven.bruny@genband.com

---

**From:** Murat Armbruster <murat@telefficientllc.com>
**Date:** Wednesday, January 28, 2015 12:41 PM
**To:** Steven Bruny <steven.bruny@genband.com>
**Subject:** Daryl

Hi Steven,

Were you able to talk to Daryl yesterday?

We still have not received anything, and our deadline is Monday!

I don't like taking these things so close to the wire and can't understand why it's taking 2 weeks to counter sign a document that Justin drafted and we all agreed to.

Thanks,

Murat

---

## Murat A. Armbruster

CEO
CoEfficient, LLC

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:   +1-415-944-3491
mobile:  +1-617-905-3924
Skype:   muratarmbruster

2323 Broadway
Oakland, CA  94612

_____

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not
the intended recipient of this e-mail or you otherwise believe you have received this message in error, please
notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail.  This
e-mail does not form the basis of a contract unless specifically stated by an authorized representative of
TelEfficient, LLC.

_____

**TEL_030023-TEL_030024**

| | |
|---|---|
| **From:** | Steven Bruny |
| **Sent:** | Friday, March 28, 2014 2:13 PM CDT |
| **To:** | Murat Armbruster |
| **CC:** | Hao Lam |
| **Subject:** | Re: Here is note draft , the LOU will be coming shortly |

But the won't..that's typical of demand note.

**From:** Murat Armbruster <murat@telefficientllc.com>
**Date:** Fri, 28 Mar 2014 12:02:45 -0700
**To:** Steven Bruny <steven.bruny@genband.com>
**Cc:** Hao Lam <hao@telefficientllc.com>
**Subject:** Re: Here is note draft , the LOU will be coming shortly

It looks like GB can call the note any time before the year is up. That won't work for us.

Sent from my iPhone

On Mar 28, 2014, at 11:58 AM, Steven Bruny <Steven.Bruny@genband.com> wrote:

> Ok..thx

**From:** Hao Lam <hao@telefficientllc.com>
**Date:** Fri, 28 Mar 2014 11:52:57 -0700
**To:** Steven Bruny <steven.bruny@genband.com>
**Cc:** Murat Armbruster <murat@telefficientllc.com>
**Subject:** Re: Here is note draft , the LOU will be coming shortly

Thank you Steven.

We will look it over and get back to you.

Hao
On Mar 28, 2014, at 11:46 AM, Steven Bruny wrote:

> <Revolving Note - GENBAND - Telefficient (3-28-14)v.2[1].doc>

# Hao T. Lam

CFO

TelEfficient, LLC

Efficiency in Telecommunications™

office:   +1-415-704-8796
mobile:  +1-510-274-7420
Skype:   comolam2

901 Mission Street, Suite 105,
San Francisco, CA 94103

---

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail. This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of CoEfficient Group, LLC.

---

TEL_037508-TEL_037510

| From: | Murat Armbruster |
|---|---|
| Sent: | Tuesday, March 10, 2015 6:48 PM CDT |
| To: | Steven Bruny |
| Subject: | Re: Comfort Letter for Bostonia |

I agree. Mark White made the request and we did not want to put it through to you, but he was pretty insistent.

So, I passed it along and wanted to see if you'd consider it. The letter only addresses a gap in the promissory note that they wanted clarified.

It is tough to keep all the parties happy!

Murat

---

## Murat A. Armbruster

CEO
CoEfficient, LLC

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:  +1-415-944-3491
mobile: +1-617-905-3924
Skype:  muratarmbruster

2323 Broadway
Oakland, CA  94612

---

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail.  This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of TelEfficient, LLC.

---

On Mar 10, 2015, at 4:31 PM, Steven Bruny <Steven.Bruny@genband.com> wrote:

This is a bit of a strange request in my view..GENBAND has been funding TEL, what more commitment is there.

--
**Steven M. Bruny**
President
Solutions Delivery and Support
mobile: +1.303.669.6185
<47A3A4C9-3F42-4FEE-BDA3-FBEFC2D795B2[62].png>

---

**From:** Mark Pugerude <mark.pugerude@genband.com>
**Date:** Tuesday, March 10, 2015 4:04 PM
**To:** Murat Armbruster <murat@telefficientllc.com>, Steven Bruny <steven.bruny@genband.com>
**Cc:** "mwhite@bostonia.com" <mwhite@bostonia.com>, Hao Lam-TEL <hao@telefficientllc.com>
**Subject:** RE: Comfort Letter for Bostonia

Comfort meaning what?   We all want to feel comfort.


Mark Pugerude
President of Global Sales
GENBAND, Inc.
IP Phone:  1.972.265.3626


-------- Original message --------
From: Murat Armbruster
Date:03/10/2015 6:43 PM (GMT-05:00)
To: Mark Pugerude ,Steven Bruny
Cc: "Mark S. White" ,Hao Lam-TEL
Subject: Comfort Letter for Bostonia

Dear Mark P and Steven,

Bostonia has requested a "comfort letter" relating to the loan to TEL/COE for the legal fees for Bostonia in the event that we don't close a transaction.

Mark White (cced here) and his team have drafted the attached letter. Our counsel has reviewed it and now we we like to ask if GENBAND would consider signing it or something to similar effect.

This will go a long way in providing Bostonia a bit more clarity (and comfort) around the terms of the Promissory Note executed with TEL/COE on December 18th and extended on January 15th.

Confidential                                                                                                    TEL_037509

Please let us know if you'd like to do a call with Mark and myself to discuss.

Thank you,

Murat

_____

## Murat A. Armbruster

CEO
CoEfficient, LLC

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:   +1-415-944-3491
mobile: +1-617-905-3924
Skype:  muratarmbruster

2323 Broadway
Oakland, CA  94612

_____

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail.  This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of TelEfficient, LLC.

_____

TEL_034433-TEL_034435

| | |
|---|---|
| **From:** | Murat Armbruster |
| **Sent:** | Wednesday, November 19, 2014 10:21 AM CST |
| **To:** | Steven Bruny |
| **Subject:** | Fwd: Genband products |

Seems odd to me that David is taking a call like this...isn't this our job to deal with this?

Maybe I'm reading too into it...

M

---

Murat A. Armbruster

CEO
CoEfficient, LLC

Solving the Energy Equation™

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:  +1-415-944-3491
mobile: +1-617-905-3924
Skype:   muratarmbruster

901 Mission Street, Suite 105
San Francisco,  CA  94103

---

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail.  This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of CoEfficient, LLC and/or TelEfficient, LLC.

---

Begin forwarded message:

**From:** Louisa Chan <LChan@willdan.com>
**Subject: RE: Genband products**
**Date:** November 19, 2014 at 6:54:59 AM PST
**To:** David Walsh <David.Walsh@genband.com>
**Cc:** "'alex.russo@mtholdings.net'" <alex.russo@mtholdings.net>,
"'murat@coefficientgroup.com'" <murat@coefficientgroup.com>, Mark Pugerude
<Mark.Pugerude@genband.com>, Jolea Lauro <Jolea.Lauro@genband.com>

Hi David,

Thank you for your interest in the NYSERDA program. I'd be happy to have a call with you and your colleagues on Thursday (2-6pm) or Friday (all day except 2:30-3:30). If you find it helpful, I can also come to your offices to do a presentation of the program or do an online presentation. Whatever works best with your schedules. I look forward to speaking with you.

Many thanks,
Louisa

**From:** David Walsh [mailto:David.Walsh@genband.com]
**Sent:** Tuesday, November 18, 2014 6:54 PM
**To:** Louisa Chan
**Cc:** 'alex.russo@mtholdings.net'; 'murat@coefficientgroup.com'; Mark Pugerude; Jolea Lauro
**Subject:** Re: Genband products

Louisa,

Can we have a quick call to discuss. I'm located in nyc so if it makes sense after our chat we can get together there. What's a good phone # to reach you.

D.

**From:** Louisa Chan [mailto:LChan@willdan.com]
**Sent:** Tuesday, November 18, 2014 05:26 PM
**To:** David Walsh
**Subject:** Genband products

Hi David,

I recently spoke with Brian Green, your Global Sustainability lead in the UK who suggested I reach out to you to tell you about financial incentives that your New York customers are eligible for through the New York State Energy Research and Development Authority (NYSERDA). I am also writing to request your assistance in connecting with the appropriate New York colleagues who will find these information useful in their client engagement efforts.

NYSERDA is a public entity aimed at making New York state more energy efficient. NYSERDA's Industrial Process Efficiency program provides financial incentives for energy efficient improvements related to data processing and data centers. I am happy to inform you that some of Genband's products fall within purview of the incentive program i.e. switchgear upgrades in telecom facilities.

Your customers can get up to $5 million or 50% of total project cost for energy efficient upgrades that have verified energy savings.

By working with NYSERDA, Genband customers can leverage incentives to realize cost savings from capital intensive improvements which helps your company demonstrate additional value to your clients. Please note, my company is paid for by NYSERDA on a flat fee, non-commission basis to provide support to interested program participants so neither your company nor your clients will ever be charged for our help.  If you have any questions about the program please feel free to get in touch.

I look forward to your reply and thank you in advance for your assistance.

Best regards,
Louisa


*****
Louisa Chan
Energy Efficiency Outreach Specialist
Willdan Energy Solutions
Independent Contractor to NYSERDA

One Exchange Plaza | 55 Broadway, Suite 1900 | New York, NY 10006
Office: +1.212.701.7280  | Mobile:+1.646.634.2591



TEL_085438-TEL_085439

| | |
|---|---|
| From: | Murat Armbruster |
| Sent: | Tuesday, January 13, 2015 3:13 PM CST |
| To: | Mark Pugerude |
| CC: | Steven Bruny; Hao Lam-TEL |
| Subject: | Re: Extension of 1st GB Loan to TEL Follow-up |

Great. Thanks. Will do.

Sent from my iPhone

On Jan 13, 2015, at 12:58 PM, Mark Pugerude <Mark.Pugerude@genband.com> wrote:

> I did ... just call Daryl.

**From:** Murat Armbruster [mailto:murat@telefficientllc.com]
**Sent:** Tuesday, January 13, 2015 3:58 PM
**To:** Mark Pugerude
**Cc:** Steven Bruny; Hao Lam-TEL
**Subject:** Extension of 1st GB Loan to TEL Follow-up

Dear Mark,

Thank you for the call yesterday and reassuring me that it shouldn't be a problem to extend the 1st GENBAND loan to TelEfficient made on April 1, 2014 can be extended to August 8, 2015 to be consistent with the other two notes.

Hopefully after you discuss with David and Daryl, this can be captured in a letter of some sort. Is there anything you need me to do to this end? Should I draft such a letter or will someone at GENBAND take care of that?

Just trying to make this not require much on the part of you and your team.

With gratitude,

Murat

_____

Murat A. Armbruster

CEO
CoEfficient, LLC

CONFIDENTIAL    TEL_085438

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:   +1-415-944-3491
mobile: +1-617-905-3924
Skype:   muratarmbruster

901 Mission Street, Suite 105
San Francisco,  CA  94103

_____

This e-mail may contain information that is privileged, confidential, and protected
from disclosure.  If you are not the intended recipient of this e-mail or you otherwise
believe you have received this message in error, please notify the sender by reply
transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail.
This e-mail does not form the basis of a contract unless specifically stated by an
authorized representative of TelEfficient, LLC.

_____

# EXHIBIT 6



**From:** Jonathan.Rubenstein@BakerBotts.com  📎
**Subject:** RE: Discovery Responses
**Date:** January 23, 2018 at 4:33 PM
**To:** tyler.bexley@rm-firm.com
**Cc:** Amy.Heard@BakerBotts.com

Tyler:

Thanks for your summary.  A few notes in response:

With respect to #1, we disagree about the appropriateness of the general objections that exist in our responses.  We've reviewed the cases you mentioned.  Neither is binding and both acknowledge uncertainty in the law in this area.  In an effort to avoid a needless dispute, however, Genband will agree to amend its responses to address some of your concerns related to the objections.

With respect to #2, your recount of our conversation is incomplete.  For clarity, I had several responses to your question about why the objections were asserted if we weren't currently withholding information.  First, I said that many of these requests were drafted in a manner that, on account of certain words of phrases used, required objections due to their ambiguity, scope, etc.  Next, I mentioned that, were Genband not to assert those objections, it risked waiver.  Third, I explained that Genband attempted to answer these interrogatories as well as it could given its understanding of the questions.  While Genband generally doesn't believe it's currently withholding information based on the objections, in the event TelEfficient comes back to Genband to complain that it didn't provide the type of quantity of information it expected to receive, Genband has lodged valid objections that the parties can later discuss.

Thank you.

Thank you.

**Jonathan Rubenstein**
Partner

Baker Botts L.L.P.
jonathan.rubenstein@bakerbotts.com
T +1.214.953.6594
F +1.214.661.4594

2001 Ross Avenue
Dallas, Texas 75201
USA



---

**From:** Tyler Bexley [mailto:tyler.bexley@rm-firm.com]
**Sent:** Tuesday, January 23, 2018 10:32 AM
**To:** Rubenstein, Jonathan <Jonathan.Rubenstein@BakerBotts.com>
**Cc:** Heard, Amy <Amy.Heard@BakerBotts.com>
**Subject:** Re: Discovery Responses

Jonathan,

Thanks for conferring with me on Genband's discovery responses this morning. The following is a summary of our discussion. Please let me know if I have misstated anything. Thank you.

1. General objections: Genband will not withdraw its general objections to the interrogatories or RFPs. As I said, I don't believe that general objections comply with Rule 193.2's specificity requirement. For case law on point, see 409 S.W.3d 859 (Texas rule) and 303 F.R.D. 466 (analogous Federal rule).

2. All interrogatories: Genband has asserted individual objections and incorporated its general objections on each interrogatory. You confirmed that Genband is not withholding any information on the basis of these objections but rather is asserting them to avoid waiver.

3. Interrogatories 9 & 10: In connection with your investigation, you confirmed that none of the relevant Genband employees could recall or believe given that could be responsive to the

relevant Genband employees could recall oral discussions that would be responsive to these interrogatories. No oral discussions or other information is being withheld on the basis of an objection.

4. All requests for production: Genband has asserted individual objections and incorporated its general objections on each RFP. With the exception of privilege and confidentiality objections, you confirmed that it is not Genband's intention to withhold documents on the basis of an objection and that Genband was taking a broad view of relevance. If Genband decides to withhold documents on the basis of a relevance or breadth objection, you will amend your responses to identify the categories or types of documents that are being withheld.

5. Confidentiality: Genband has asserted confidentiality objections to several RFPs, including Nos. 17 and 18, to which Genband responded that it is not currently producing documents but will amend as necessary. You stated that Genband was ensuring that it is complying with NDAs with third parties and would either produce responsive documents after complying with notice requirements or identify withheld documents if unable to produce.

6. RFPs 24-26: Genband objected to these requests on grounds of vagueness and breadth, among other things. You stated that it was not clear what types of documents were being sought by these requests. Per our agreement to clarify and narrow these requests, below are the modified requests we are seeking. Please let me know if Genband will produce responsive documents to the modified requests.

 —No. 24: All teaming agreements and similar contractual arrangements between you and any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

—No. 25: All communications between you and any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

—No. 26: All internal Genband communications relating to any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

7. Document production and protective order: As we discussed, I will get a draft protective order to you this afternoon. You indicated that Genband expects to begin producing documents this week or next and to complete its document production either next week or the following, subject to any issues with the third-party confidential documents.

Please let me know if there is anything else we need to address or anything on which we need to confer further.  Thank you.

## Reese Marketos LLP

**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
www.rm-firm.com

On Jan 19, 2018, at 3:45 PM, Jonathan.Rubenstein@BakerBotts.com wrote:

You can call my office number below.

**Jonathan Rubenstein**
Partner

Baker Botts L.L.P.
jonathan.rubenstein@bakerbotts.com
T +1.214.953.6594
F +1.214.661.4594

2001 Ross Avenue
Dallas, Texas 75201
USA

<image001.png>

<image002.png>  <image003.png>  <image004.png>  <image005.png>
<image006.png>  <image007.png>

---

**From:** Tyler Bexley [mailto:tyler.bexley@rm-firm.com]
**Sent:** Friday, January 19, 2018 3:38 PM
**To:** Rubenstein, Jonathan <Jonathan.Rubenstein@BakerBotts.com>
**Cc:** Heard, Amy <Amy.Heard@BakerBotts.com>
**Subject:** Re: Discovery Responses

That works.  Let me know what number to call.

Reese Marketos LLP
**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
www.rm-firm.com

On Jan 19, 2018, at 3:26 PM, <Jonathan.Rubenstein@BakerBotts.com>
<Jonathan.Rubenstein@BakerBotts.com> wrote:

9:30 am Tuesday?

Jonathan B. Rubenstein
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, Texas  75201
Direct Dial -- (214) 953-6594
Fax -- (214) 661-4594
jonathan.rubenstein@bakerbotts.com

On Jan 19, 2018, at 3:23 PM, Tyler Bexley <tyler.bexley@rm-firm.com>
wrote:

Jonathan,

I'll be in court most of the day Monday.  Let me know if you can do Tuesday
morning.  I can do any time.  Thanks.

## Reese Marketos LLP

**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
www.rm-firm.com

On Jan 19, 2018, at 11:11 AM,
Jonathan.Rubenstein@BakerBotts.com wrote:

I'm tied up this morning and out of pocket this afternoon.  We
can do 10 am on Monday, however.  Please let me know if that
works.

Jonathan B. Rubenstein
Baker Botts L.L.P.

2001 Ross Avenue
Dallas, Texas  75201
Direct Dial -- (214) 953-6594
Fax -- (214) 661-4594
jonathan.rubenstein@bakerbotts.com

On Jan 19, 2018, at 9:41 AM, Tyler Bexley <tyler.bexley@rm-firm.com> wrote:

Amy/Jonathan,

Please let me know when you are available to confer regarding these responses.  Specifically, I would like to discuss what I view as improper general and boilerplate objections and attempt to get an understanding of what specific documents are being withheld pursuant to an objection.  I would also like to discuss when you expect to begin producing documents.  For confidentiality issues, I'll have a draft protective order to you this afternoon.

Finally, pursuant to Rule 193.3(b), I also request a privilege log for any documents you are withholding based on an assertion of privilege.  Thank you.

## Reese Marketos LLP

**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
www.rm-firm.com

On Jan 18, 2018, at 5:59 PM,
amy.heard@bakerbotts.com wrote:

Tyler,

Please find attached GENBAND Management Service Corporation's Original Responses to CoEfficient, LLC and TelEfficient, LLC's First Set of Requests for Production and Interrogatories.

Best,
Amy


**Amy Heard**  (469) 251-6647
Baker Botts L.L.P.


**Confidentiality Notice:**
The information contained in this email and any
attachments is intended only for the recipient[s] listed
above and may be privileged and confidential. Any
dissemination, copying, or use of or reliance upon such
information by or to anyone other than the recipient[s]
listed above is prohibited. If you have received this
message in error, please notify the sender immediately
at the email address above and destroy any and all
copies of this message.
<GENBAND's Responses to Interrogatories.pdf>
<GENBAND's Responses to RFPs.pdf>

**EXHIBIT 7**

From: amy.heard@bakerbotts.com
Subject: RE: Genband Discovery Issues
Date: April 18, 2018 at 4:29 PM
To: tyler.bexley@rm-firm.com
Cc: Jonathan.Rubenstein@BakerBotts.com, Allie.Smith@BakerBotts.com



Tyler:

I am not sure when Jonathan will be available to discuss as he is currently traveling and will be largely out of pocket for at least a few days. I imagine he will reach out to you when he is able and coordinate a time.

I will reach out to our client to confirm there is no separate Aztek server. I am unaware of one, and I can tell you that we have not withheld any Aztek documents on the basis of their Aztek progeny, so anything we have that's responsive you have or will receive in our upcoming production.

As to personal messages, I refer you to our response to your request.

I will answer your previous questions in turn:

1. We have a document that reflects the answers to your questions, and we thought that we produced it early on, but it was apparently left out inadvertently. It will be in our upcoming production of documents.
2. We are working with our client to nail down these dates and will update you when we get them. You already have all emails discussing any such closings. We are not withholding anything regarding timing for any reason.
3. We are not withholding anything based on an objection. No deals were closed with the identified parties using third-party financing.
4. The organizational chart responsive to 1. should answer your question.
5. Russo was a contractor until March 2018.
6. As discussed, we will supplement our response with bates numbers once you have identified the trade secrets sufficiently to allow us to know which of the documents you sent us over the course of the relationship you are now classifying as trade secrets.
7. All correspondence with third parties to whom GENBAND mentioned TelEfficient or discussed third-party financing have been produced. As we do not yet understand what exactly you are defining as the "financial model" this is difficult to respond to.
8. We have not withheld any teaming agreements, contractual arrangements or communications between GENBAND any company, or any internal communications in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient.

Thanks,
Amy

**Amy Heard** (469) 251-6647
Baker Botts L.L.P.

**From:** Tyler Bexley [mailto:tyler.bexley@rm-firm.com]
**Sent:** Wednesday, April 18, 2018 3:44 PM
**To:** Rubenstein, Jonathan <Jonathan.Rubenstein@BakerBotts.com>; Heard, Amy
<Amy Heard@BakerBotts.com>

<Amy.Heard@BakerBotts.com>
**Subject:** Re: Genband Discovery Issues

I'm following up on this. In addition, I also would like to discuss some document production issues, including the following:

1. There are several documents that were produced by Defendants that should also have been in Genband's production but did not appear to be there. For just a few examples, see: TEL_000525, TEL_000961, TEL_001479, TEL_001603, TEL_001777, TEL_001879, TEL_002392, TEL_043680, TEL_043721, TEL_069250, TEL_079384. Some of these appear to be documents from Aztek, so I'd like to get an understanding of whether Genband has access to those documents and searched any Aztek servers/storage locations for responsive documents. I also want to ensure that we're not missing any other responsive documents.

2. I did not see any personal emails of text messages from any of the custodians from whom we requested such information. I would expect responsive text messages from at least Steve Bruny, as there are some in our production between him and Mr. Armbruster. Please confirm that you searched the requested custodians' personal emails and text messages.
Please let me know when you're available to discuss. Thank you.

## Reese Marketos LLP

**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
www.rm-firm.com

On Apr 16, 2018, at 10:59 AM, Tyler Bexley <tyler.bexley@rm-firm.com> wrote:

Jonathan/Amy:

Further to our discussions last week, below is a list of issues we have with Genband's discovery responses. Please let me know if you will amend Genband's responses to address these issues or if we need to confer by telephone again. Thank you.

1. First Rogs, No. 1: Genband refers to Rule 197.2 but neither identifies specific documents nor provides any further answer to this interrogatory. Please supplement this response to either point to specific documents by bates number or provide a narrative response explaining the corporate structure and ultimate parent companies.

2. First Rogs, No. 6: Genband's answer simply refers back to Interrogatory No. 4. However, the response to No. 4 does not state the date when deals closed, which No. 6 requests.

3. First Rogs, No. 7: Genband's answer refers back to its response to Interrogatory Nos. 4 and 5. No. 7 is slightly broader than those requests, as it asks whether Genband has

closed deals with any of the identified parties using third-party financing between March 2012. It may be that the answer is no, but I would like to be clear that Genband has answered the broader question and isn't withholding information based on an objection.

4. Second Rogs, No. 1: Genband's answer explains the merger between Genband and Sonus but does not answer the interrogatory, which asks who is responsible for the liabilities of the Genband entities that are counter-defendants in this case. To the extent that there is a document that directly answers this question, please identify the bates number.

5. Second Rogs, No. 2: Genband states that Mr. Russo has never been an employee of any Genband, Sonus, or Ribbon entity. However, the interrogatory also asks whether he was affiliated with Genband. Please supplement the response to identify his current/former Genband affiliation.

6. Second Rogs, Nos. 3 & 4: As previously discussed, Genband has agreed to supplement these answers to identify documents by bates number following our identification of the trade secret financial models by bates number

7. Second Rogs, No. 5: Genband's reference to Rule 197.2 does not answer this interrogatory, which seeks the identify of third parties with whom Genband shared TelEfficient's financial models and the date of each occurrence.

8. First RFPs, Nos. 24-27: In my January 23 email, I clarified and narrowed these RFPs at your request (as reproduced below). Please let me know the status of Genband's response to these narrowed requests.

 —No. 24: All teaming agreements and similar contractual arrangements between you and any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

—No. 25: All communications between you and any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

—No. 26: All internal Genband communications relating to any company in the business of providing financial instruments similar to those provided by CoEfficient and/or TelEfficient to finance switch sales and/or upgrades. This request is limited to the time period of 2013 to present.

## Reese Marketos LLP

**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
www.rm-firm.com

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

**EXHIBIT 8**

From: Amy.Heard@BakerBotts.com 📎
Subject: responses to your last email
Date: May 1, 2018 at 5:39 PM
To: tyler.bexley@rm-firm.com
Cc: Jonathan.Rubenstein@BakerBotts.com, Allie.Smith@BakerBotts.com, david.gerkin@BakerBotts.com

Ⓐ

Tyler:

Please find attached courtesy copies of the file-stamped motion and proposed order we filed yesterday, as well as the notice of hearing for May 16th filed this afternoon.

Additionally, below are responses to your last email. We can make time to discuss tomorrow if needed.

**First Rogs, No. 1**: The below production includes the org chart:

[Click here to download the file(s) listed below](#)

Password: **e52e9bi9ze**

GEN_0006.zip    1.83 GB

If the link above does not open, please copy and paste the following URL into your browser:
https://bbmft.bakerbotts.com/pkg?token=15e4dd62-ec1e-4c5a-8a87-7d85e4296c7f

The secure message expires on 5/15/18 4:43:55 PM

**Second Rogs, No. 2**: Mr. Russo's consulting agreement was with GENBAND US LLC.
**Second Rogs, Nos. 3 & 4**: We are still working through the 19 pages of bates numbers you sent. Once we have a better understanding what in those 700-plus documents you believe to be your "trade secret" we will revisit this issue.

**Additional Production**: We will be producing Master Agreements with several of our customers, and will do so before Mr. Armbruster's deposition.

**First RFPs, No. 28**: We have requested any communications sent from personal devices owned by the custodians you listed who are employed by GENBAND and produced any such communications relevant to this dispute.
**Second Rogs, No. 1**: Each entity is responsible for its own liabilities. Sonus Networks has assumed the liabilities of GENBAND Management Services Company.
**Second Rogs, No. 5**: As previously mentioned, we are still unclear how wide you are casting the net of "financial model." GENBAND is not shielding information on the basis of objection; all discussions of TelEfficient's "financial model" would have been facilitated by email and as such are in your possession. Other than advertising the affiliation with a financing company as contemplated by the Teaming Agreement, GENBAND did not share TelEfficient work product without TelEfficient's prior involvement with a customer.

**Absence of email attachments**: We have looked at the emails you attached as examples. With the exception of two that were improperly marked, the majority were parent emails with attachments that were nonresponsive to your request.
**Document production and objection issues**: We conducted a diligent search and produced what we found. The majority of the emails you listed were from Aztek domains. Those email servers were not

retained after the acquisition of Aztek by GENBAND and therefore we do not have access to those emails. Any other discrepancies may be due to flaws in your search protocol or human error. We have not withheld any of the documents you included on objection or other grounds.

**Interrogatory verifications**: We will provide verifications.

Thanks,
Amy

**Amy Heard**  (469) 251-6647
Baker Botts L.L.P.

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.



2018.04.30 Genband's
Motion for P...ection.pdf

Cause No. DC-16-12593

| | | |
|---|---|---|
| GENBAND Management Services, Corporation, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| CoEfficient, LLC; TelEfficient, LLC. | § § | DALLAS COUNTY, TEXAS |
| Defendants/ Counter-Plaintiff, | § § § | |
| v. | § § | |
| GENBAND Management Services, Corporation, GENBAND Holdings Company, and GENBAND US LLC, Counter-Defendants | § § § | 116th JUDICIAL DISTRICT |

**PROTECTIVE ORDER**

This Court, having considered Plaintiffs' Motion for Protective Order in the above-styled

lawsuit, and after hearing arguments of counsel has determined that the Motion has merit, and

shall be and is in all respects **GRANTED.**

It is therefore **ORDERED** that the deposition of David Walsh shall not take place.

SIGNED this ___ day of _____, 2018.

_____
JUDGE PRESIDING

ORDER ON MOTION FOR PROTECTION                    Solo Page



Genband's Notice of
Hearing on…otection.pdf

# EXHIBIT 9

From: Jonathan.Rubenstein@BakerBotts.com 
Subject: RE: responses to your last email
Date: May 2, 2018 at 3:29 PM
To: tyler.bexley@rm-firm.com
Cc: Amy.Heard@BakerBotts.com, Allie.Smith@BakerBotts.com

## With respect to item #5 below, the redactions were for attorney-client privilege.

**Jonathan Rubenstein**
Partner

Baker Botts L.L.P.
jonathan.rubenstein@bakerbotts.com
T +1.214.953.6594
F +1.214.661.4594

2001 Ross Avenue
Dallas, Texas 75201
USA



From: Tyler Bexley <tyler.bexley@rm-firm.com>
Sent: Wednesday, May 2, 2018 3:24 PM
To: Rubenstein, Jonathan <Jonathan.Rubenstein@BakerBotts.com>
Cc: Heard, Amy <Amy.Heard@BakerBotts.com>; Smith, Allie <Allie.Smith@BakerBotts.com>; Gerkin, David <david.gerkin@BakerBotts.com>
Subject: Re: responses to your last email

Jonathan,

Thanks for speaking with me just now. To recap what we discussed:

1. Second Rogs, Nos. 3 & 4: You are still working through the amended interrogatory responses we sent relating to trade secrets, but you expect to be in a position to serve amended responses to these interrogatories within the next week or two.

interrogatories within the next week or two.

2. Second Rogs, No. 5: You agreed that Genband would amend its response to this interrogatory to include information consistent with Amy's email explanation and your telephone explanation that Genband shared TelEfficient financial models with customers who were working with TelEfficient and Genband. This may consist of referring to another interrogatory response that identifies those customers.

3. First RFPs, No. 28: You requested responsive personal emails and text messages from the identified custodians who currently work for Genband, including Walsh, Bruny, and Raiford. Responsive documents are in the most recent production.

4. Document production issues: You reiterated that Genband conducted a comprehensive document collection and is not withholding information based on any objections.

5. Redactions in new production: You will ask Amy the basis for the redactions in the production from last night and get back to me.

Please let me know if I have misstated anything from our conference. Thank you.

## Reese Marketos LLP
**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
www.rm-firm.com

On May 2, 2018, at 12:48 PM, Jonathan.Rubenstein@BakerBotts.com wrote:

We can talk briefly at 3 pm if that works.

**Jonathan Rubenstein**
Partner

Baker Botts L.L.P.
jonathan.rubenstein@bakerbotts.com
T +1.214.953.6594
F +1.214.661.4594

2001 Ross Avenue
Dallas, Texas 75201
USA

<u>\<image001.png\></u>

<u>\<image002.png\></u>  <u>\<image003.png\></u>  <u>\<image004.png\></u>  <u>\<image005.png\></u>
<u>\<image006.png\></u>  <u>\<image007.png\></u>

---

**From:** Tyler Bexley <<u>tyler.bexley@rm-firm.com</u>>
**Sent:** Wednesday, May 2, 2018 11:30 AM
**To:** Heard, Amy <<u>Amy.Heard@BakerBotts.com</u>>
**Cc:** Rubenstein, Jonathan <<u>Jonathan.Rubenstein@BakerBotts.com</u>>; Smith, Allie
<<u>Allie.Smith@BakerBotts.com</u>>; Gerkin, David <<u>david.gerkin@BakerBotts.com</u>>
**Subject:** Re: responses to your last email

Amy,

Thanks for these responses. I have some follow up questions that I'd like to confer on. Are
you available this afternoon? Thanks.

## Reese Marketos LLP

**Tyler J. Bexley**
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201 | Direct: (214) 382-9805 | Main: (214) 382-9810
<u>www.rm-firm.com</u>

On May 1, 2018, at 5:39 PM, <<u>Amy.Heard@BakerBotts.com</u>>
<<u>Amy.Heard@BakerBotts.com</u>> wrote:

Tyler:

Please find attached courtesy copies of the file-stamped motion and
proposed order we filed yesterday, as well as the notice of hearing for May
16th filed this afternoon.

Additionally, below are responses to your last email. We can make time to
discuss tomorrow if needed.

**First Rogs, No. 1**: The below production includes the org chart:

[Click here to download the file(s) listed below](#)

Password: **e52e9bi9ze**

GEN_0006.zip     1.83 GB

If the link above does not open, please copy and paste the following URL into your browser:
[https://bbmft.bakerbotts.com/pkg?token=15e4dd62-ec1e-4c5a-8a87-7d85e4296c7f](https://bbmft.bakerbotts.com/pkg?token=15e4dd62-ec1e-4c5a-8a87-7d85e4296c7f)

The secure message expires on 5/15/18 4:43:55 PM

**Second Rogs, No. 2**: Mr. Russo's consulting agreement was with GENBAND US LLC.
**Second Rogs, Nos. 3 & 4**: We are still working through the 19 pages of bates numbers you sent. Once we have a better understanding what in those 700-plus documents you believe to be your "trade secret" we will revisit this issue.

**Additional Production**: We will be producing Master Agreements with several of our customers, and will do so before Mr. Armbruster's deposition.

**First RFPs, No. 28**: We have requested any communications sent from personal devices owned by the custodians you listed who are employed by GENBAND and produced any such communications relevant to this dispute.
**Second Rogs, No. 1**: Each entity is responsible for its own liabilities. Sonus Networks has assumed the liabilities of GENBAND Management Services Company.
**Second Rogs, No. 5**: As previously mentioned, we are still unclear how wide you are casting the net of "financial model." GENBAND is not shielding information on the basis of objection; all discussions of TelEfficient's "financial model" would have been facilitated by email and as such are in your possession. Other than advertising the affiliation with a financing company as contemplated by the Teaming Agreement, GENBAND did not share TelEfficient work product without TelEfficient's prior involvement with a customer.

**Absence of email attachments**: We have looked at the emails you attached as examples. With the exception of two that were improperly marked, the majority were parent emails with attachments that were nonresponsive to your request.
**Document production and objection issues**: We conducted a diligent search and produced what we found. The majority of the emails you listed were from Aztek domains. Those email servers were not retained after the acquisition of Aztek by GENBAND and therefore we do not have access to those emails. Any other discrepancies may be due to flaws in your search protocol or human error. We have not withheld any of the documents you included on objection or other grounds.

**Interrogatory verifications**: We will provide verifications.

Thanks,
Amy

**Amy Heard**  (469) 251-6647
<span style="color:red">Baker Botts L.L.P.</span>

**Confidentiality Notice:**
The information contained in this email and any attachments is intended only for
the recipient[s] listed above and may be privileged and confidential. Any
dissemination, copying, or use of or reliance upon such information by or to anyone
other than the recipient[s] listed above is prohibited. If you have received this
message in error, please notify the sender immediately at the email address above
and destroy any and all copies of this message.
<2018.04.30 Genband's Motion for Protection.pdf><2018.04.30 Proposed
Order - Genband's Motion for Protection.pdf><Genband's Notice of Hearing
on Motion for Protection.pdf>

# EXHIBIT 10

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs,* | §<br>§<br>§<br>§ | |
| v. | §<br>§ | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants.* | §<br>§<br>§<br>§<br>§ | 116th JUDICIAL DISTRICT |

## AGREED PROTECTIVE ORDER

Upon motion of the parties and for good cause shown, the Court hereby enters the following Agreed Protective Order to govern the exchange of confidential materials in this action.

**IT IS HEREBY ORDERED** that:

1. The terms and conditions of this Order shall govern the production and handling of documents, answers or responses to interrogatories, responses to requests for admission, depositions, and other discovery exchanged in the above-referenced litigation (this "Litigation"), including materials produced by third parties in response to discovery requests or subpoenas.

2. **Definitions.** For purposes of this Protective Order, the term "Party" shall mean any party to this Litigation. The term "Producing Party" shall mean any Party to this Litigation who produces or discloses information or materials in the Litigation or whose witnesses give deposition testimony. The term "Producing Party" also shall include any non-party who agrees, in writing, to be bound by the terms of this Protective Order pursuant to Paragraph 9, *infra*, and produces or discloses information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to Paragraphs 4 and 5, *infra*, in the Litigation. The term "Receiving Party" shall mean any Party to whom information or materials are produced or disclosed in this Litigation, or who elicits deposition testimony from a Producing Party. The term "Receiving Party" also shall include any non-party who agrees, in writing, to be bound by the terms of this Protective Order pursuant to Paragraph 9, *infra*, and receives information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to Paragraphs 4 and 5,

1

*infra*, in the Litigation. The term "Confidential Material" means any documents or information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY pursuant to the terms herein. The words "document" and "documents" shall mean all written or electronic documents, data, materials, videotapes, and other tangible items, and all information contained therein or that can be derived therefrom.

3. **Designation of Confidential Documents.** A Producing Party may designate as CONFIDENTIAL any document or information (including discovery responses or portions thereof), not in the public domain, which that Party reasonably deems to set forth proprietary, non-public, commercial, or trade secret information with respect to the Producing Party, or confidential information belonging to non-parties. All such designations shall be made reasonably and in good faith. The Producing Party shall make such designation at the time of delivery of a copy of the document or information to the Receiving Party. The designation CONFIDENTIAL shall be made by stamping or writing the word "CONFIDENTIAL" on the face of the copy of the document or information so designated in a manner so as not to obscure the contents of the document.

4. **Designation of Attorney's Eyes Only Documents.** A Producing Party may designate as ATTORNEY'S EYES ONLY any document or information (including discovery responses or portions thereof) that meet the definition of CONFIDENTIAL, *supra*, and also is highly sensitive such that if disclosed to persons other than outside counsel would reveal significant technical or business advantages of the Producing Party or a non-party, which could reasonably be expected to result in injury to the Producing Party or non-party. All such designations shall be made reasonably and in good faith. A document should not be designated ATTORNEY'S EYES ONLY if the designation of CONFIDENTIAL would protect any Party's or non-party's interest. The Producing Party shall make such designation at the time of delivery of a copy of the document or information to the Receiving Party. The designation ATTORNEY'S EYES ONLY shall be made by stamping or writing the words "ATTORNEY'S EYES ONLY" on the face of the copy of the document or information so designated in a manner so as not to obscure the contents of the document.

5. **Designation of Confidential or Attorney's Eyes Only Deposition Testimony.** A Producing Party may, on the record of a deposition, or within 10 days after receipt of the transcript(s) from such deposition, designate in good faith any portion or portions of such transcript(s), including exhibits and videotape, as CONFIDENTIAL or ATTORNEY'S EYES ONLY if it qualifies for either such designation. When doing so, the party seeking the confidentiality designation must provide the page and line numbers of the testimony deemed CONFIDENTIAL or ATTORNEY'S EYES ONLY and exhibits by exhibit number. After the expiration of 10 days, if no confidentiality designation is made, the entire deposition transcript will then be deemed non-confidential.

6. Notwithstanding any provision in this agreement to the contrary, all documents produced in this case shall only be used for purposes of this litigation.

7. Non-parties, including retained experts and parties responding to subpoenas, may accept and agree to be bound by the terms of this Protective Order, provided that each such non-

2

party first shall execute an acknowledgment and agreement, in the form attached hereto as Exhibit A. A non-party to this Litigation that agrees to be bound by the terms of this Protective Order may designate as CONFIDENTIAL or ATTORNEY'S EYES ONLY as defined in Paragraphs 5 and 6, *supra*, any discoverable documents or information being produced by the non-party, by means of the procedures described in Paragraphs 5 and 6, *supra*. All documents or information designated as CONFIDENTIAL or ATTORNEY'S EYES ONLY by a non-party in accordance with the terms of this Protective Order shall be treated by the Parties as Confidential Material.

8.      Notwithstanding the foregoing, a Party's or non-party's inadvertent failure to designate a document or information as Confidential Material as set forth herein, shall not constitute a waiver of any claim that the inadvertently disclosed material is entitled to protection under this Protective Order. Upon learning of an inadvertent failure to designate a document or information as Confidential Material, a Party or non-party may so designate a document or information as CONFIDENTIAL or ATTORNEY'S EYES ONLY, with the effect that the designated document or information thereafter shall be subject to the protections of this Protective Order.

9.      **Permitted Use and Disclosure of Confidential Documents.** Information designated as "CONFIDENTIAL" shall be used solely for the purpose of this Litigation and shall not be used for any other purpose, including without limitation, any business, proprietary, or commercial purpose. Confidential Material may be disclosed, summarized, described, characterized, or otherwise communicated or made available in whole or in part only to the following persons:

A.      Parties to this Litigation and counsel for the Parties to this Litigation, including their employees, officers, and agents;

B.      The Court, any Special Masters, or Mediators appointed by the Court;

C.      Stenographic personnel, court reporters, videographers, graphic support, photocopying, document imaging, or database services providing services in the Litigation;

D.      Potential or actual experts, contractors, or consultants retained by a Party for purposes of the Litigation, provided that each such expert, contractor or consultant executes an acknowledgment in the form attached as Exhibit A, agreeing to be bound by the provisions of this Protective Order;

E.      Any person who prepared, permissibly received, or reviewed the Confidential Material prior to its production or prior to testimony in this case and who executes an acknowledgment in the form attached as Exhibit A; and

F.      Persons who, in addition to those identified above, are permitted access by order of the Court or upon stipulation of the Producing Party.

10.     **Permitted Use and Disclosure of Attorney's Eyes Only Documents.** Information designated as "ATTORNEY'S EYES ONLY" shall be used solely for the purpose of this

3

DEFENDANT'S MOTION TO COMPEL AND REQUEST FOR RULING ON                    402
DISCOVERY OBJECTIONS - Page 96 of 101

Litigation and shall not be used for any other purpose, including without limitation, any business, proprietary, or commercial purpose. Attorney's Eyes Only Documents may be disclosed or made available in whole or in part only to the following persons:

A. Outside counsel of record for the Parties to this Litigation, including their employees, officers, and agents;

B. The Court, any Special Masters, or Mediators appointed by the Court;

C. Stenographic personnel, court reporters, videographers, graphic support, photocopying, document imaging, or database services providing services in the Litigation;

D. Potential or actual experts, contractors, or consultants retained by a Party specifically for purposes of the Litigation, provided that each such expert, contractor or consultant executes an acknowledgment in the form attached as Exhibit A, agreeing to be bound by the provisions of this Protective Order;

E. Any person who prepared, permissibly received, or reviewed the document prior to its production or prior to testimony in this case and who executes an acknowledgment in the form attached as Exhibit A;

F. Persons who, in addition to those identified above, are permitted access by order of the Court or upon stipulation of the Producing Party.

11. **Notice of Use and Disclosure of Confidential or Attorney's Eyes Only Documents.** Prior to review of Confidential or Attorney's Eyes Only Documents by persons identified in Paragraphs 9D, 9E, 10D or 10E of this Protective Order, a Party must provide notice to the Producing Party. Upon receipt of such notice, a Producing Party may challenge the release of Confidential or Attorney's Eyes Only Documents to the persons identified in Paragraphs 9D, 9E, 10D or 10E within five (5) business days. The Producing Party shall state the objection by letter to counsel of record for the requesting Party and copy all counsel of record in this Litigation. After providing this notice of objection, the Parties shall confer within five (5) calendar days in an attempt to resolve the dispute regarding the release of the documents or information. If the Parties are unable to resolve the dispute, the requesting Party may move the Court to allow the person identified in Paragraphs 9D, 9E, 10D or 10E of this Protective Order to review the Confidential or Attorney's Eyes Only Documents subject to the other conditions of this Protective Order. In resolving any such motion, the Producing Party shall have the burden of demonstrating that the benefit of allowing the person to review the document or information at issue does not outweigh the potential harm to the Producing Party. Until the Court rules on the motion, the relevant documents or information shall continue to be treated by each Party or participating non-party as designated.

12. Nothing in this Protective Order shall bar or otherwise restrict outside counsel from rendering advice to his or her client with respect to this Litigation and, in the course thereof, from discussing in a general way Confidential Material.

4

13. Counsel of record for the Parties shall employ reasonable protective measures to ensure that the information and documents governed by this Protective Order are used only for the purposes specified herein, and disclosed only to authorized persons. All Confidential Material shall be kept in a secure manner by each Party and by those who are authorized to have access to such material.

14. **Filing Under Seal.** The Producing Party seeking to protect any Confidential Material shall have the burden to request that the Court seal any filed Confidential Material in this Litigation pursuant to Texas Rule of Civil Procedure 76a. The Party seeking to file any papers with or otherwise use any Highly Confidential or Confidential Discovery Material in open court shall provide reasonable notice to the Producing Party in advance of such use. If the Producing Party desires for such Confidential Material to be filed under seal, the filing Party shall use the e-filing designation "Contains Sensitive Material" to initially file the Confidential Material. The Producing Party shall then have the burden to file a motion for the Court to maintain the material under seal.

15. If a Party or participating non-party that has obtained Confidential Material pursuant to this Protective Order: (a) is subpoenaed in another proceeding; (b) is served with a demand in another action to which it is a party; (c) is served with any other legal process by one not a Party to this Litigation; or (d) is otherwise required to provide material to a regulatory entity or body; and in any such case, the subpoena, demand, legal process, or requirement to produce would require disclosure of Confidential Material produced or provided in this Litigation by another Party or non-party, the Party or participating non-party shall give prompt written notice of its receipt of such subpoena, demand, legal process, or requirement to produce to all counsel of record so as to allow any Party or Producing Party at least ten (10) days, or such lesser time as such subpoena, demand, legal process, or other requirement to produce specifies for production, to intercede and protect its rights. Provided that such notice is given, nothing herein shall be construed as requiring any Party or anyone else covered by this Protective Order to challenge or appeal any order requiring production of any Confidential Material, or to subject itself to any penalties for non-compliance with any subpoena, demand or legal process or to seek any related relief from this or any Court. In the event that a regulatory entity or body requires a Party or participating non-party to disclose to it Confidential Material subject to this Protective Order before the Party or participating non-party can practicably provide written notice to of the requirement to counsel of record for the Party who provided the Confidential Material, the Party or participating non-party may comply with the requirements of the regulatory entity or body, provided that the Party or participating non-party so required to disclose Confidential Material to a regulatory entity or body shall notify counsel of record for the Party that provided the Confidential Material immediately, but in no event more than four (4) business days thereafter.

16. Nothing in this Protective Order is intended to determine or affect, in any way, the admissibility of Confidential Material. Furthermore, nothing herein shall be deemed to restrict in any manner any Party's dissemination or use of its own Confidential Material.

17. In the event any Confidential Material is, either intentionally or inadvertently, disclosed to someone not authorized to receive such material under this Protective Order, or, if a

5

person so authorized breaches any of his or her obligations under this Protective Order, counsel of record for the Party involved immediately shall disclose the unauthorized disclosure or breach to the Producing Party's counsel of record, and also shall use his or her best efforts to obtain the return of all copies of the Confidential Material and to prevent any further disclosures of the same.

18. **Challenge to Confidential and/or Attorney's Eyes Only Designations.** A Party may challenge a Producing Party's designation at any time. If any Party objects to the designation by a Producing Party of any document or information as CONFIDENTIAL or ATTORNEY'S EYES ONLY, the Party so objecting shall state the objection by letter to counsel of record for the Producing Party and copy all counsel of record in this Litigation. If the designation is made at or during a deposition, any objection to designation may be alternatively made on the record. After providing this notice of objection, the Parties and any other Producing Party or its counsel shall confer within five (5) calendar days in an attempt to resolve the dispute regarding the designation of the documents or information. If the Parties are unable to resolve the dispute, the objecting Party may move the Court to remove the designation of CONFIDENTIAL or ATTORNEY'S EYES ONLY after in camera review. In resolving any such motion, the Producing Party shall have the burden of demonstrating that the document or information at issue constitutes CONFIDENTIAL or ATTORNEY'S EYES ONLY material in accordance with Paragraphs 5 and 6. Until the Court rules on the motion, the relevant documents or information shall continue to be treated by each Party or participating non-party as designated.

19. **Inadvertent Production.** Inadvertent production of any document that a party or non-party later claims should not have been produced because of a privilege, including but not limited to the attorney-client privilege or work product doctrine ("Inadvertently Produced Privileged Document"), will not be deemed to waive any privilege, provided that the Producing Party shall promptly notify the Receiving Party in writing of such inadvertent production. The Producing Party may request the return of any Inadvertently Produced Privileged Document. A request for the return of an Inadvertently Produced Privileged Document shall identify the document inadvertently produced and the basis for withholding such document from production. If a Party or non-party requests the return, pursuant to this paragraph, of any Inadvertently Produced Privileged Document then in the custody of another Party or non-party, such other party shall within five (5) business days (a) return to the requesting Party or non-party the Inadvertently Produced Privileged Document and copies thereof; (b) destroy all notes or other work product reflecting the content of such Inadvertently Produced Privileged Documents; and (c) delete any such Inadvertently Produced Privileged Documents from any litigation-support database or any other means of electronically storing information. The party returning such material may then move the Court for an order compelling production of the material, but that party shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production. Once information is determined to be Inadvertently Produced Privileged Documents and subject to this paragraph, the Receiving Party shall not disclose or use any Inadvertently Produced Privileged Documents in this Litigation or for any other purpose, unless and until the Court orders otherwise.

6

20. Nothing herein shall preclude any Party or non-party seeking an order from the Court that any portion of the evidence be taken in camera, with all related testimony and Confidential Material sealed and withheld from the general public.

21. In the event anyone subject to the terms of this Protective Order shall violate or threaten to violate the terms of this Protective Order, the aggrieved Party immediately may apply to obtain injunctive relief against any such person violating or threatening to violate any of the terms of this Protective Order, and in the event that the aggrieved Party does so, the responding Party subject to the provisions of this Protective Order shall not employ as a defense thereto the claim that the aggrieved Party possesses an adequate remedy at law.

SIGNED: Feb. 5 , 2018.

HON. TONYA PARKER

AGREED:

 s/ Jonathan Rubenstein
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendants

 s/ Tyler J. Bexley
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs

7

DEFENDANT'S MOTION TO COMPEL AND REQUEST FOR RULING ON
DISCOVERY OBJECTIONS - Page 100 of 101

406

**Exhibit A**

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § § | 116th JUDICIAL DISTRICT |

     I, _____, do hereby certify that I have read and agree to be bound by and subject to that certain Agreed Protective Order dated _____, 2018, entered in the above-referenced action, and I subject myself to the jurisdiction and venue in the above-referenced Court, for purposes of enforcement of such Agreed Protective Order. I understand that all documents produced in this case may only be used for purposes of this litigation and that I am bound by the Agreed Protective Order not to disclose the documents or otherwise share the information I review.

     This _____ day of _____, 2018.


_____
Printed Name


_____
Signature

8

FILED
DALLAS COUNTY
5/4/2018 10:55 AM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

## NOTICE OF HEARING

Please take notice that a hearing on Plaintiff's Motion to Compel and Request for Ruling on Discovery Objections has been scheduled for **May 16, 2018 at 3:15 p.m.** in the 116th District Court.

Respectfully submitted,

**REESE MARKETOS LLP**

By: */s/ Tyler J. Bexley*
    Tyler J. Bexley
    State Bar No. 24073923
    tyler.bexley@rm-firm.com
    750 N. Saint Paul St., Suite 600
    Dallas, Texas 75201-3201
    214.382.9810 telephone
    214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS COEFFICIENT,
LLC and TELEFFICIENT, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 4, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

<u> */s/ Tyler J. Bexley*               </u>
Tyler J. Bexley

**CAUSE NO. DC-16-12593**

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| GENBAND MANAGEMENT SERVICES CORPORATION, *Counter-Defendant*, | § § § | 116th JUDICIAL DISTRICT |

**THIRD AMENDED LEVEL 3 SCHEDULING ORDER**

In accordance with Rules 166, 190, and 192 of the Texas Rules of Civil Procedure, the Court makes the following amended order to control the schedule of the case.

1.     This case will be ready and is set for jury trial on **November 12, 2018**.  If not reached as set, the case may be carried to the next week.  Trial announcements must be made in accordance with Rule 3.02 of the Local Rules of the Civil Courts of Dallas County, Texas. When no announcement is made for defendant, defendant will be presumed ready.  If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a of the Texas Rules of Civil Procedure.

2.     Pretrial matters will be completed by the following dates:

| | |
|---|---|
| July 19, 2018 | **Fact discovery closes.** All fact depositions shall be completed by this date, and all written discovery requests shall be served so that responses are due no later than this date. |
| July 26, 2018 | **Fact discovery motions deadline.**  Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed by this date or such complaint is waived, except for the sanction of exclusion under Rule 193.6. |

1

| | |
|---|---|
| July 26, 2018 | **Expert designation deadline for party seeking affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| August 24, 2018 | **Expert designation deadline for party opposing affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| August 31, 2018 | **Deadline for amended pleadings other than those adding new claims, defenses, or parties.** Amended pleadings responsive to timely filed pleadings may be filed after the deadline if filed within 14 days after the pleading to which they respond. |
| September 7, 2018 | **Expert designation deadline for reply/rebuttal experts.** Any expert designation must include the information required by Rule 194.2(f). |
| September 7, 2018 | **Expert discovery closes.** |
| September 19, 2018 | **Deadline to file motions for summary judgment.** Summary judgment motions must be heard no later than 30 days prior to trial. |
| September 28, 2018 | **Deadline to file motions to exclude or limit expert testimony.** Such motions must be heard no later than 30 days prior to trial. |

The parties may by written agreement alter these deadlines. Except by agreement of the parties, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3. Each side may have 50 hours of oral depositions and 30 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

4. The parties shall mediate this case no later than August 31, 2018, unless otherwise provided by court order. Named parties shall be present during the entire mediation process, and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **The parties agree to mediate this case with Hon. Jeff**

2

**Kaplan (Ret.) from JAMS Dallas. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation.**

5. Fourteen days before the Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examinations, a list of exhibits, and copies of any exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten days before the Trial setting, the parties shall exchange in writing (a) their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and (b) their objections and any counter-designations to the opposing party's deposition designations. **On or before ten days before the Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreements on such matters.** By 4:00 p.m. on the Thursday before the Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4:00 p.m. the Thursday before the trial setting.

6. A pre-trial conference shall be conducted from 8:00 a.m. to 9:00 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trail conference shall be scheduled the week before the Trial Setting.

3

If any parties are joined in this action, the party joining such additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

SIGNED on this _____ day of _____, 2018.

_____
HON. TONYA PARKER

AGREED:


*/s/ Jonathan Rubenstein*
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendants



*/s/ Tyler J. Bexley*
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs

4

FILED
DALLAS COUNTY
5/11/2018 4:43 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO.  DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION

Defendants/Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC (collectively, "TelEfficient") file this response to Plaintiff's Motion for Protection and respectfully request that the Court (1) deny Plaintiff's motion; and (2) order Plaintiff to present David Walsh for a deposition as noticed.

## SUMMARY

TelEfficient seeks to take the deposition of the David Walsh, the former CEO of GENBAND, because he was personally involved in GENBAND's scheme to defraud TelEfficient, misappropriate TelEfficient's trade secrets, and induce TelEfficient into entering into loan agreements that imposed onerous terms on TelEfficient.  Walsh is not a "high-ranking executive with little involvement in the complexities of the facts crucial to the case" as GENBAND contends.  (Pl.'s Motion at 1.)  On the contrary, Walsh met with

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 1 of 10**

TelEfficient's top executive, Murat Armbruster, numerous times and had discussions that are central to the parties' claims in this case. Walsh also was exposed to TelEfficient's proprietary information and led a discussion surrounding TelEfficient's trade secrets during a meeting with TelEfficient's investors. As summarized by one of Walsh's colleagues at GENBAND, "*Walsh has high level visibility*" with the TelEfficient business relationship. (Ex. 2 (emphasis added).)[1]

Because of Walsh's direct personal involvement in the facts giving rise to TelEfficient's claims in this case, he does not qualify for protection under the apex doctrine. Additionally, the evidence demonstrates that Walsh has unique and superior knowledge about which no other witness can testify. The Court therefore should deny GENBAND's motion for protection and order Walsh to testify.

## ARGUMENT

A party may seek protection from a harassing deposition of a high-ranking corporate officer under the common law "apex" doctrine. *Crown Central Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995). In *Crown Central*, the Texas Supreme Court developed the test that is applied when a party invokes the apex doctrine:

> When a party seeks to depose a corporate president or other high level corporate official and that official (or the corporation) files a motion for protective order to prohibit the deposition accompanied by the official's affidavit denying any knowledge of relevant facts, the trial court should first determine whether the party seeking the deposition has arguably shown that the official has any unique or superior personal knowledge of discoverable information. If the party seeking the deposition cannot show that the

---

[1] TelEfficient's exhibits are filed separately as containing sensitive information because many of the documents have been marked "Confidential" under the Court's Agreed Protective Order.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 2 of 10**

official has any unique or superior personal knowledge of discoverable information, the trial court should grant the motion for protective order and first require the party seeking the deposition to attempt to obtain the discovery through less intrusive methods.

*Id.*

GENBAND's motion for protection fails under both prongs of the *Crown Central* test. First, Walsh did not and cannot deny "any knowledge" of relevant information because he was personally involved in the facts giving rise to the case. Second, even if Walsh's affidavit was sufficient to trigger apex protection, TelEfficient has "arguably shown" that Walsh has unique or superior knowledge. Thus, the Court should deny GENBAND's motion.

## A.  The apex doctrine does not apply because Walsh was personally involved in the misrepresentations giving rise to TelEfficient's claims.

The purpose of the apex doctrine is to protect high-level corporate officers from "depositions that are harassing, burdensome, and unlikely to lead to relevant information." *In re Miscavige*, 436 S.W.3d 430, 435 (Tex. App.—Austin 2014, orig. proceeding). For example, the Texas Supreme Court has applied the apex doctrine to prevent depositions of the Wal–Mart CEO in a slip-and-fall case and Samsung's chairman in a case where the plaintiff merely claimed that the issues "smack[ed] of chairman-level importance." *Wal–Mart Stores, Inc. v. Street*, 754 S.W.2d 153, 154–55 (Tex. 1988); *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 176–77 (Tex. 2000). But the apex doctrine applies only where a party seeks to depose an executive "merely because of his corporate position." *Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 168 (Tex. App.—Houston

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 3 of 10

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 3 of 63

[14th Dist.] 2000, pet. denied). "[T]he 'apex' doctrine does not apply" when a party seeks to depose an executive who is alleged to have "first-hand knowledge of certain facts" giving rise to the claims in the case. *Id.*

Hence, Texas courts have made clear that the apex doctrine is not triggered unless the proposed deponent denies ***any knowledge*** of relevant facts. The Dallas Court of Appeals, for example, explained that *Crown Central* requires a party invoking the apex doctrine to "fil[e] the corporate official's affidavit denying ***any knowledge*** of relevant facts." *In re Southpak Container Corp.*, 418 S.W.3d 360, 362 (Tex. App.—Dallas 2013, orig. proceeding) (emphasis added); *accord In re TMX Finance of Tex., Inc.*, 472 S.W.3d 864, 875 (Tex. App.—Houston 2015, orig. proceeding) ("In determining the sufficiency of a corporate official's affidavit, the question is whether the official 'sufficiently denied knowledge of any relevant facts regarding' the subject matter of the litigation."). Another court of appeals rejected application of the apex doctrine where the witness's "affidavit failed to satisfy the threshold requirement of *Crown Central*, to 'deny any knowledge of relevant facts.'" *In re Columbia Rio Grande Healthcare, L.P.*, 977 S.W.2d 433, 434 (Tex. App.—Corpus Christi-Edinburg 1998, orig. proceeding).

Like the affidavit that the court rejected in *Columbia Rio Grand Healthcare*, Walsh's affidavit fails to deny personal knowledge of the facts at issue in the case. In fact, Walsh admits that he was involved in meetings at which TelEfficient information was presented, participated in phone calls and discussions regarding TelEfficient deals, and oversaw the TelEfficient relationship. (Walsh Aff. ¶¶ 8–9.) Thus, Walsh's affidavit is

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 4 of 10

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 4 of 63

insufficient to invoke the apex doctrine because Walsh does not (and cannot) deny ***any knowledge*** of relevant facts.[2]

## B. Walsh has unique or superior knowledge relevant to the facts of the case.

Even if Walsh's affidavit was sufficient to shift the burden to TelEfficient to demonstrate his unique or superior knowledge, the evidence satisfies that burden. To defeat GENBAND's invocation of the apex doctrine, TelEfficient need only "arguably" show that Walsh has unique or superior knowledge. *Crown Central*, 904 S.W.2d at 128. TelEfficient easily satisfies this required showing.

Contrary to the picture Walsh attempts to paint in his affidavit, Walsh was directly involved in GENBAND's relationship with TelEfficient. Walsh claims in his affidavit that he lacks knowledge of "relevant facts regarding GENBAND US LLC and TelEfficient's business relationship" (Walsh Aff. ¶ 3), but GENBAND's own documents prove otherwise. In fact, Mark Pugerude, GENBAND's then-President of Global Sales, sent an email in 2013 describing the importance of TelEfficient to GENBAND and remarked that "Walsh has high level visibility with this now." (Ex. 2.)

Walsh also claims that he was "not involved in the editing and polishing of financial models related to specific customers prior to client presentations" and that any

---

[2] GENBAND's cited authority does not compel a different conclusion. For example, *BP Products* merely stands for the proposition that courts should not mechanically apply *Crown Central* to require particular language in an affidavit. *In re BP Prods. N. Am., Inc.*, No. 01-06-00613-CV, 2006 WL 2192546, at *5 (Tex. App.—Houston [1st Dist.] Aug. 4, 2006, orig. proceeding). But TelEfficient does not ask the Court to reject the apex doctrine based on the absence of some magic words in Walsh's affidavit. Rather, TelEfficient contends that the substance of the affidavit makes clear that Walsh was, in fact, personally involved in the facts giving rise to the case. Conversely, the executive in *BP Products* testified by affidavit that his only knowledge about the facts of the case came from second hand information. *Id.* at *4.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 5 of 10**

information he has about such matters was reported to him. (Walsh Aff. ¶ 7.) This is simply not true. As set forth in the Declaration of Murat Armbruster, Walsh was directly involved in at least one in-depth discussion of TelEfficient's proprietary mechanism and models that are at issue in this case. (Ex. 1, Armbruster Decl. ¶ 4.) In fact, Armbruster provided a photograph of Walsh leading a meeting discussing TelEfficient's financing mechanism that had been drawn on a white board. (*Id.*)

Walsh seeks to avoid being deposed by claiming that all of his calls and meetings with TelEfficient included other GENBAND employees who can testify about those discussions. (Walsh Aff. ¶ 9.) This is not accurate. As set forth in the Declaration of Murat Armbruster, Walsh had several one-on-one conversations or meetings with Armbruster over the course of the parties' business relationship. (Ex. 1, Armburster Decl. ¶ 4.) Thus, Walsh is the only GENBAND representative who could testify regarding these conversations. *See Alcatel*, 11 S.W.3d at 179 (explaining that an apex deposition would be appropriate where "a high-level executive is the only person with personal knowledge of the information sought").

In total, Walsh participated in at least six phone calls and seven in-person meetings with TelEfficient's top executive. (Ex. 1, Armbruster Decl. ¶ 4.) Examples of Walsh's extensive involvement with the facts giving rise to this case include the following:

- A September 2013 in-person meeting with Armbruster and AT&T representatives seeking to close a deal involving GENBAND, TelEfficient, and AT&T. (*Id.*)

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 6 of 10**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 6 of 63**

- An October 2013 conference in which Walsh and Armbruster presented and Walsh touted GENBAND's relationship with TelEfficient. (*Id.*; *see* Ex. 3 (news article about the conference noting GENBAND's relationship with TelEfficient and pointing out that TelEfficient enables GENBAND "to sell more gear faster," creating "a win-win all around").)

- A December 2014 dinner meeting with Armbruster and a potential investor discussing, among other things, TelEfficient's proprietary mechanism and financial models. (Ex. 1, Armbruster Decl. ¶ 4.) During this meeting, Armbruster drew TelEfficient's financing mechanism on a white board, and Walsh went through the mechanism with the group, as depicted in a photograph in Armbruster's Declaration. (*Id.*)

- A September 2015 call in which Walsh demanded that TelEfficient renegotiate the parties' Teaming Agreement to allow GENBAND to work with other financing companies. (*Id.*; Ex. 4.)

- Decision-making regarding extending financing to TelEfficient, including the Notes that are the basis for GENBAND's claims in this case. (Ex. 5; Ex. 1, Armbruster Decl. ¶ 5.)

- Substantive involvement in closing deals with telecommunications companies and executing legal documents with TelEfficient and telecommunications companies. (Exs. 6, 7.)

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 7 of 10

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 7 of 63

- Internal discussions with other GENBAND executives expressing concerns that TelEfficient was making too much money and discussing how GENBAND could "snatch back some" of the money. (Exs. 8, 9.)

In short, Walsh had extensive involvement in GENBAND's business relationship with TelEfficient, far beyond what he represents in his affidavit. This is not a case where TelEfficient seeks to depose a high-ranking executive merely because he attended a single meeting with other company employees[3] or based on pure speculation that he was involved in high-level decisions.[4] On the contrary, TelEfficient has presented evidence of Walsh's extensive and unique involvement in GENBAND's relationship with TelEfficient and the subject matter of this litigation. This evidence easily meets the requirement of "arguably" showing that Walsh has unique or superior knowledge regarding the facts at issue in this case. The Court should deny GENBAND's motion and order GENBAND to present Walsh for a deposition as noticed.

---

[3] *See In re Celadon Trucking Servs., Inc.*, 281 S.W.3d 93, 96 (Tex. App.—El Paso 2008, orig. proceeding) (rejecting apex deposition where CEO attended one meeting where there were other employees present).

[4] *See Alcatel*, 11 S.W.3d at 177 (rejecting apex deposition based on speculation that the significance of the issues "smacks of chairman-level importance").

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 8 of 10**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 8 of 63**

Respectfully submitted,

**REESE MARKETOS LLP**


By:  */s/ Tyler J. Bexley*
        Tyler J. Bexley
         State Bar No. 24073923
         tyler.bexley@rm-firm.com
        750 N. Saint Paul St., Suite 600
        Dallas, Texas 75201-3201
        214.382.9810 telephone
        214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/
COUNTER-PLAINTIFFS COEFFICIENT,
LLC and TELEFFICIENT, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

*/s/ Tyler J. Bexley*
Tyler J. Bexley

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 10 of 10**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 10 of 63**

# EXHIBIT 1

424

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES | § | IN THE DISTRICT COURT OF |
| CORPORATION, *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| COEFFICIENT, LLC and | § | |
| TELEFFICIENT, LLC, | § | |
| *Defendants/Counter-Plaintiffs*, | § | |
| | § | DALLAS COUNTY, TEXAS |
| v. | § | |
| | § | |
| GENBAND MANAGEMENT SERVICES | § | |
| CORPORATION, GENBAND | § | |
| HOLDINGS COMPANY, and | § | |
| GENBAND US, LLC, *Counter-* | § | |
| *Defendants*. | § | 116th JUDICIAL DISTRICT |

## <u>DECLARATION OF MURAT ARMBRUSTER</u>

1.    My name is Murat Armbruster. I am over 21 years old, and I am competent to make this Declaration in all respects. The facts stated in this Declaration are true and correct.

2.    I am the CEO of CoEfficient, LLC, which is the Managing Member of TelEfficient, LLC. I have held this position since the founding of both companies. Both currently and at the time of the facts giving rise to this lawsuit, I was responsible for the management of CoEfficient and TelEfficient, including the companies' relationship with GENBAND. Accordingly, I have personal knowledge of the matters set forth in this Declaration.

3.    I was introduced to GENBAND's CEO, David Walsh, via email by Steven Bruny on August 6, 2013. Since that time, I have exchanged dozens of emails with Mr. Walsh, including numerous emails about the facts that give rise to the claims in this case.

1

4.     In addition to my email correspondence with Mr. Walsh, I have also spoken with him by telephone at least 6 times and have met in person with him at least 7 times. Some of those times, Mr. Walsh was the sole GENBAND representative on the call or at the meeting. The following is a list of some of my calls and meetings with Mr. Walsh:

- In September 2013, I met in person with Mr. Walsh and representatives from AT&T in Texas to assist GENBAND in closing a deal with AT&T.

- In October 2013, I attended a conference and presented with Mr. Walsh at his invitation. Mr. Walsh touted GENBAND's relationship with TelEfficient during the conference and discussed the benefits TelEfficient brought to GENBAND and its customers. During course of the conference, I had one-on-one conversations with Mr. Walsh. The following photograph depicts my time on stage with Mr. Walsh at this conference:



2

- In April 2014, I participated in multiple calls in which Mr. Walsh was involved. These calls related to a meeting with the Federal Communications Commission relating to the FCC's interest in green funds used to finance telecommunications projects. I also participated in a meeting with the FCC that Mr. Walsh led.

- In December 2014, I attended a dinner meeting in Washington, DC with Mr. Walsh and representatives from Bostonia. The purpose of the meeting was to introduce GENBAND to TelEfficient's investment partner. Below is a photograph depicting Mr. Walsh going over TelEfficient's proprietary mechanism that I drew on a white board prior to the dinner meeting:



3

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 14 of 63**

- In September 2015, I participated in a call with Mr. Walsh regarding the future of TelEfficient's relationship with GENBAND. Mr. Walsh led the call and demanded the removal of the exclusivity provision in the Teaming Agreement so that GENBAND could work with other finance companies. Mr. Walsh stated that the exclusivity provision was unreasonable.

5.      Throughout TelEfficient's relationship with GENBAND, it was my understanding that Mr. Walsh was the final decision maker regarding the loans to TelEfficient and TelEfficient's work on deals with GENBAND customers. This was specifically conveyed to me by Mark Pugerude.

4

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 15 of 63**

**JURAT**

     My name is Murat Alexander Armbruster, my date of birth is November 1, 1968, and my

address is 600 Athol Avenue, Oakland, California 94610, United States. I declare under penalty of

perjury that the foregoing is true and correct.

Executed in San Francisco County, State of California, on the 10th day of May, 2018.

Murat Armbruster

4

**EXHIBIT 2**

430



**From:** Mark Pugerude
**Sent:** Thursday, September 5, 2013 7:55 AM
**To:** Daryl Raiford
**Subject:** Re: TelEfficient

The ATT team checked out TelEfficient via Citibank. They have endorsed the idea and the guys are gearing up to do this kind of deal making so u need to be up to speed. NTr on a massive scale has not happened because of the economic... this deal construct is working on paper. I tried to make sure you and your team got involved earlier and often... I feel like we are behind now. this is and always has been a good idea. Walsh has high level visibility with this now (he will probably end up trying to use them for Inertech as well).

Please just give this your attention and see if we can get this normalized. We need you and your teams brain power

431

CONFIDENTIAL

GEN_00031623

on this. We need to make this work. It is possibly a 200m idea.

Thanks,

MLP

Mark Pugerude
IP Phone +1 (703) 629-5155

**From:** Daryl Raiford
**Sent:** Wednesday, September 4, 2013 2:57 PM
**To:** Steven Bruny
**Cc:** David Walsh; Mark Pugerude; Robin Wright
**Subject:** RE: TelEfficient

I've just received the attached, but don't know if it is out of date or not.

I didn't really want to have the briefing by email.....would prefer to have been prepared for tomorrow's meeting.

I get nervous when the rev rec people tell me we potentially have highly unusual performance obligations that cause rev rec to be on a cash basis. Cash basis causes bookings profile to also move to cash basis and I hate this outcome.

**From:** Steven Bruny
**Sent:** Wednesday, September 4, 2013 2:48 PM
**To:** Daryl Raiford
**Cc:** David Walsh; Mark Pugerude; Robin Wright
**Subject:** Re: TelEfficient

I think the key asks are guaranteeing our equipment works and delivers a base energy savings ( we decide what they are) and first patent once first foa is deployed, then rest if cash upfront in rest of project. Are other terms you are worried about or heard about.

Sent from my iPhone

On Sep 4, 2013, at 1:43 PM, "Daryl Raiford" <Daryl.Raiford@genband.com> wrote:

Sorry, already have dinner plans.

I understand the 'ask' from Telefficient are some very unusual terms, and feel very exposed having a meeting with Telefficient without being fully up to speed.

**From:** Steven Bruny
**Sent:** Wednesday, September 4, 2013 2:39 PM
**To:** Daryl Raiford
**Cc:** David Walsh; Mark Pugerude; Robin Wright
**Subject:** Re: TelEfficient

I can brief David over dinner tonight when I land. We are also prepping for AT&T exec meeting in morning. Can you join tonight?

Sent from my iPhone

On Sep 4, 2013, at 1:32 PM, "Daryl Raiford" <Daryl.Raiford@genband.com> wrote:

Steve,

I think it would be good for David and I to have a briefing on current status of TelEfficient (including their proposed terms, etc) before we meet with their principal tomorrow. Can we get this arranged?

432

CONFIDENTIAL
GEN_00031624

# EXHIBIT 3

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 20 of 63**

| | |
|---|---|
| From: | Brad Bush |
| To: | * Management |
| CC: | Brad Thatcher; Jessica Beffa; Denise Duggan; Dennis Watson; Joe McGarvey |
| Sent: | 10/10/2013 5:05:40 PM |
| Subject: | Fwd: TIA keynote coverage: TMCnet, FierceTelecom and Light Reading |
| Attachments: | ATT00001.bin |

Management team, attached is updated coverage from TIA.

Thanks,

Brad

Begin forwarded message:

**From:** Jessica Beffa <jbeffa@thatcherandco.com>
**Date:** October 10, 2013 at 12:21:26 PM EDT
**To:** Brad Bush <Brad.Bush@genband.com>, Denise Duggan <Denise.Duggan@genband.com>, "Dennis Watson (Dennis.Watson@genband.com)" <Dennis.Watson@genband.com>, Joe McGarvey <Joe.McGarvey@genband.com>, "Brad Thatcher" <bthatcher@thatcherandco.com>
**Subject: TIA keynote coverage: TMCnet, FierceTelecom and Light Reading**

Hi all,

Another article from TIA 2013 from Doug Mohney, TMCNet. We have embedded all of the coverage to date from the show, including:
- TMCnet
- FierceTelecom
- Light Reading

**GENBAND Talks Financials to Accelerate PSTN Conversation**
Doug Mohney, TMCnet
October 09, 2013
http://it.tmcnet.com/topics/it/articles/2013/10/09/356212-genband-talks-financials-accelerate-pstn-conversation.htm

By nearly all accounts, the world's telecommunications providers aren't in any major hurry to switch over from the existing PSTN to an all-IP multiservice infrastructure due to the expense and time involved. GENBAND (News - Alert) believes it has a financial model to change all that.

Who pays for the switch to the all-IP network appears to be a big problem. Carriers such as Verizon (News - Alert) appear to have adopted an "abandon in place" strategy, letting existing facilities and equipment degrade until and if customers switch to fiber-based options. Or, worse yet as in the case of Hurricane Sandy on Fire Island, N.Y., failing to replace damaged central office facilities and forcing a migration to wireless.

GENBAND Chairman and CEO David Walsh presented a "PSTN Sunset & Sustainability" model during his keynote speech at TIA (News - Alert) 2013 this week. The PSTN's true cost these days is power, resulting in carbon emissions. Meanwhile, the cost of building Layers 1-7 have gone down considerable in the last decade, while "Layer 0" -- mechanical and electrical costs -- have substantially increased. Over the next decade, power costs will continue to increase.

The solution, Walsh says, is to swap out all existing legacy as soon as possible. It consumes a whopping 12 billion kilowatt hours every year. Replacing everything with new gear should result in a 70-percent reduction -- 8.4 billion kilowatt hours annually -- and works out to a $1.3 billion power bill savings annually.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 21 of 63

CONFIDENTIAL
GEN_00024630

Dropping in an all-IP, multiservices network provides a number of advantages. A new IP-based network provides increased flexibility and capability to add new services, especially with businesses continuing to value voice and multimedia usage increasing. There are also benefits with a much lower real estate footprint as well.

But the ticking clock is with equipment that, in some cases, is 25 to 35 years old with an expected lifespan of 25 years. Network maintenance costs are increasing and most "grey beards" who understand all the deployed legacy gear has retired from the service provider world -- and the younger guys out of college understand IP.

The telecom retired worker issue is similar to the demand for COBOL programmers as the year 2000 and Y2K bugs loomed. GENBAND has stocked up on personnel who understand legacy PSTN gear, while that knowledge is vanishing out of the traditional telecom world.  That loss of knowledge translates to increase risk. For carriers, an ultimate transition to IP and turning off the PSTN is a no-brainer, but the problem is finding the capital financing to convert central offices from legacy gear to IP.

GENBAND has teamed up with TelEfficient LLC, a finance company, to structure an upgrade deal funded out of future operational expense (OPEX (News - Alert)) energy cost savings to fund deployment of energy efficient hardware today. TelEfficient provides the cash upfront for converting COs from PSTN to all-IP and gets paid back over time from the electricity savings -- after all, we're talking about a 70-percent reduction in the power bill, so there should be enough money to go around for both service provider and finance company. GENBAND gets to sell more gear faster and provides its established expertise in migrating companies from PSTN to IP. The service provider gets new gear and reduces its carbon footprint, so it's a win-win all around.

Walsh cited a case study in his keynote that encompassed 86 central offices with 104 switches, transitioning infrastructure to one switch and 39 gateways. Estimated as a 10-year project, the entire network was migrated in three years, with the capital expense -- yes, just like the car commercials, no money down -- financed via operational expense. The $60 million project saved 54 percent power across the network with about 160,000 metric tons of $CO_2$ emissions reduced per year. Total savings of $80 million on the power bill was expected over the term of the project.

GENBAND is in discussion with a number of service providers with some close to signing, Walsh told me. What he didn't say was deals would establish a larger GENBAND footprint within carriers, enabling the company to offer follow-through products and services to be deployed via software.

I'm interested to see how soon and how fast carriers sign up. In certain areas of the world, such as Europe and California, there are regulatory and utility incentives to migrate to more power-efficient equipment. It also takes a while for service providers to analyze and embrace a new business model, so it might take a couple of years before GENBAND has a ramp and pipeline of CAPX/OPEX style deals.

435

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 22 of 63**

CONFIDENTIAL

**GENBAND's Walsh: Power, cooling remain the PSTN's biggest challenges**
Sean Buckley, FierceTelecom
October 9, 2013
http://www.fiercetelecom.com/story/genbands-walsh-power-cooling-remain-pstns-biggest-challenges/2013-10-09

WASHINGTON, D.C.--One of the inescapable facts about the public switched telephone network (PSTN) is that it is very expensive to power and cool. It's part of why AT&T (NYSE: T) and other large telcos have been lobbying the FCC to give it a timeline to shut down the PSTN network.

David Walsh, CEO and president of GENBAND, says that the shutdown of the existing PSTN network needs to be done carefully.

"A lot of people have said, 'let the PSTN die in place,' but the consequences of that are pretty severe," he said. "The problem right now is not a technology one, but that this infrastructure is very expensive and is a massive power expense and a big producer of $CO_2$."

What has driven up the operational costs of running the PSTN is a lack of innovation on the electrical and mechanical layer of the network. In particular, the chiller plant technology that cools the central offices (COs) that house the switching equipment has not changed in nearly 100 years.

"When you look at the OSI model, there have been enormous amounts of optimization in all the layers, but there's a layer below called Layer 0, which is the mechanical and electrical infrastructure this all sits on, and there's been no optimization in that," Walsh said. "What you have seen over the last decade is that the mechanical and electrical part is growing and becoming much more important."

CONFIDENTIAL **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 23 of 63**
GEN_00024632

Power and cooling expenses continue to rise at a time when the prices of storage and Internet transit services continue to decline.

The cost of network storage, for example, has dropped from $1 million in 1960 to 10 cents in 2010. Likewise, Internet transit rates have dropped from a high of $1,200 per megabit in 1998 to $1.05 per megabit in 2013.

"If you look at that same period of time, power costs in the last decade have gone up by 50 percent," Walsh said. "The amount of power that servers are consuming has doubled, which has led to a tripling of your power costs."

Working in conjunction with CoEfficient, a company focused on clean energy technology, GENBAND said it is helping one unnamed telco transition away from a TDM-based to an all IP-based network.

CoEfficient and GENBAND said they will help this service provider condense its network of 86 COs with 104 Class 5 switches to just one switch and 39 gateways. The two companies claim when this transition is complete it will generate $8 million in annual energy savings.

Besides reducing energy and cooling costs, the other opportunity in transitioning to an IP-based network is it creates a foundation to handle machine-to-machine and multimedia applications.

"The real opportunity going forward is having a multimedia infrastructure that can deal with what's coming around the corner, and what's coming around the corner is the Internet of things, but that's where we have to move from the voice-only TDM world to this Internet of things," Walsh said. "We have the Internet today that allows for everyone to connect, but the next evolution of that is when devices and things start talking to each other."



**GenBand Plots Funding of TDM Death March**

437

CONFIDENTIAL

GEN_00024633

Carol Wilson, Light Reading
October 9, 2013
http://www.lightreading.com/genband-plots-funding-of-tdm-death-march/d/d-id/706001?f_src=lightreading_gnews

NATIONAL HARBOR, Md. -- TIA 2013: The Future of the Network -- GenBand has launched what it believes is a unique way of encouraging telecom network operators to replace their TDM networks faster. The gear maker is working with an energy audit firm and Wall Street financiers to help operators finance the total cost of a TDM replacement, based on the money saved on power and water and the potential benefits to the environment.

The one catch: Network operators have to use Genband Inc. as their general contractor and agree to exclusively deploy its next-gen network gear, including softswitch, gateways, and session border controllers, as well as a 10-year maintenance and support deal.

GenBand Chairman and new CEO David Walsh unveiled the new strategy in a keynote speech at the TIA event, for which his company is the major sponsor and an inescapable presence. It differs greatly from vendor financing deals of the past, he insisted to Light Reading in an interview, because GenBand is taking no financial risk -- that lies with the banks it has enlisted. But GenBand is helping its operator customers prove that they can pay off the financing of their next-gen networks based on the money they save on energy and water costs. (See Pulling the Strings At Genband.)

To do that, GenBand is working with TelEfficient, a unit of CoEfficient, a company which can come in, do an energy audit of a telecom operator, and prove their operating cost savings. Those energy cost savings -- which according to Walsh are as high as 70 percent -- are then used to insure the financing of the new network purchase.

"We have been building the technical infrastructure to allow telcos to migrate from TDM to IP multimedia," he said. "The obstacle here is how do you finance it? What we have come up with is a no-money-down operating expense, paid from avoided cost."

There are other potential financial benefits to telcos -- real-estate requirements are cut by up to 90 percent and in some cases the freed-up real estate can be sold, reducing property tax liability as well. Tax credits, utility company rebates, and government incentives for adopting green technology may also be available. But those are seen as additional perks and aren't factored into the basic equation.

GenBand installs and maintains all of the equipment and those costs are part of the financing process. At the end of 10 years, telcos can decide how to proceed -- whether they want further upgrades or replacements, Walsh says.

"This approach is new in this industry but it's not new in other industries," he insists. "This is how GE and Siemens finance CAT scans and MRI machines for hospitals, it's how Boeing and Airbus help finance airplanes."

Walsh also stresses the inherent risks in simply allowing TDM switches, which are anywhere from 10 to 35 years old, to die a slow death. He said they waste power and water and generate carbon dioxide emissions, while in some cases they are beyond maintenance windows and potentially become unreliable.

One reason that GenBand chose to go public with the strategy now is that the company is "well down the road" with a number of telcos in lining up financing deals and expects to begin to announce customers soon. The TIA event was a chance to bring the plan to a broader audience.

GenBand says the math works for any telco with a substantial installed base of TDM switches. As part of his keynote, Walsh presented a case study of a telco with 86 Central Offices and 104 switches that could be consolidated into one switch and 39 gateways. The replacement could be done in three years and would then generate $8 million a year in savings by cutting the power usage for the entire network in half, while also reducing real estate costs and taxes.

If interested customers have competitors' equipment in their networks today, say a Metaswitch Networks softswitch or an Acme Packet Inc. (Nasdaq: APKT) SBC, GenBand is willing to work around that and incorporate it into the long-term plans. Walsh, though, quickly adds that there is also a business case to be made for "rip and replace" strategies. But the financing assistance is otherwise based on going end-to-end GenBand.

"We aren't in the business of helping finance our competitors' products," Walsh says.

CONFIDENTIAL

GEN_00024634

CONFIDENTIAL

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 26 of 63**

GEN_00024635

**EXHIBIT 4**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 27 of 63**

| | |
|---|---|
| **From:** | David Walsh |
| **Sent:** | Friday, September 11, 2015 10:12 AM CDT |
| **To:** | Murat Armbruster; Jolea Lauro |
| **CC:** | Alex Russo (external); Justin Ferguson; Daryl Raiford |
| **Subject:** | |

Murat,

We would like to schedule a call today anytime between 1:30-3:30pm. est to discuss our relationship. Specifically we want to talk through the recommended changes we suggested to the partnering agreement as well as discuss the status of the loan. We've made some great progress with ATT and it looks like all this hard work is going to finally pay off! I don't like loose ends, especially when we are heading into such a large and important project. I've copied my assistant Jolea - she can help coordinate a time that works for all.

Thanks,

David


Sent from my iPhone

**EXHIBIT 5**

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 29 of 63

**From:** Daryl Raiford
**To:** Mark Pugerude; David Walsh; Alex Russo
**Sent:** 7/23/2014 2:46:04 PM
**Subject:** RE: Results from yesterday's meeting?

There are a number of structures to accomplish the result.....starting with a convertible note (pre-money value), then possibly warrants excercisable at a pre-money price at a fixed point in time, etc.

However......I'm not totally thrilled with more exposure to TEL.

**From:** Mark Pugerude
**Sent:** Wednesday, July 23, 2014 9:05 AM
**To:** David Walsh; Alex Russo; Daryl Raiford
**Subject:** Fw: Results from yesterday's meeting?

Daryl and Alex...

I talked to David about the need to prop up Tel Efficient for about 3 - 6 months.    Murat has lost on employee so his burn is less but he still needs more due to ATT going without financing.

The massive upside is that Verizon's NTr deal is at 65m is clearly going Tel EfF and of course the Vodafone NZ deal as well.   This does not count on CenturyLink, Portugal Telecom, and others.

The details is that they need another 300 - 400K. We know about cash issues... so David wanted to explore if we should not take another type of economic interest in Tel EfF.    he suggested a call with Alex... so I think the four of us need to get together as soon as we can so we can figure this out.

This needs to be something we talk about in the next 48 hours if we can.

Thanks,

MLP

Mark Pugerude
IP Phone +1 (703) 629-5155

**From:** Steven Bruny <Steven.Bruny@genband.com>
**Sent:** Wednesday, July 23, 2014 8:55 AM
**To:** Mark Pugerude
**Subject:** Re: Results from yesterday's meeting?

Tuesday/ Wednesday

Sent from my iPhone

On Jul 23, 2014, at 7:44 AM, "Mark Pugerude" <Mark.Pugerude@genband.com> wrote:

T/W?

Mark Pugerude
IP Phone +1 (703) 629-5155

**From:** Steven Bruny

CONFIDENTIAL

443

GEN_00006735

**Sent:** Wednesday, July 23, 2014 8:43 AM
**To:** Mark Pugerude
**Subject:** FW: Results from yesterday's meeting?

I told Murat you will be with David this week on T/W.

--
**Steven Bruny**
Sr. Vice President
Major Accounts

2801 Network Boulevard
Suite 300
Frisco, TX 75034, USA
www.genband.com
mobile +1.303.669.6185
steven.bruny@genband.com

**From:** Murat Armbruster <murat@telefficientllc.com>
**Date:** Wednesday, July 23, 2014 2:51 AM
**To:** Steven Bruny <steven.bruny@genband.com>
**Cc:** Hao Lam-TEL <hao@telefficientllc.com>
**Subject:** Results from yesterday's meeting?

Hi Steven,

Wondering if there was a decision made about TEL funding at yesterday's meeting.

Thanks,

Murat

Murat A. Armbruster

CEO
CoEfficient, LLC

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:  +1-415-944-3491
mobile:  +1-617-905-3924
Skype:  muratarmbruster

901 Mission Street, Suite 105

CONFIDENTIAL DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 31 of 63                    GEN_00006736

San Francisco, CA 94103

---

This e-mail may contain information that is privileged, confidential, and protected from disclosure. If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail. This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of TelEfficient, LLC.

---

445

CONFIDENTIAL GEN_00006737

**EXHIBIT 6**

446

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 33 of 63**

| | |
|---|---|
| **From:** | Murat Armbruster |
| **Sent:** | Thursday, November 28, 2013 2:05 PM CST |
| **To:** | David Walsh |
| **CC:** | Mark Pugerude; Alex Russo; Zach Green; Daryl Raiford; Jonathan Knop; John Ryan; Robin Wright; 'Hao@coefficientgroup.com'; Justin Ferguson |
| **Subject:** | Re: TelE Term Sheet |

Thank you for your confidence. We too are optimistic and grateful that you and Mark stepped in to pull this one from the fire.

Regarding projected returns, if the last seven years are any indication of the next seven, we should be in good shape.

Average annual increase in price of electricity in Hawaii over last seven years was 9.6%.

Hope the call with Kevin tomorrow goes well. We look forward to getting this first one done and rinse and repeating!

Happy Thanksgiving to all of you at Genband from us at TelEfficient. We have very much enjoyed working with you this past year and half.

Murat

---

Murat A. Armbruster

CEO
CoEfficient, LLC

Solving the Energy Equation™

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:  +1-415-944-3491
mobile:  +1-617-905-3924
Skype:  muratarmbruster

901 Mission Street, Suite 105

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 34 of 63**
Confidential

San Francisco, CA 94103

_____

This e-mail may contain information that is privileged, confidential, and protected from disclosure. If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail. This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of CoEfficient, LLC and/or TelEfficient, LLC.

_____

On Nov 28, 2013, at 9:42 AM, David Walsh <David.Walsh@genband.com> wrote:

Team,

Great work by all. I'm feeling positive about this one. McQuarrie Bank will like 12% returns and they probably have modeled 15% because they believe electricity rates will increase in the 5% range not 3%. HT should like someone putting up equity for these types of returns. Its going to be very interesting but this is "the first olive out of the jar". If we can get this one done, we might be able to run the table. I also think if we get in to HT for Network Transformation we will likely see a bunch of plus business in other product areas!

Happy Thanksgiving!

D.

**From**: Mark Pugerude
**Sent**: Thursday, November 28, 2013 11:23 AM
**To**: David Walsh; Alex Russo; Zach Green; Daryl Raiford; Jonathan Knop; John Ryan; Robin Wright; Murat Armbruster <murat@coefficientgroup.com>; Hao Lam <Hao@coefficientgroup.com>; Justin Ferguson
**Subject**: FW: TelE Term Sheet

TO ALL ...

This is the note and the signed Term Sheet I sent to Kevin.   TelEfficient worked late yesterday to get this signed so I appreciate the effort.   Thanks also to the GENBAND team for getting this in shape to send off to Kevin and jumping on the phone yesterday for an hour long conference call.   We really appreciate the help and insight.

Without HT saying they want to fund with ProjectCo we are most likely dead in the water.  We are certainly not excited about that prospect.   However, if we can get HT funded and going ... this is like cracking the hardest nut ... the rest will be a lot easier.

I will give everyone an update when I get a response from Kevin after our phone call tomorrow.

448

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 35 of 63**

Thanks again for everyone's help.

Mark Pugerude

---

**From:** Mark Pugerude
**Sent:** Thursday, November 28, 2013 12:17 PM
**To:** 'Kevin Paul'
**Cc:** 'Murat Armbruster'
**Subject:** TelE Term Sheet

Kevin:

Attached you will find the signed Term Sheet and the Financial Model as we discussed in our meeting last Friday.   First and foremost this is a non-binding Term Sheet.   The purpose of this document is to agree in principle that Hawaiian Telecom wishes to fund their grooming, office collapse and network modernization plans with an operating agreement under a ProjectCo business entity versus capital expenditure or lease program.   Second, the "equity investor" is highlighted as the funding source and the terms for the anticipated returns for this type of investment are outlined.  Finally, the term sheet outlines treatment of the savings and how to distribute to the respected parties.   We inserted the language that we will guarantee the power usage versus the current network components and the 3 different waterfalls we discussed in our meeting.   I think the term sheet covers all the salient points we discussed and will provide enough of the important deal points for Murat to engage the investor in a fulsome manner.

It is important to highlight, the added benefit of the operating agreement is that this construct does not impact the balance sheet in terms of a debt obligation and contributes positively to EBITDA every year.   This was a key component you required and this approach allows for that type of financial performance.

I think the deciding factor has very little to do with TeleEfficient, GENBAND or HT and your technology decisions.   It is simply more of a question does HT want to utilize GREEN ENERGY type funds to fund their grooming, office collapse and modernization plans.   Professional investors have many ways of investing in HT right now.  You have both public debt and public equity.   This investor was very clear that their interest in investing in HT was solely through this  program.     So the money is there but HT has to decide that they want to go after GREEN ENERGY funds to groom and modernize the network.

This is a very interesting business opportunity.  I look forward to talking with you on Friday.

**Mark Pugerude**
President of Global Sales
2801 Network Boulevard, Suite 300
Frisco, TX 75034 USA
IP Phone: 1.972.265.3626
mark.pugerude@genband.com
<image001.jpg>
Connect with

449

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 36 of 63**
**Confidential**                                                                                                                  **TEL_026615**

us:<image002.gif><u>&lt;image003.gif&gt;</u>&lt;image002.gif&gt;<u>&lt;image004.gif&gt;</u>&lt;image002.gif&gt;<u>&lt;imag
e005.gif&gt;</u>&lt;image002.gif&gt;<u>&lt;image006.gif&gt;</u>&lt;image002.gif&gt;<u>&lt;image007.gif&gt;</u>

**Confidential**

**EXHIBIT 7**

451



November 27, 2013

Mr. Kevin Paul
Hawaiian Telcom, Inc.
Senior Vice President, Technology
1177 Bishop Street
Honolulu, Hawaii 96813

Mr. David Walsh
President and Chief Executive Officer
GENBAND US LLC
2801 Network Boulevard, Suite 300
Frisco, Texas 75034

      Re:    **Hawaiian Telcom Network Transformation Program**

Dear Kevin and David:

      Based on the information provided by TelEfficient, LLC ("TEL"), GENBAND US LLC ("GB") and Hawaiian Telcom, Inc. ("HT") and further communications among the parties regarding the proposed Hawaiian Telcom Network Transformation Program (the "Program"), TEL is pleased to propose terms for the Program as follows:

**GENERAL DESCRIPTION**

| | |
|---|---|
| Customer: | Hawaiian Telcom, Inc. |
| Prime: | Special purpose vehicle organized by TEL as a wholly-owned subsidiary to serve as the project company ("ProjectCo") |
| Project Administrator: | TelEfficient, LLC |
| Equipment Provider: | GENBAND US LLC |
| Service Subcontractor: | GENBAND US LLC |
| Investor: | To be determined ("Investor") |
| Project Term: | 10 years |
| Construction Term: | 3 years |

      TEL, through ProjectCo, proposes to design, procure, install and maintain telecom fixed line switching equipment manufactured by GB that is acceptable to HT (the "TEL Assets") and to provide ongoing telecom switching and other related services to HT at its premises (the "TEL Services" and, together with the TEL Assets, the "TEL System").

      HT will procure a substantial reduction in energy consumption and other performance benefits through the application of the TEL System. ProjectCo will be compensated for the TEL Services from

452

Confidential                TEL_026540

such energy consumption reductions, and HT will be entitled to share in the ProjectCo Annual Residual Cash Distribution (as provided below).

GB, on behalf of ProjectCo, will install and maintain the equipment. HT, TEL and GB will establish a measurement and verification protocol to calculate the actual energy savings achieved as a result of the TEL System.

GB will guaranty that the power usage of the TEL System (subject to the TEL System being operated in accordance with the GB specifications), such power usage to be determined by, and mutually agreeable to, the parties, taking into consideration, among other factors, the assumed equipment performance on which the financial models were derived. ProjectCo, with TEL, will conduct measurement and verification of energy savings on a monthly or quarterly basis.

## KEY FINANCIAL TERMS

ProjectCo Income:
- Investor will capitalize ProjectCo with the necessary funds for the TEL System during the Construction Term
- HT will be responsible for payment to ProjectCo of all energy costs and all realized kWh units saved, subject to measurement and verification (M&V) of energy savings
- Rebate and incentive capture will accrue in ProjectCo and may be applied toward the cost of the TEL Assets or will be distributed to the involved parties as part of the Residual Cash Distribution

ProjectCo Cost:
- $1M per year for three years will be paid by ProjectCo to HT during the Construction Term
- $26,597,578 will be paid by ProjectCo to GB for construction and commissioning cost of the TEL Assets
- $8,821.411 will be paid by ProjectCo to GB for GBCare services during the Project Term
- $1.5M will be paid by ProjectCo to state and local authorities for sales taxes
- $1.6M will be paid by ProjectCo to TEL to cover project development fees
- $1.45M will be paid by ProjectCo to vendors for M&V, legal, accounting, insurance, and other fees, costs and expenses not yet identified
- $2M will be paid by ProjectCo to TEL over 10 years for management fee

ProjectCo Annual Residual Cash Distribution:
- "Distribution Waterfall" prior to Investor achieving 12% return on investment:
    o 85% to Investor
    o 15% to HT
- "Distribution Waterfall" after 12% return is achieved by Investor and until HT accrues $20M in total distributions:
    o 66% to HT
    o 17% to TEL
    o 17% to Investor

- "Distribution Waterfall" after 12% return is achieved by Investor and HT achieves $20M in total distributions:
    o 25% HT
    o 25% TEL
    o 25% Investor
    o 25% GB

2

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 40 of 63**
Confidential
TEL_026541

*This term sheet is not intended to be and does not constitute a legally binding or enforceable obligation of the parties. No prior or subsequent conduct or action by the parties hereto, whether in furtherance of the proposed transaction or otherwise, shall abrogate the foregoing disclaimer of intent to be bound hereby or create any binding obligations respecting the proposed transaction. No legally binding obligation will be created, implied or inferred until all parties have completed their necessary diligence, obtained all required corporate authorizations and executed and delivered definitive agreements, the terms of which shall supersede this letter and all prior negotiations, discussions, representations, agreements and understandings, whether written or oral, respecting the proposed transaction.*

If the terms herein are generally acceptable to you, please sign below and return by **November 30, 2013.** Thank you for giving TEL an opportunity to present these preliminary terms for the Program.

Sincerely,

TELEFFICIENT, LLC

By: CoEfficient, LLC
    Managing Member

By: _____
    Murat Armbruster
    Chief Executive Officer

ACCEPTED AND AGREED TO
this ___ day of November, 2013:

HAWAIIAN TELCOM INC.

By:_____
    Kevin Paul
    Senior Vice President, Technology

ACCEPTED AND AGREED TO
this 27th day of November, 2013:

GENBAND US LLC

By:_____
    David Walsh
    President and Chief Executive Officer

3

454

Confidential                                                                          TEL_026542



# TEL - HT - Pro-forma Summary

| Energy Price Increase | 3% | 4% |
|---|---|---|
| Investment In | 20,000,000 | 20,000,000 |
| Energy Savings | 80,516,705 | 86,465,105 |
| Rebates & Incentives | 3,200,000 | 3,200,000 |
| **Total Cash In** | **103,716,705** | **109,665,105** |
| Cash to HT | (3,000,000) | (3,000,000) |
| GB Construction & Commissioning | (26,597,578) | (26,597,578) |
| GB Care | (8,821,411) | (8,821,411) |
| Taxes (4.35%) | (1,540,726) | (1,540,726) |
| Development Fee (8% of Capital) | (1,600,000) | (1,600,000) |
| Vendors | (1,450,000) | (1,450,000) |
| Management Fee (1% of Capital) | (2,000,000) | (2,000,000) |
| Investment Out (12%) | (42,400,000) | (42,400,000) |
| **Total Cash Out** | **(87,409,715)** | **(87,409,715)** |
| Shared Savings | 16,306,990 | 22,255,390 |

Confidential – Please Do Not Circulate

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 42 of 63**
**Confidential**
TEL_026543





**For Discussion Purposes Only**

| Project Term (Months) | 120 | Energy Savings | $80,516,705 | Energy Rate Baseline | 2012 | HT Shared Savings | |
|---|---|---|---|---|---|---|---|
| Capital Needed | 20,000,000 | Energy Savings in kWh | 219,849,915 | Annual Rate Increase | 3% | Switches Replace | 104 |
| Return on Capital | 12.00% | $CO_2$ Savings in Metric Tons | 155,115 | Rebates & Incentives | 3,200,000 | Number of Sites | 86 |

| | Construction Period | | | Commercialization Period | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period/Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Total |
| BEGINNING CASH | - | 4,592,044 | 352,167 | 255,643 | - | - | - | - | - | 94,856 | - |
| **Cash In** | | | | | | | | | | | |
| Energy Savings | 2,327,464 | 5,901,321 | 7,930,409 | 8,399,064 | 8,651,036 | 8,910,567 | 9,177,884 | 9,453,221 | 9,736,817 | 10,028,922 | 80,516,705 |
| Rebates & Incentives | | | | 3,200,000 | | | | | | | 3,200,000 |
| Total Cash In | 2,327,464 | 5,901,321 | 7,930,409 | 11,599,064 | 8,651,036 | 8,910,567 | 9,177,884 | 9,453,221 | 9,736,817 | 10,028,922 | 83,716,705 |
| | | | | | | | | | | | |
| **Cash Out** | | | | | | | | | | | |
| Cash to Hawaiian Telcom | (1,000,000) | (1,000,000) | (1,000,000) | | | | | | | | (3,000,000) |
| **Construction & Commissioning** | | | | | | | | | | | |
| GENBAND | (13,389,620) | (7,657,377) | (5,550,581) | | | - | | | | - | (26,597,578) |
| Sales Tax | (582,448) | (333,096) | (241,450) | | | | | | | | (1,156,995) |
| **Operations & Maintenance** | | | | | | | | | | | |
| GENBAND | (424,869) | (743,388) | (905,512) | (963,949) | (963,949) | (963,949) | (963,949) | (963,949) | (963,949) | (963,949) | (8,821,411) |
| Sales Tax | (18,482) | (32,337) | (39,390) | (41,932) | (41,932) | (41,932) | (41,932) | (41,932) | (41,932) | (41,932) | (383,731) |
| Developer Fee | (1,600,000) | | | | | | | | | | (1,600,000) |
| Legal | (200,000) | | | | | | | | | | (200,000) |
| Measurement & Verification | (275,000) | (130,000) | (50,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (700,000) |
| Accounting | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (50,000) |
| Insurance | (40,000) | (40,000) | (40,000) | (45,000) | (45,000) | (50,000) | (55,000) | (60,000) | (65,000) | (70,000) | (500,000) |
| Management & Overhead | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (2,000,000) |
| Total Cash Out | (17,735,420) | (10,141,198) | (8,026,933) | (1,285,881) | (1,290,881) | (1,295,881) | (1,300,881) | (1,305,881) | (1,310,881) | (1,315,881) | (45,009,715) |
| | | | | | | | | | | | |
| Net Project Cash Flow | (15,407,956) | (4,239,877) | (96,524) | 10,313,183 | 7,360,155 | 7,614,686 | 7,877,003 | 8,147,340 | 8,425,937 | 8,713,041 | 38,706,990 |
| **Cash From Investments** | | | | | | | | | | | |
| Investment In | 20,000,000 | | | | | | | | | | 20,000,000 |
| Investment Repayment | | - | - | (8,983,503) | (6,256,132) | (6,472,484) | (6,695,453) | (6,925,239) | (7,067,190) | | (42,400,000) |
| Net Cash From Investments | 20,000,000 | - | - | (8,983,503) | (6,256,132) | (6,472,484) | (6,695,453) | (6,925,239) | (7,067,190) | | (22,400,000) |
| | | | | | | | | | | | |
| Net Cash After Investment | 4,592,044 | (4,239,877) | (96,524) | 1,329,681 | 1,104,023 | 1,142,203 | 1,181,551 | 1,222,101 | 1,358,747 | 8,713,041 | 16,306,990 |
| Hawaiian Telcom Shared Savings | | | | (1,585,324) | (1,104,023) | (1,142,203) | (1,181,551) | (1,222,101) | (1,263,890) | (1,321,185) | (8,820,277) |
| ENDING CASH | 4,592,044 | 352,167 | 255,643 | - | - | - | - | - | 94,856 | 7,486,713 | 7,486,713 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hawaiian Telcom Shared Savings | 1,000,000 | 1,000,000 | 1,000,000 | 1,585,324 | 1,104,023 | 1,142,203 | 1,181,551 | 1,222,101 | 1,263,890 | 6,312,327 | 16,811,419 |
| TelEfficient Shared Savings | | | | | | | | | | 1,247,785 | 1,247,785 |
| Investor Shared Savings | | | | | | | | | | 1,247,785 | 1,247,785 |

This finance model is intended for discussion purposes only and is not to be used as a final version of the economics of this transaction. It is based upon certain working but not fully qualified assumptions relating to construction, commissioning, service and maintenance, cost of capital, legal fees, measurement and verification, and other anticipated and unforeseen costs associated with the implementation of this proposed program.

Confidential – Please Do Not Circulate

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 43 of 63**
**Confidential**
TEL_026544

  

**For Discussion Purposes Only**

| Project Term (Months) | 120 | Energy Savings | $86,465,105 | Energy Rate Baseline | 2012 | HT Shared Savings | |
|---|---|---|---|---|---|---|---|
| Capital Needed | 20,000,000 | Energy Savings in kWh | 219,849,915 | Annual Rate Increase | 4% | Switches Replace | 104 |
| Return on Capital | 12.00% | $CO_2$ Savings in Metric Tons | 155,115 | Rebates & Incentives | 3,200,000 | Number of Sites | 86 |

| | Construction Period | | | Commercialization Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Period/Year** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | **Total** |
| **BEGINNING CASH** | - | 4,635,957 | 576,701 | 809,376 | - | - | - | - | - | 4,177,334 | |
| Cash In | | | | | | | | | | | |
|   Energy Savings | 2,371,377 | 6,081,942 | 8,259,608 | 8,831,296 | 9,184,548 | 9,551,930 | 9,934,007 | 10,331,367 | 10,744,622 | 11,174,407 | 86,465,105 |
|   Rebates & Incentives | | | | 3,200,000 | | | | | | | 3,200,000 |
|     Total Cash In | 2,371,377 | 6,081,942 | 8,259,608 | 12,031,296 | 9,184,548 | 9,551,930 | 9,934,007 | 10,331,367 | 10,744,622 | 11,174,407 | 89,665,105 |
| | | | | | | | | | | | |
| Cash Out | | | | | | | | | | | |
|   Cash to Hawaiian Telcom | (1,000,000) | (1,000,000) | (1,000,000) | - | - | - | - | - | - | - | (3,000,000) |
|   Construction & Commissioning | | | | | | | | | | | |
|     GENBAND | (13,389,620) | (7,657,377) | (5,550,581) | - | - | - | - | - | - | - | (26,597,578) |
|     Sales Tax | (582,448) | (333,096) | (241,450) | | | | | | | | (1,156,995) |
|   Operations & Maintenance | | | | | | | | | | | |
|     GENBAND | (424,869) | (743,388) | (905,512) | (963,949) | (963,949) | (963,949) | (963,949) | (963,949) | (963,949) | (963,949) | (8,821,411) |
|     Sales Tax | (18,482) | (32,337) | (39,390) | (41,932) | (41,932) | (41,932) | (41,932) | (41,932) | (41,932) | (41,932) | (383,731) |
|   Developer Fee | (1,600,000) | - | - | | | | | | | | (1,600,000) |
|   Legal | (200,000) | | | | | | | | | | (200,000) |
|   Measurement & Verification | (275,000) | (130,000) | (50,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (700,000) |
|   Accounting | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (50,000) |
|   Insurance | (40,000) | (40,000) | (35,000) | (40,000) | (45,000) | (55,000) | (60,000) | (60,000) | (65,000) | (70,000) | (500,000) |
|   Management & Overhead | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (2,000,000) |
|     Total Cash Out | (17,735,420) | (10,141,198) | (8,026,933) | (1,285,881) | (1,290,881) | (1,295,881) | (1,300,881) | (1,305,881) | (1,310,881) | (1,315,881) | (45,009,715) |
| | | | | | | | | | | | |
|   Net Project Cash Flow | (15,364,043) | (4,059,256) | 232,675 | 10,745,415 | 7,893,667 | 8,256,049 | 8,633,127 | 9,025,487 | 9,433,741 | 9,858,526 | 44,655,390 |
| Cash From Investments | | | | | | | | | | | |
|   Investment In | 20,000,000 | | | | | | | | | | 20,000,000 |
|   Investment Repayment | | | | (9,821,573) | (6,709,617) | (7,017,642) | (7,338,158) | (7,671,664) | (3,841,346) | | (42,400,000) |
|     Net Cash From Investments | 20,000,000 | - | - | (9,821,573) | (6,709,617) | (7,017,642) | (7,338,158) | (7,671,664) | (3,841,346) | | (22,400,000) |
| | | | | | | | | | | | |
| **Net Cash After Investment** | 4,635,957 | (4,059,256) | 232,675 | 923,842 | 1,184,050 | 1,238,407 | 1,294,969 | 1,353,823 | 5,592,395 | 9,858,526 | 22,255,390 |
|   Hawaiian Telcom Shared Savings | | | | (1,733,219) | (1,184,050) | (1,238,407) | (1,294,969) | (1,353,823) | | (1,415,061) | (8,219,529) |
| **ENDING CASH** | 4,635,957 | 576,701 | 809,376 | | | | | | 4,177,334 | 14,035,860 | 14,035,860 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hawaiian Telcom Shared Savings | 1,000,000 | 1,000,000 | 1,000,000 | 1,733,219 | 1,184,050 | 1,238,407 | 1,294,969 | 1,353,823 | 4,199,950 | 6,572,351 | 20,576,770 |
| TelEfficient Shared Savings | | | | | | | | | 696,222 | 1,643,088 | 2,339,310 |
| Investor Shared Savings | | | | | | | | | 696,222 | 1,643,088 | 2,339,310 |

This finance model is intended for discussion purposes only and is not to be used as a final version of the economics of this transaction. It is based upon certain working but not fully qualified assumptions relating to construction, commissioning, service and maintenance, cost of capital, legal fees, measurement and verification, and other anticipated and unforeseen costs associated with the implementation of this proposed program.

Confidential – Please Do Not Circulate

# EXHIBIT 8

458

| | |
|---|---|
| **From:** | Mark Pugerude |
| **To:** | Steven Bruny |
| **Sent:** | 9/28/2013 1:52:13 PM |
| **Subject:** | FW: HT |

I need to talk to you about Murat's business plan ... Walsh finally saw that we are not making any money and that the cost of capital is over 20%!    We are off on the HT deal by 5m – 6m dollars in gross profit.    The only place that can happen is out of Murat's pocket.  We cant sell the HT for 13% GM.

Lakey already talked to Murat but I am fearful he wont be able to put the right spin on it ... I think we need to step in to hold this thing together.  I can present the case to Murat but I need your help in getting the message through to him

Please read Walsh's take on the deal.  He told Daryl that we cant do it this level and need to go back at Murat.

Mark Pugerude

---

**From:** David Walsh
**Sent:** Saturday, September 28, 2013 1:19 AM
**To:** Daryl Raiford; Robin Wright; Mark Pugerude; Keith Landau; Jeff Townley; Phillip Pound
**Subject:** RE: HT

Team,

We need too have Murat break out the cash to investors line or at least tell us what the interest assumptions are. If there's no fees in the cash to investors line iy looks like the interest rate assumption is around 15%. We need to confirm. It looks like TelEfficient has added approx $8M fee as the cash out line is $49M and we are getting $41M. In addition to the $8M fee they expect to get a piece of the savings estimated at approx $3.5M for a total of $11.5M. Wow! Lets not forget it looks like they add charging all of there cost to the project as well - see mgt snd overhead line   My guess is that the banks have to put money to work in green projects so if you add 2pts to HT's WACC and we should be in the right zip code. My guess is that we will do a little better on the cost of money and TelEfficients fees are to high. HT does incredibly well as they get paid $6.3M to allow us to give them a new infrastructure. Only in Americas or Hawaii this kind of stuff happens! My quick read on the proposal is that we do all the work and everyone else makes all the money. We need to move our standard margin to at least 50%.

D.

D.

Sent via the Samsung Galaxy S™ III, an AT&T 4G LTE smartphone

---

-------- Original message --------
From: Daryl Raiford <Daryl.Raiford@genband.com>
Date:
To: Robin Wright <Robin.Wright@genband.com>,David Walsh <David.Walsh@genband.com>,Mark Pugerude <Mark.Pugerude@genband.com>,Keith Landau <Keith.Landau@genband.com>,Jeff Townley <jeff.townley@genband.com>,Phillip Pound <Phillip.Pound@genband.com>
Subject: FW: HT

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 46 of 63

CONFIDENTIAL

GEN_00001923

Jonathan was kind to provide the one page. I haven't reviewed yet but there may be nuggets included that help us understand TEL's return.

---

**From:** Jonathan Knop
**Sent:** Friday, September 27, 2013 10:44 AM
**To:** Daryl Raiford
**Cc:** Dan Lakey
**Subject:** RE: HT

Daryl,

I have attached the Pro Forma that we are submitting with the RFP response, which is TelEfficient's current best view of this deal as it would look to HT. This is very useful in understanding the deal dynamics and variables.

Thanks,

**Jonathan Knop**
M: (949) 633-4472

CONFIDENTIAL DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 47 of 63          GEN_00001924

**EXHIBIT 9**

461

| From: | David Walsh |
|---|---|
| To: | Dan Lakey; Mark Pugerude |
| CC: | David Walsh; Robin Wright; Keith Landau; Jeff Townley; Steven Bruny |
| Sent: | 10/10/2013 3:10:49 PM |
| Subject: | Re: Notes from HT meeting. |

It was my understanding that our price didn't break out what Murat was getting that way we could snatch back some to fix the very low gross margin that was built into the proposal. Now it seems that HT doesn't think 15 percent is fair for Murat and they want that. Two people can't eat the same meal and that's why I didn't want MURATs fees broken out. Sounds like we have some work to do.

D.

Sent via the Samsung Galaxy S™ III, an AT&T 4G LTE smartphone

-------- Original message -------
From: Dan Lakey <Dan.Lakey@genband.com>
Date:
To: Mark Pugerude <Mark.Pugerude@genband.com>
Cc: David Walsh <David.Walsh@genband.com>,Robin Wright <Robin.Wright@genband.com>,Keith Landau <Keith.Landau@genband.com>,Jeff Townley <jeff.townley@genband.com>,Steven Bruny <Steven.Bruny@genband.com>
Subject: Re: Notes from HT meeting.

Not bad, just part of the process. If we came back with with $10M in share, he would want $20m.

Comments inserted.

Dan Lakey - GENBAND
(214) 455-6128 - Mobile

On Oct 9, 2013, at 1:55 PM, "Mark Pugerude" <Mark.Pugerude@genband.com> wrote:

Not the best meeting then ... what do we think we can do to give them more savings in the outer years?
-

-Cut further into
Tel's cut is what HT wants. TEL is looking at that now  They have 15% mark up on product and services. We can give some of that to HT.

 why does Jalkut not like NTr?
- he hasn't seen a viable biz case in his long history. I plan to show him one.
What was the next steps?
- let HT get comfortable with the current numbers and we give them a counter in a few days.

CONFIDENTIAL
GEN_00024639

Mark Pugerude
IP Phone +1 (703) 629-5155

**From:** Dan Lakey
**Sent:** Wednesday, October 9, 2013 7:41 PM
**To:** David Walsh; Robin Wright; Mark Pugerude; Keith Landau; Jeff Townley
**Cc:** Steven Bruny
**Subject:** Notes from HT meeting.

All,

We held the RFP defense meeting in Honolulu today. We had GB Sales, Architecure, and PLM presenting as well as Hao from TelEfficient. Meeting we scheduled for 2-hours, but stretched to three. I had a one on with the CTO following the meeting.

Technical and Services piece went very well. It appeared be clear to HT that GB is the only viable choice for this project.

Hao and Jonathan presented the financial modeling. This piece was not well received. Net/net, HT wants a larger piece of the savings.
1.    They want to start sharing in year-1. In our current model, we don't start sharing the savings until after the build out in year-4.
2.    Of the $80M in total savings, they only share in about $2.5M after 10-years. They are looking for a lot more, likely in the 10% range.

HT will get the spreadsheet model later today. Once they review the model, they will have a better understanding of the split of the $80M and where the costs are. Following their review, they will come back to us with and ask on savings.

We have been asked to give them options that could improve their share of the savings (lower interest rate, capital lease versus service contract, LOC, etc.). Jonathan and Hao will work with HT on refining the model to maximize the financial benefit to HT.

HT does understand that there are getting the benefit of a brand new network with our proposal. They believe they have other options to get there, if we can't make this model work including:
·    Speed up their copper to fiber program
·    Speed up the grooming program that is generating cost savings today. They have a company grooming down networks today at no cost (power savings funded)
·    Do both of the above and revisit NTr in a year or two when the network is smaller. This is the real risk. We need to give them a compelling enough biz case to do NTr now (in Q4)

Points from my one on one with Kevin:
·    He does not believe that the BoD will approve the project unless the HT savings allocation is much higher than $2.5M.
·    I talked to him about Meta, their financial situation, why they can't perform this project, and why we beat them at a higher price at Lime.
·    He said that if Meta shows him a much higher share of the savings, and he is confident in their ability to perform, we may be in trouble. I doubt Meta could do either, but if they come up with a very different scope and convince Kevin that his risk if covered (maybe performance guarantees), anything is possible if Meta is desperate. We believe they are desperate
·    I asked if this project could be awarded in Q4. They have BoD meetings in early November and December. They can get this done if they choose to.
·    Dick Jalkut, the CoB, is not an NTr fan. So the biz case will need to be very compelling with little risk to HT.
·    I asked him to be candid with me and tell me what it will take to get this project over the line in Q4. He committed to do this.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTION - Page 50 of 63

CONFIDENTIAL                                                                                        GEN_00024640

Dan Lakey – GENBAND
Mobile (214)455-6128

464

CONFIDENTIAL

GEN_00024641

# EXHIBIT 10

465

| | |
|---|---|
| **From:** | Robin Wright |
| **Sent:** | Wednesday, August 7, 2013 9:41 PM CDT |
| **To:** | Sara Barnowski; Lauro, Jolea A |
| **Cc:** | Murat Armbruster |
| **Subject:** | RE: introduction |

Hi Sara,

   I'm copying Jolea here, she is David's assistant and can help set up some time. I'll leave the coordination up to you two. If I can do anything to help (beyond the calendar), let me know.
Thanks,

Robin

**From:** Sara Barnowski [mailto:sbarnowski@coefficientgroup.com]
**Sent:** Wednesday, August 7, 2013 7:39 PM
**To:** Robin Wright
**Cc:** Murat Armbruster
**Subject:** Re: introduction

Hi Robin,

As per the thread below, I'd love to set up a time for Murat to speak with David.

Murat has a fair amount of availability late next week (8/14 - 8/16) or early the week after (8/19 - 8/20). If something in that time frame will work that would be great, otherwise please suggest something that fits with David's schedule.

Also, please let me know if David might have a chance to meet with Murat in person at some point surrounding the September 5th AT&T meeting in Dallas.

Kind regards,
Sara B

On Tue, Aug 6, 2013 at 8:19 PM, Murat Armbruster <murat@coefficientgroup.com> wrote:
Thank you Steven.

David, nice to meet you.

Robin, I have cced Sara to help coordinate a time to talk with David.

Otherwise (or in addition) perhaps we can schedule time before or after the AT&T meeting on Sept 5th for an in-person meeting.

466

Best,

Murat

_____

Murat A. Armbruster

CEO
CoEfficient, LLC

Solving the Energy Equation™

Managing Member
TelEfficient, LLC

Efficiency in Telecommunications™

office:   +1-415-944-3491
mobile:  +1-617-905-3924
Skype:   muratarmbruster

901 Mission Street, Suite 105
San Francisco,  CA  94103

_____

This e-mail may contain information that is privileged, confidential, and protected from disclosure.  If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail.  This e-mail does not form the basis of a contract unless specifically stated by an authorized representative of CoEfficient, LLC and/or TelEfficient, LLC.

_____

On Aug 6, 2013, at 9:14 AM, Steven Bruny <Steven.Bruny@genband.com> wrote:

David,

467

I'd like you to meet Murat Armbruster, founder of CoEffecient and a Fellow with the Carbon War Room. Murat founded his company in San Francisco to focus on financing energy based projects with particular interest in the Telecommunications area. Murat currently is working with GENBAND on proposals to Hawaiian Tel and AT&T and starting project conversations at Verizon, CenturyLink and BT. He was responsible for helping Verizon get energy rebates from Con Edison on one of our Ntr projects and has been consulting with BT on other energy projects. Murat's cell is 617-905-3924.

Murat,

Please meet our Chairman and CEO, David Walsh. I have given you David's background including COO/President of Global Crossings. David mentioned to me he is involved in other Green Projects with the carriers and would like to speak with you. David is coming to the September 5th AT&T executive meeting in Dallas to discuss the Ntr project so you two will be able to meet in person then. In the meantime, please give David a call at 917-647-3255 or schedule a time to talk via Robin Wright who manages our operations at 510-847-4462.


Best,

Steven


**Steven Bruny**
Sr. Vice President
Major Accounts

2801 Network Boulevard
Suite 300
Frisco, TX 75034, USA
**www.genband.com**
mobile +1.303.669.6185
steven.bruny@genband.com
<D20FCFCC-B4EB-4893-8F98-38637C9FE02D.png>
Connect with us:<7F667BAC-AFCE-4544-8088-2163313FD228.png><65E078C7-41A8-4F40-91CD-6B9D1BF3D1FA.png><5925B119-342D-4CF2-9CA8-9725B47FE2F8.png><C246068B-EDAD-440C-9B1F-3515C9191C4D.png><B12E4527-C783-45ED-B736-53CC4FFAFB72.png><3F24512C-7FEC-4F53-B898-8A39BF63E8BD.png><DBB8D4CF-9AFC-4B4E-9EF6-5BBFD287B84F.png><DD7AEC6E-50F3-4789-AAE9-BA5D43A829F0.png><35569306-4C8A-4A9D-8260-E87B24A4640C.png><E8D6609B-D164-4889-9F8A-65BA5B331692.png>


--
Sara Barnowski


Analyst
CoEfficient, LLC


468

Solving the Energy Equation™

office: +1-415-691-6543
mobile: +1-860-705-9419
Skype: s.barnowski

901 Mission Street, Suite 105,
San Francisco, CA 94103

_____

This e-mail may contain information that is privileged, confidential, and protected from disclosure. If you are not the intended recipient of this e-mail or you otherwise believe you have received this message in error, please notify the sender by reply transmission; and do not use, disclose, distribute, copy, print or rely on this e-mail. This e-mail does not form the basis of a contract unless specifically stated by an

authorized representative of CoEfficient Group, LLC.

_____

469

**CONFIDENTIAL**                                                                              **TEL_051819**

# EXHIBIT 11

470

**To:** Dan Lakey[Dan.Lakey@genband.com]
**From:** Mark Pugerude
**Sent:** Tue 8/6/2013 10:08:39 AM
**Importance:** Normal
**Subject:** Fw: TelEfficient
**MAIL_RECEIVED:** Tue 8/6/2013 10:08:39 AM

I have no idea.   Daryl just prolonging to show power is all I can say.   I just sent this up to Walsh. He is meeting with Murat.   He won't want to have the meeting with this overhang.

Mark Pugerude
IP Phone +1 (703) 629-5155



David...

I just got this note from Dan Lakey in regards to the Green Energy Finance firm and the fact that we have still not completed the package of information for him.   Despite that fact he still made the trip to Hawaii for Hawaiian Telecom.

I know you have a meeting with Murat with Telefficent coming up in the next few days in regards to AT&T.   He is out in Hawaii right now doing as we are presenting to the Board of Directors of Hawaiian Telecom.   He did this even though we have not completed the NDA /non-compete and provided the financial package he required.

I want you to be prepared for his opinion that we are not easy to work with in regards to partnering.   Jamie Koven has cleared us to work with these guys after his meeting at Perspectives13 and I double confirmed that fact with an email and phone call to Jamie last month.



Mark Pugerude
IP Phone +1 (703) 629-5155

471

I am with Murat at HT. He is waiting for our response on Signed NDA (Hannon already signed) and the our financials. Do you know is where the hang up is?

Dan Lakey - GENBAND
(214) 455-6128 - Mobile

472

**EXHIBIT 12**

| From: | Murat Armbruster |
|---|---|
| Sent: | Friday, September 20, 2013 5:48 PM CDT |
| To: | David Walsh |
| CC: | Dennis Watson; Robin Wright; Brad Bush; Sara Barnowski; Hao Lam |
| Subject: | Re: TIA panel discussion |

Dear David,

This sound like a great opportunity.

I will follow up your marketing team on Monday.

Best,
Murat

Sent from my iPhone

On Sep 20, 2013, at 7:09 AM, David Walsh <David.Walsh@genband.com> wrote:

Hi Murat,

I am moderating a keynote session at the TIA conference in DC on October 8th. What I'd like to do is have a carrier on the panel to talk about the challenges of eliminating their TDM networks (especially opex) and have you join me as well to talk about the financial models you've developed as a mechanism for facilitating the process in a cost effective, and green, way. Would you be able to join me on that panel?

I've copied some of our marketing team responsible for working with TIA and making this happen to provide you more information and event details. We think this is a topic of great interest to the telcos at TIA and can be a great panel.

Let me know if you can make it. Would be great to see you.

Here's a link to the event:
http://www.tia2013.org/

Thanks,

D.

**EXHIBIT 13**

475

| From: | David Walsh |
|---|---|
| Sent: | Tuesday, November 15, 2016 1:51 PM CST |
| To: | Murat Armbruster; Maria Flores |
| CC: | Daryl Raiford; Alex Russo (external); Patrick Joggerst; John Ryan |
| Subject: | |

Murat,

I would like to have a quick catch up call to review your proposals for PR Tel and Telepacific. I want to make sure we are aligned on the opportunity and understand the economics that we are presenting including things like cost of money and management fees. I don't want something proposed until we understand how we both are making money from these activities. I'm available between 6-8pm est today.  My assistant Maria will coordinate and send out a dial in.

D.

Sent from my iPhone

476

FILED
DALLAS COUNTY
8/11/2018 11:22 AM
FELICIA PITRE
DISTRICT CLERK

Cause No. DC-16-12593

| | | |
|---|---|---|
| GENBAND Management Services, Corporation, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| CoEfficient, LLC; TelEfficient, LLC. | § § | DALLAS COUNTY, TEXAS |
| Defendants/ Counter-Plaintiff, | § § § | |
| v. | § § | |
| GENBAND Management Services, Corporation, GENBAND Holdings Company, and GENBAND US LLC, Counter-Defendants | § § § § | 116th JUDICIAL DISTRICT |

## GENBAND'S RESPONSE TO DEFENDANTS' MOTION TO COMPEL AND REQUEST FOR RULING ON DISCOVERY OBJECTIONS

Plaintiffs GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US LLC ("GENBAND") file this response to the Motion to Compel and request for ruling on discovery objections filed by Defendants/Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC ("TelEfficient").

The Court should deny TelEfficient's premature, and oftentimes inaccurate, Motion. The parties have engaged in regular, ongoing conversations regarding discovery, with both sides amending and supplementing requests for production and interrogatory responses throughout the discovery period. In fact, the parties conducted a conference just one day before this Motion was filed—but TelEfficient did not raise several of the issues raised in this motion, nor did it alert Plaintiffs of any impending motion to compel. These circumstances call into question whether TelEfficient has satisfied its meet-and-confer obligations under Local Rule 2.07.

**GENBAND's Response to Defendants' Motion to Compel**          **Page 1**

In any event, as mentioned several times in TelEfficient's Motion, GENBAND has not withheld any non-privileged information responsive to TelEfficient's discovery requests, and GENBAND continues to work through additional issues raised by TelEfficient so that any additional information or documents can be provided. It is unclear from TelEfficient's Motion what information or documents it believes it is entitled to that it has not already received or that GENBAND has refused to provide. The parties are not at a stalemate.

Instead, TelEfficient's Motion to Compel seems largely academic. It seeks erasure of tailored objections by GENBAND to interrogatories and requests for production – which were made appropriately, in good faith, and in furtherance of protecting GENBAND's rights. TelEfficient seeks amended responses to those written discovery requests and complains about the adequacy of GENBAND's document production, which is not yet complete. The discovery period remains open until May 31, and the parties are currently working on an agreed motion to present to the Court to extend the schedule, including the discovery deadline, by an additional six or more weeks. Because the parties have yet to even confer on some of the issues TelEfficient raises in its Motion, and because more time remains in the discovery period, the Court should deny TelEfficient's Motion and allow the discovery process to proceed.

**1. GENBAND's objections to RFPs Nos. 24-26 are necessary and appropriate.**

Despite GENBAND's repeated explanations and requests for amendment, TelEfficient has not formally amended its overbroad Requests for Production Numbers 24-26. The Requests seek all manner of documents between GENBAND and "any company in the business of providing loans or other instruments to finance switch sales and/or upgrades." As GENBAND has explained to TelEfficient, the request as written is overbroad because it is not at all tailored to the issues in this lawsuit. First, it is not limited in time and could capture any time period. Next, it requests

any kind of document between any company whose business it is to provide loans or financing instruments for switch sales or upgrades. This request as written is not limited to documents that actually relate to loans or financing or any issue implicated by the claims or counterclaims in this case. The inartful drafting of the request requires an objection on the grounds that is overbroad, and it was reasonable for GENBAND to do so.

TelEfficient attempted to address GENBAND's concerns informally – a practice with which GENBAND does not generally take issue – but TelEfficient's complaints in its Motion are to GENBAND's formal responses to the discovery request. And because TelEfficient did not amend its formal discovery request, GENBAND's objections had to remain in place. GENBAND's objections are not "prophylactic;" they are in response to overbroad requests in place at the time of objection. Nor was GENBAND's confidentiality objection inappropriate: the parties had not yet signed the Agreed Protective Order at the time of objection.

To resolve this issue, GENBAND stated in an email that it has not withheld any documents responsive to the requests as reworded in TelEfficient's emails. GENBAND received no further complaint from TelEfficient until the Motion. To the extent TelEfficient was dissatisfied or concerned with GENBAND's responses to Requests Nos. 24-26, it could and should have mentioned that at the conference the day before this Motion was filed. GENBAND remains willing to cooperate and work out these concerns with TelEfficient.

**2. GENBAND has fully responded to TelEfficient's discovery requests, and TelEfficient has failed to conference with GENBAND on any remaining concerns regarding the objections.**

The Court should also overrule GENBAND's objections to certain other discovery requests (Defendants' First Request for Production, Nos. 5, 7-13, and 27-31; Defendants' First Set of Interrogatories, Nos 1, 3 and 7-11; and Defendants' Second Set of Interrogatories, Nos. 1 and 3-

5). GENBAND has legitimate concerns about the wording of TelEfficient's overbroad requests and has objected on that basis to preserve its rights. GENBAND stated in conference with TelEfficient that it has not withheld information based on its objections to these requests. Further, as was also explained in conference, GENBAND has dutifully searched for documents and information in its possession, custody and control and can attest that nothing responsive has been withheld *thus far*. GENBAND must preserve its objection because discovery is an ongoing process.

TelEfficient further requests that certain objections be overruled as improper or invalid objections based on various caselaw. TelEfficient cites the federal case *Duarte v. St. Paul Fire & Marine Ins. Co.*, 2015 WL 7709433, at *5 (W.D. Tex. Sept. 25, 2015) as rejecting an "argument that possession, custody or control is an objection," but the case actually rejected an "argument that possession, custody, or control is an objection that can be waived because the practical effect of that ruling would result in a party being compelled to produce that which they cannot, ultimately resulting in a continued violation of a court order for failing to comply." TelEfficient also states that there is no such objection as "marshalling the evidence" under Texas law. It is worth noting that TelEfficient made this exact same objection to GENBAND's Request for Production No. 6. The appropriate forum to work out TelEfficient's concerns would have been at one of the conferences conducted by the parties.

TelEfficient also requests that the Court overrule objections that certain of its requests were vague, overbroad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. While TelEfficient claims that the vague phrases in its requests are "relating to" "regarding" and "mentioning," GENBAND is far more concerned with other, more specific vagaries. TelEfficient's use of "potential customers" is vague. Asking for "all" documents

**GENBAND's Response to Defendants' Motion to Compel**                    **Page 4**

"relating to …potential customers" is both vague and overbroad. TelEfficient's cited case *In re Sting Soccer Group, LP*, 2017 WL 5897454, at *7 (Tex. App.—Dallas Nov. 30, 2017, no pet.) provides that a request may properly ask for "all," "each," or "every" document *pertaining to a relevant, narrow subject of the litigation*." (emphasis added). The vague phrase "potential customers," is not narrow and could encompass irrelevant information, depending on how the vague phrase is interpreted. In this case, a potential customer could mean something as narrow as "companies with whom contracts were drafted," or as broad as "any telecom company in the world." The request is vague. TelEfficient did not raise any concerns about these objections at the conference that counsel for both parties conducted one day before TelEfficient filed its motion.

To the extent TelEfficient is concerned about whether information sought is equally available to both parties, or about other specific objections, the proper place to raise these concerns would also have been at the conference.

- For instance, TelEfficient asks in Interrogatory No. 3 for GENBAND to identify the parties whom it introduced to TelEfficient. TelEfficient necessarily has this information, and counsel's citation of language in *Sting Soccer* regarding automatic authentication rights is inapposite. This is a valid objection.

- Likewise, TelEfficient asks in Interrogatory No. 9 for GENBAND to identify statements "in which a GENBAND employee or representative discussed whether GENBAND would extend the maturity date of the Notes." GENBAND has produced many statements applicable to this request. It is virtually impossible to determine whether the statements produced amount to every statement made by anyone at GENBAND on the topic. GENBAND has undertaken more than reasonable efforts to provide information

responsive to this request and has told TelEfficient that it is not aware that it is withholding any non-privileged, responsive information.

Had TelEfficient brought up its concerns at conference, GENBAND would have been able to clarify its objections, and work out a cooperative solution with TelEfficient.

### 3. Defendants' privilege and confidentiality complaints do not require Court intervention.

The discovery period is ongoing, and GENBAND fully intends to produce a privilege log identifying the documents it has withheld. GENBAND anticipates that TelEfficient will also provide a privilege log for the documents it has withheld – which it, too, has not yet done. Nor does TelEfficient's confidentiality complaints require this Court's intervention. GENBAND has contractual obligations to provide assurance of confidentiality and a sufficient period of notice to the third-party customers whose information might be revealed through the discovery process, notwithstanding the existence of the Protective Order. GENBAND has provided periodic updates to TelEfficient on the status of the production of confidential documents. TelEfficient has not communicated any issues with this process. The appropriate forum for such a complaint would have been one of the numerous conferences between the parties.

### 4. Discovery is not yet complete: GENBAND is still in the process of producing all responsive documents and amending interrogatory responses.

Even though the discovery period is still not closed, TelEfficient attempts to draw significance from the number of documents as-yet produced by the parties. TelEfficient is a small company and its entire business is the subject of this suit. GENBAND is a very large company and its relationship with TelEfficient was a small piece of this business. The practical result of this reality is that much more targeted searching and reviewing of documents is required by GENBAND to get to a set of documents that is relevant, responsive, and non-privileged. Disparity

in the number of documents produced makes a lot of sense in the context of this dispute, and as TelEfficient says, is "not dispositive."

TelEfficient also has misrepresented the discussions between TelEfficient and GENBAND surrounding "missing" emails in GENBAND's production. This Motion is the first time GENBAND has seen this list of emails or been given a chance to investigate the documents.[1] Upon investigation, after the issue was raised for the first time in this Motion, GENBAND located an error in its search query that it has subsequently corrected. GENBAND plans to make a supplemental production as soon as possible—and certainly before the end of the discovery period. This was not an attempt to "withhold" documents, and GENBAND would have resolved this issue regardless of this motion; all counsel needed to do was inform GENBAND of the issue.

Finally, TelEfficient claims GENBAND has not fully responded to interrogatories, but this is also untrue. GENBAND has responded, it has conferred on those responses, and in some instances GENBAND has communicated that the discovery process is ongoing.

## Conclusion

GENBAND has not refused to search for or produce information or documents that are the subject of this Motion. To the contrary, each time that TelEfficient raised concerns with certain of GENBAND's responses to requests for production or interrogatories, GENBAND has taken seriously those concerns, acted on them, revised its discovery responses, and produced additional information. The same is true with the issues raised here. Discovery is ongoing, and GENBAND

---

[1] Previously, TelEfficient's counsel sent a list of fifteen emails he believed were missing from GENBAND's production. Upon review, thirteen were sent or received at email domains from Aztek, not GENBAND, and GENBAND does not have access to Aztek emails. One email was actually produced by GENBAND as part of a chain, and only one of the fifteen emails could not be found in GENBAND's production. GENBAND reviewed its search protocols and determined that the email should have been returned by the queried search, leading GENBAND to reasonably conclude that the one missing email of thousands was simply a random error.

**GENBAND's Response to Defendants' Motion to Compel**     **Page 7**

continues to cooperate with Defendants to resolve any discovery issues. Defendants' Motion to Compel should be denied.

Dated: May 11, 2018        Respectfully submitted,

*/s/ Jonathan Rubenstein*

Jonathan Rubenstein
jonathan.rubenstein@bakerbotts.com
Texas Bar No. 24037403
Susan Kennedy
susan.kennedy@bakerbotts.com
Texas Bar No. 24051663
Amy C. Heard
amy.heard@bakerbotts.com
Texas Bar No. 24097818

BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 953-6500

ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANT GENBAND MANAGEMENT SERVICES CORPORATION AND COUNTER-DEFENDANTS GENBAND HOLDINGS COMPANY AND GENBAND US LLC

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was served on the following counsel of record pursuant to the Texas Rules of Civil Procedure:

Tyler J. Bexley
tyler.bexley@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3202

ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS COEFFICIENT, LLC AND TELEFFICIENT, LLC

*/s/ Amy C. Heard*
Amy C. Heard

**GENBAND's Response to Defendants' Motion to Compel**      **Page 8**

FILED
DALLAS COUNTY
5/14/2018 6:02 PM
FELICIA PITRE
DISTRICT CLERK

## CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | §<br>§<br>§<br>§ | |
| v. | §<br>§ | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | §<br>§<br>§<br>§<br>§<br>§ | 116th JUDICIAL DISTRICT |

### THIRD JOINT MOTION FOR CONTINUANCE OF TRIAL SETTING AND ENTRY OF AMENDED LEVEL 3 SCHEDULING ORDER

Plaintiff/Counter-Defendants and Defendants/Counter-Plaintiffs file this Second Joint Motion for Continuance of Trial Setting and Entry of Amended Level 3 Scheduling Order.

### PROCEDURAL HISTORY

1.  Plaintiff filed its Original Petition on September 23, 2016. Plaintiff filed a First Amended Petition on October 4, 2016 and a Second Amended Petition on October 27, 2016.

2.  Defendants filed their Original Answer on November 18, 2016.

3.  On May 2, 2017, the Court entered a Level 3 Scheduling Order setting the case for trial on April 2, 2018.

4.  On October 20, 2017, Defendants filed an Amended Answer and a Counterclaim.

5.  On November 20, 2017, the Court entered an Amended Level 3 Scheduling Order setting the case for trial on July 16, 2018.

6.  On January 9, 2018, Defendants filed an Amended Counterclaim, adding additional parties and claims to this case.

---

7.      On March 7, 2018, this Court entered a Second Amended Level 3 Scheduling Order.

8.      In the last four months, the parties have served multiple sets of written discovery and responses to that written discovery. The parties are in the process of producing a substantial volume of documents and scheduling multiple depositions spread out across the country.

## ARGUMENT

9.      The parties respectfully request that the Court continue the current trial setting to November 12, 2018 and enter the Second Amended Level 3 Scheduling Order filed contemporaneously with this Motion. The parties request a continuance of the trial setting because (a) the parties have exchanged and are in the process of continuing to exchange a substantial volume of documents in response to written discovery requests; and (b) the parties continue to take several depositions at locations throughout the country, which involves coordinating multiple schedules of witnesses and counsel. This short continuance is requested to allow the parties to properly complete discovery.

10.     Texas Rule of Civil Procedure 247 allows the parties to agree to continue the trial setting of a case. Additionally, Texas Rule of Civil Procedure 251 permits the Court to grant a motion for continuance when all of the parties have consented to the continuance.

11.     Here, the parties all agree to a continuance of the current trial setting of this case. The parties' agreement is evidenced by signatures from each party's corporate representative below, as required by the Local Rules.

12.     This continuance is not sought for purposes of delay, but so that justice may be done.

---

## CONCLUSION

Plaintiff and Defendants respectfully request that the Court continue the trial setting in this case to November 12, 2018 and enter the Second Amended Level 3 Scheduling Order filed with this Motion.

## CONSENT OF GENBAND MANAGEMENT SERVICES CORPORATION

The undersigned, who is an authorized representative of GENBAND Management Services Corporation, hereby consents on behalf of GENBAND Management Services Corporation to the continuance requested in this Joint Motion.

_____
Signature

_____
EVP / CFO
Title

_____
5/14/18
Date

## CONSENT OF COEFFICIENT, LLC AND TELEFFICIENT, LLC

The undersigned, who is an authorized representative of CoEfficient, LLC and TelEfficient, LLC, hereby consents on behalf of CoEfficient and TelEfficient to the continuance requested in this Joint Motion.

_____
Signature

CEO, CoEfficient, Managing Member, TelEfficient
Title

_____
5/14/18
Date

Respectfully submitted,


By: _s/ Jonathan Rubenstein_____
     Jonathan Rubenstein
       jonathan.rubenstein@bakerbotts.com
       Texas Bar No. 24037403
     Susan Kennedy
       susan.kennedy@bakerbotts.com
       Texas Bar No. 24051663
     Amy C. Heard
       amy.heard@bakerbotts.com
       Texas Bar No. 24097818

     BAKER BOTTS L.L.P.
     2001 Ross Avenue
     Dallas, Texas 75201
     Telephone: (214) 953-6500

**ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANTS**


By: _s/ Tyler J. Bexley_____
     Tyler J. Bexley
      State Bar No. 24073923
      tyler.bexley@rm-firm.com
     **REESE MARKETOS LLP**
     750 N. Saint Paul St., Suite 600
     Dallas, Texas 75201-3202
     214.382.9810 telephone
     214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/ COUNTER-PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

*s/ Amy C. Heard*
Amy C. Heard

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff,* | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs,* | § § § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| GENBAND MANAGEMENT SERVICES CORPORATION, *Counter-Defendant,* | § § | 116th JUDICIAL DISTRICT |

## THIRD AMENDED LEVEL 3 SCHEDULING ORDER

In accordance with Rules 166, 190, and 192 of the Texas Rules of Civil Procedure, the Court makes the following amended order to control the schedule of the case.

1.    This case will be ready and is set for jury trial on **November 12, 2018**. If not reached as set, the case may be carried to the next week. Trial announcements must be made in accordance with Rule 3.02 of the Local Rules of the Civil Courts of Dallas County, Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a of the Texas Rules of Civil Procedure.

2.    Pretrial matters will be completed by the following dates:

| | |
|---|---|
| July 19, 2018 | **Fact discovery closes.** All fact depositions shall be completed by this date, and all written discovery requests shall be served so that responses are due no later than this date. |
| July 26, 2018 | **Fact discovery motions deadline.** Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed by this date or such complaint is waived, except for the sanction of exclusion under Rule 193.6. |

1

| July 26, 2018 | **Expert designation deadline for party seeking affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| August 24, 2018 | **Expert designation deadline for party opposing affirmative relief.** Any expert designation must include the information required by Rule 194.2(f). |
| August 31, 2018 | **Deadline for amended pleadings other than those adding new claims, defenses, or parties.** Amended pleadings responsive to timely filed pleadings may be filed after the deadline if filed within 14 days after the pleading to which they respond. |
| September 7, 2018 | **Expert designation deadline for reply/rebuttal experts.** Any expert designation must include the information required by Rule 194.2(f). |
| September 7, 2018 | **Expert discovery closes.** |
| September 19, 2018 | **Deadline to file motions for summary judgment.** Summary judgment motions must be heard no later than 30 days prior to trial. |
| September 28, 2018 | **Deadline to file motions to exclude or limit expert testimony.** Such motions must be heard no later than 30 days prior to trial. |

The parties may by written agreement alter these deadlines. Except by agreement of the parties, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3. Each side may have 50 hours of oral depositions and 30 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

4. The parties shall mediate this case no later than August 31, 2018, unless otherwise provided by court order. Named parties shall be present during the entire mediation process, and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **The parties agree to mediate this case with Hon. Jeff**

2

**Kaplan (Ret.) from JAMS Dallas. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation.**

5.     Fourteen days before the Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examinations, a list of exhibits, and copies of any exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten days before the Trial setting, the parties shall exchange in writing (a) their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and (b) their objections and any counter-designations to the opposing party's deposition designations. **On or before ten days before the Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreements on such matters.** By 4:00 p.m. on the Thursday before the Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4:00 p.m. the Thursday before the trial setting.

6.     A pre-trial conference shall be conducted from 8:00 a.m. to 9:00 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trail conference shall be scheduled the week before the Trial Setting.

If any parties are joined in this action, the party joining such additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

SIGNED on this _29th_ day of _May_____, 2018.

HON. TONYA PARKER

AGREED:

This case is governed by the Court's Policies and Procedures and Dallas County Courts Local Rules, available at www.dallascounty.org

_/s/ Jonathan Rubenstein_
Jonathan Rubenstein
Counsel for Plaintiff/Counter-Defendants

_/s/ Tyler J. Bexley_
Tyler J. Bexley
Counsel for Defendants/Counter-Plaintiffs

4

494

FILED
DALLAS COUNTY
7/26/2018 5:45 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-16-12593

| | | |
|---|---|---|
| GENBAND MANAGEMENT SERVICES CORPORATION, *Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| COEFFICIENT, LLC and TELEFFICIENT, LLC, *Defendants/Counter-Plaintiffs*, | § § § § | |
| v. | § § § | DALLAS COUNTY, TEXAS |
| GENBAND MANAGEMENT SERVICES CORPORATION, GENBAND HOLDINGS COMPANY, and GENBAND US, LLC, *Counter-Defendants*. | § § § § § | 116th JUDICIAL DISTRICT |

## COEFFICIENT, LLC AND TELEFFICIENT, LLC'S
## SECOND AMENDED COUNTERCLAIM

Counter-Plaintiffs CoEfficient, LLC and TelEfficient, LLC file this Second Amended Counterclaim against Counter-Defendants GENBAND Management Services Corporation, GENBAND Holdings Company, and GENBAND US, LLC (collectively, "GENBAND"), and respectfully state as follows:

### NATURE OF CLAIMS

1.     This is a case about GENBAND, a subsidiary of a multimillion-dollar public company, defrauding CoEfficient and TelEfficient, both startup companies, and using the proprietary information and expertise of those companies to close tens of millions of dollars worth of deals. Among other things, GENBAND sells landline switches to telephone companies. Although upgrading these switches can save telephone companies millions of dollars in energy costs over a long period of time, the switches require a

significant upfront capital investment. In order to present attractive financing proposals that allow telephone companies to use energy cost savings to pay for switch upgrades over an extended period of time, GENBAND partnered with TelEfficient, a provider of special financial instruments designed to finance the capital costs of energy efficient projects in the telecommunications sector. TelEfficient is a subsidiary of CoEfficient, which pioneered the use of unique financial instruments to help companies pay for energy efficient projects.

2. GENBAND entered into a Teaming Agreement and Non-Disclosure Agreement with TelEfficient, under which TelEfficient agreed to present its proprietary financial models and expertise to potential GENBAND customers. GENBAND did not have the expertise or models to present the business case justifying the expense of its switches on its own, instead relying on TelEfficient's proprietary models and expertise. GENBAND consistently acknowledged the value it saw in TelEfficient's expertise, with GENBAND's President recognizing that a TelEfficient-GENBAND partnership was potentially worth hundreds of millions of dollars.

3. Over the course of GENBAND's relationship with TelEfficient, GENBAND used TelEfficient's expertise and information to close millions of dollars in projects with telephone companies, including AT&T and Verizon. Along the way, GENBAND consistently represented to TelEfficient that these projects would be financed with TelEfficient, which would have resulted in millions of dollars of revenue for TelEfficient. GENBAND also represented that TelEfficient would be compensated for its expertise and time spent helping GENBAND close deals. GENBAND made these representations so that TelEfficient would continue to provide its expertise and proprietary models to

GENBAND's customers for a period of several years. But GENBAND's representations were false. While GENBAND closed numerous deals with telephone companies, none of them involved TelEfficient financing, despite an exclusivity agreement and non-disclosure agreement between GENBAND and TelEfficient. And while GENBAND made millions of dollars from its relationship with TelEfficient, TelEfficient received nothing. TelEfficient relied on GENBAND's representations, resulting in millions of dollars of investment and debt spent to benefit GENBAND and its customers, with no return to TelEfficient.

4.    To make matters worse, GENBAND loaned about $600,000 to CoEfficient and TelEfficient with the representations that (a) GENBAND's deals with customers would close with TelEfficient financing, enabling TelEfficient to make sufficient income to pay off the loans; and (b) GENBAND would continue to extend the maturity date of the loans until TelEfficient was earning sufficient income to pay of the balance. These representations also turned out to be false. After GENBAND had leveraged maximum value from TelEfficient's proprietary models and expertise, GENBAND called the loans (despite representing that it would not do so) and demanded payment from CoEfficient and TelEfficient. When CoEfficient and TelEfficient were unable to pay, GENBAND filed this lawsuit.

5.    Based on GENBAND's unlawful conduct, Counter-Plaintiffs file this Counterclaim asserting causes of action of fraud, fraudulent inducement, negligent misrepresentation, breach of contract, and misappropriation of trade secrets. GENBAND's tortious conduct has caused millions of dollars of damage to CoEfficient and TelEfficient. Thus, Counter-Plaintiffs seek monetary relief of over $1,000,000. Counter-

Plaintiffs seek a maximum of $30.1 million, not including exemplary damages, attorneys' fees, costs, and interest.

## DISCOVERY LEVEL

6. Pursuant to Texas Rule of Civil Procedure 190, discovery in this case is being conducted under Level 3.

## PARTIES

7. Counter-Plaintiff CoEfficient, LLC is a California limited liability company with its principal place of business in Oakland, California.

8. Counter-Plaintiff TelEfficient, LLC is a Maryland limited liability company with its principal place of business in Oakland, California.

9. Counter-Defendant GENBAND Management Services Corporation ("GB Management") is a Delaware corporation with its principal place of business in Collin County, Texas. GB Management has already appeared in this case and may be served through counsel.

10. Counter-Defendant GENBAND Holdings Company ("GB Holdings") is a foreign company with its principal place of business in Collin County, Texas. GB Holdings has already appeared in this case and may be served through counsel.

11. Counter-Defendant GENBAND US, LLC ("GB US") is a Delaware limited liability company with its principal place of business in Collin County, Texas. GB US has already appeared in this case and may be served through counsel.

12. As a result of a merger effectuated in October 2017, the Counter-Defendants are now direct or indirect subsidiaries of a publicly traded company doing

business as Ribbon Communications, Inc. Ribbon Communications is the trade name of the new company formed after GENBAND merged with Sonus Networks, Inc. Counter-Plaintiffs are informed and believe that GB Holdings is Cayman Islands holding company that is wholly owned by Ribbon Communications. Counter-Plaintiffs are informed and believe that GB US is wholly owned by a subsidiary of Ribbon Communications and GB Management was dissolved.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over the Counter-Defendants because they are entities with their principal places of business in Texas.

14.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy is within this Court's jurisdictional limits.

15.     Venue is proper in Dallas County because GENBAND Management initiated suit in this county.

## FACTUAL BACKGROUND

16.     CoEfficient was founded by Murat Armbruster in March 2012. Prior to founding CoEfficient, Mr. Armbruster spent three years as a senior advisor to the Carbon War Room, a nonprofit started by Richard Branson to focus on accelerating the adoption of business solutions that reduce carbon emissions. One of the Carbon War Room's central goals is to reduce the capital costs and market barriers that make energy efficient and low-carbon projects difficult for businesses.

17.     While at the Carbon War Room, Mr. Armbruster noticed that, despite the long-term cost savings that a business can enjoy from energy efficient upgrades, the

upfront capital cost of such upgrades is often prohibitive. To address this problem, Mr. Armbruster developed a unique solution to give businesses access to financial instruments that enable them to unlock large-scale energy efficiency and the cost savings that come with it. Although the intricacies of the financial instruments are complex, the general purpose is to replace a business's old, inefficient equipment with new, highly efficient equipment, and use the energy and other savings to pay for the program, thereby avoiding any upfront capital outlay by the business. To this end, the model was developed in conjunction with an investor group to ensure that the instruments being developed would have the necessary capital behind them. These financial instruments were unique and unlike anything offered in the market, enabling an entrepreneur like Mr. Armbruster to capitalize on his innovation while also promoting energy efficient and reducing carbon emissions.

18. Mr. Armbruster founded CoEfficient for the purpose of commercializing his innovative financial solutions and the know-how he developed relating to financing energy efficient projects. He envisioned that these financial solutions could be used to fund energy efficient projects across multiple industries. To facilitate the broad reach of the company, CoEfficient created several subsidiary companies to focus on different industries. One of those subsidiaries was TeleSwitch Finance, LLC, which CoEfficient incorporated in March 2012 to focus on financing energy efficient projects in the telecommunications sector. This company would eventually become TelEfficient.

19. One of Mr. Armbruster's colleagues from the Carbon War Room put him in contact with Aztek Networks, a company involved in switch consolidation and network

migration solutions. One of Aztek's focuses was providing equipment and services related to the migration and upgrade of telephone companies' network switches. Mr. Armbruster discussed his ideas for alternative financing with Aztek's CEO, Steven Bruny, and Mr. Bruny expressed interest in working with Mr. Armbruster. Mr. Bruny and Mr. Armbruster began discussing how TelEfficient could help Aztek's customers.

20.     Shortly after these discussions, in April 2012, Aztek reached an agreement to be acquired by GENBAND. TelEfficient's contact at Aztek, Mr. Bruny, became a Vice President at GENBAND and, later, its Chief Operating Officer. After the acquisition closed, TelEfficient began working with GENBAND on a proposal for Hawaiian Telecom, one of GENBAND's customers. GENBAND also asked TelEfficient to collaborate on several additional proposals in order to present attractive financial solutions to GENBAND's customers.

21.     In August 2012, TelEfficient and GENBAND entered into a Teaming Agreement recognizing that "they will benefit from working together so that GENBAND may secure Contracts with Clients for Projects as may be mutually agreed." The Teaming Agreement further recognized TelEfficient's value to GENBAND as a provider of financial solutions and consulting services that would "assist GENBAND in securing the Contracts."

22.     The Teaming Agreement also recognized that the parties retained the rights to their respective proprietary information and intellectual property and referenced a Non-Disclosure Agreement between TelEfficient and GENBAND. In the Non-Disclosure Agreement, GENBAND agreed not to disclose or use any of TelEfficient's proprietary or

501

confidential information for any purpose other than to carry out a commercial transaction with TelEfficient. GENBAND and TelEfficient also signed additional Non-Disclosure Agreements with each GENBAND customer to whom TelEfficient provided its proprietary information and expertise.

23.    On June 27, 2013, GENBAND and TelEfficient entered into an Amended and Restated Teaming Agreement. The amended agreement contained an exclusivity agreement, under which GENBAND was prohibited from working with other third party financing companies or offering financing services to any of the customers for whom TelEfficient prepared financing proposals, including Verizon, Hawaiian Telecom, Sprint, AT&T, and Optus, among others.

24.    Over the next several months, TelEfficient partnered with GENBAND, at GENBAND's request, to work on financing proposals for several telecommunications projects, including switch removal and transformation projects for Verizon, AT&T, Bell Canada, CenturyLink, Vodafone, and others. Throughout the course of these projects, GENBAND maintained the relationship with each customer and was responsible for communicating with each customer. In fact, the Teaming Agreement specifically provided that "GENBAND will maintain sole responsibility for all aspects of the Projects, including without limitation, Contract negotiation, Client relationship management, and Project management." Thus, TelEfficient was forced to rely on GENBAND for information about the status of the projects and their need for TelEfficient's financial solutions.

25.    From the beginning, TelEfficient brought significant value to GENBAND and its customers. Early on, TelEfficient installed monitoring equipment at Verizon's

offices in Philadelphia to demonstrate the economic benefits Verizon would gain by replacing their old switches with GENBAND switches. For other customers, TelEfficient provided value by creating complex energy and financial models that made the business cases that ultimately led GENBAND to close deals with those customers. TelEfficient built its financial models from the ground up, committing thousands of hours of analyst time and significant sums of money to the development of this proprietary information and expertise. Importantly, GENBAND did not have the ability to demonstrate these business cases and financial benefits to its customers without TelEfficient's proprietary data models and expertise. In fact, GENBAND would regularly request TelEfficient's involvement in proposals that were running into resistance and needed additional demonstration of value to the customer to increase the likelihood of closing the deal.

26. With TelEfficient's assistance, GENBAND closed deals for switch replacement with some of its customers, resulting in tens of millions of dollars in revenue for GENBAND. For example, GENBAND closed multiple deals with AT&T as a result of TelEfficient's assistance demonstrating the business case for switch replacement to AT&T. While GENBAND profited significantly from the value that TelEfficient brought to the table, TelEfficient did not. TelEfficient raised millions of dollars in debt and equity to finance its involvement in GENBAND projects but, ultimately, never made any income from those projects. Throughout this process, GENBAND led TelEfficient to believe that its efforts would eventually be rewarded, constantly representing that it had new deals that would require financing from TelEfficient. GENBAND made these representations

because it needed the value TelEfficient brought to demonstrate the business case for GENBAND's switches and ultimately close deals.

27.    One of the larger proposals in which TelEfficient was involved was for AT&T.  This proposal involved hundreds of hours of time and hundreds of thousands of dollars in capital from TelEfficient.  To ensure that TelEfficient had sufficient capital to complete the proposal, GENBAND loaned TelEfficient $100,000 under a Revolving Credit Note dated April 1, 2014.  In making this loan to TelEfficient, GENBAND represented that it expected to be repaid from proceeds paid to TelEfficient from an expected AT&T deal.  In fact, the Note includes an acceleration date that is triggered by TelEfficient's receipt of funds from the expected AT&T deal.  Additionally, prior to the execution of the Note, GENBAND consistently represented to TelEfficient that the AT&T deal was going to close and the TelEfficient would be included in the deal.  Because GENBAND controlled the AT&T relationship and had primary contact with AT&T, TelEfficient relied on GENBAND's representations about the likelihood of closing the deal and the likelihood that AT&T would use TelEfficient to finance the project.  TelEfficient relied on these representations in executing the Note and would not have agreed to the terms of the Note absent GENBAND's representations.  TelEfficient also relied on these representations in raising funds from investors and incurring substantial operational debts to cover the costs of the AT&T project.

28.    GENBAND also represented to TelEfficient on several occasions that if the AT&T deal was delayed or ran into problems, GENBAND would not call the Note and would continue to extend the Note until TelEfficient received funds to pay the debt.  In

fact, after reviewing a draft of the Note on March 28, 2014, Mr. Armbruster, the head of TelEfficient, emailed Mr. Bruny, who had become a Vice President at GENBAND, to express his concern that GENBAND could call the Note any time, stating that this term would not work for TelEfficient. On the same day, Mr. Bruny responded that this term was merely standard language and assured TelEfficient that GENBAND will not call the Note. Mr. Bruny and others at GENBAND made similar representations verbally in connection with the Note. TelEfficient relied on these representations in executing the Note and would not have agreed to the terms of the Note absent GENBAND's representations.

29. Ultimately, GENBAND was successful in closing the AT&T deal to replace old switches with new GENBAND switches. In fact, GENBAND closed at least two deals with AT&T as a result of TelEfficient's assistance, resulting in tens of millions of dollars in profit to GENBAND. TelEfficient, however, received no compensation from the AT&T deal because AT&T decided to finance the project itself without TelEfficient's involvement. Thus, TelEfficient invested hundreds of man-hours and substantial sums of money in the AT&T proposal and brought significant value to GENBAND to facilitate closing the deal but did not receive any compensation for its contribution. This was directly contrary to GENBAND's representations that AT&T was expected to close the deal using TelEfficient's financing. GENBAND had never financed a deal with AT&T and knew that AT&T almost never used outside financing for deals such as this but withheld this information from TelEfficient and continued to tell TelEfficient that AT&T would use

TelEfficient's financing because GENBAND needed TelEfficient's expertise and financial modeling to close the deal.

30.     GENBAND knew by early 2014 that AT&T might move forward without TelEfficient financing and began structuring a deal that did not include financing. However, GENBAND withheld this information from TelEfficient and continued to represent that the AT&T deal was likely to close with financing so that TelEfficient would continue to provide its proprietary information and expertise to assist GENBAND in closing the deal. GENBAND continued to make these representations even after AT&T closed without financing.

31.     By July 2014, TelEfficient was in a difficult financial situation, with significant debt and little capital left for operations. Relying on GENBAND's representations that the AT&T deal was going to close with TelEfficient financing, TelEfficient had not secured additional funding because the AT&T deal would have been worth more than $1 million in revenue to TelEfficient. When the AT&T deal closed without TelEfficient financing, TelEfficient was left with insufficient funds to continue operating.

32.     GENBAND, however, needed TelEfficient's expertise and knowledge—this time for a project with Verizon—so GENBAND proposed an additional loan to TelEfficient in the amount of $300,000. Having relied on GENBAND's representations to its detriment, TelEfficient was left with no option but to accept GENBAND's loan proposal. This time, however, GENBAND decided that it wanted the Note to be with TelEfficient's parent company, CoEfficient. GENBAND leveraged its superior bargaining

position and TelEfficient's financial problems to not only force CoEfficient to be the signor on a new Note, but also to agree to guarantee the Note executed by TelEfficient on April 1, 2014. With no real option but to acquiesce to GENBAND's demands, CoEfficient entered into a Promissory Note with GENBAND in the amount of $300,000 on August 8, 2014. The Promissory Note required CoEfficient to guarantee the April 1, 2014 Note and required TelEfficient to guarantee the August 8, 2014 Note.

33. In connection with the Promissory Note, GENBAND represented that the Verizon deal was going to close using TelEfficient financing. GENBAND also continued to tell TelEfficient and CoEfficient that AT&T was considering a deal to use TelEfficient financing even after the AT&T deal had already closed. CoEfficient, as borrower (and guarantor on the April 1, 2014 Note), and TelEfficient, as guarantor, relied on GENBAND's representations because GENBAND had primary contact with Verizon and AT&T and controlled the customer relationships. GENBAND also represented, once again, that if the Verizon deal was delayed or ran into problems, GENBAND would not call the Note and would continue to extend the Note until TelEfficient/CoEfficient received funds to pay the debt. CoEfficient relied on these representations in executing the Promissory Note and agreeing to guarantee the April 1, 2014 Note and would not have agreed to these terms absent GENBAND's representations. TelEfficient relied on GENBAND's representations in agreeing to guarantee the August 8, 2014 Promissory Note and would not have agreed to the guaranty absent GENBAND's representations. TelEfficient also relied on GENBAND's representations in raising funds from investors and incurring substantial operational debts to cover the costs of the Verizon project.

34.     On September 30, 2014, GENBAND sent a letter regarding "Funding Conditions of the August 7, 2014 Promissory Note." Among other things, the letter contained an agreement that GENBAND and CoEfficient would use an attached exhibit as the commercial fee structure in any TelEfficient-related deal (the "Fee Structure Agreement"). The Fee Structure Agreement was executed by Daryl Raiford on behalf of GENBAND and Murat Armbruster on behalf of CoEfficient.

35.     After several months of working on the Verizon deal, TelEfficient had expended significant amounts of money and was running low on capital. Because TelEfficient was critical to GENBAND's success with the Verizon project, GENBAND agreed to loan CoEfficient (as TelEfficient's parent company) up to an additional $255,000, as memorialized in a December 18, 2014 Promissory Note, which TelEfficient also signed as a guarantor. The Promissory Note makes specific reference to the contemplated Verizon deal. In connection with this Promissory Note, GENBAND made the same representations that (a) the Verizon deal would close with TelEfficient financing; and (b) the Promissory Note would be extended until CoEfficient/TelEfficient received sufficient funds to pay the balance. CoEfficient relied on these representations in executing the Promissory Note, and TelEfficient relied on these representations in signing the guaranty.

36.     On information and belief, GENBAND was ultimately successful in closing a deal with Verizon to replace its old switches with new GENBAND switches, resulting in millions of dollars in profit for GENBAND. Once again, however, TelEfficient was left out of the deal, resulting in no compensation to TelEfficient for the substantial sums of

money and hours TelEfficient poured into the Verizon project. TelEfficient's proprietary models and expertise were critical to the Verizon deal and enabled GENBAND to close the deal, but TelEfficient was left with nothing to show for its efforts other than substantial debt. TelEfficient had detrimentally relied on GENBAND's representations that the Verizon deal would close with TelEfficient financing, which turned out to be wrong. GENBAND had never financed a deal with Verizon and knew that Verizon almost never used outside financing for deals such as this but withheld this information from TelEfficient and continued to tell TelEfficient that Verizon would use TelEfficient's financing because GENBAND needed TelEfficient's expertise and financial modeling to close the deal.

37.    GENBAND also withheld other information from TelEfficient, and, in fact, its employees were regularly instructed not to share complete information with TelEfficient. For example, GENBAND did not timely inform TelEfficient that deals with AT&T or Verizon either would not go forward at all or would close without financing.

38.    GENBAND made similar representations to TelEfficient for each of the proposals in which TelEfficient was involved. For example, GENBAND led TelEfficient to believe that deals with CenturyLink, Vodafone New Zealand, Telecom New Zealand, Claro Puerto Rico, and TelePacific would close with TelEfficient financing. GENBAND also led TelEfficient to believe that it would be compensated for its expertise and time spent on deals that ultimately closed (including deals with AT&T and Verizon), including through the Fee Structure Agreement. But none of these deals—which collectively represented tens of millions of dollars of value to GENBAND—closed with TelEfficient

financing; they either did not close at all or closed with some other method of financing. TelEfficient relied on GENBAND's representations, investing millions of dollars and incurring significant debt to assist GENBAND on these deals, only to receive no compensation for its efforts.

39. As TelEfficient continued to invest substantial sums of money in these GENBAND projects, it needed additional funds to cover operational expenses. In late spring of 2015, TelEfficient requested an additional loan of $300,000 from GENBAND to cover these expenses. GENBAND indicated that the company would be able to make the $300,000 loan to TelEfficient. Then, in May 2015, GENBAND's Vice Chairman, Alex Russo, called Mr. Armbruster, and indicated that a loan in the amount of $300,000 would be a problem. Instead, Mr. Russo sought to take advantage of TelEfficient's precarious financial position by attempting to acquire both CoEfficient and TelEfficient for pennies on the dollar. Specifically, Mr. Russo proposed that GENBAND acquire CoEfficient (and all of its assets, including TelEfficient) in exchange for the forgiveness of the outstanding Notes. This would allow GENBAND to take all of the value TelEfficient brought to its deals without paying anything beyond the amounts already owed by CoEfficient and TelEfficient. Because this significantly undervalued the company, CoEfficient and TelEfficient declined. When CoEfficient and TelEfficient declined the offer, Mr. Russo refused to make the $300,000 loan that GENBAND had previously agreed to make.

40. GENBAND instead agreed to make a smaller loan in the amount of $40,000 to CoEfficient. The loan is evidenced by a Promissory Note dated May 9, 2015, executed by CoEfficient as the borrower and TelEfficient as guarantor. As with the prior

Notes, CoEfficient and TelEfficient executed the May 9, 2015 Promissory Note in reliance on GENBAND's representations that (a) the deals on which TelEfficient was working would close with TelEfficient financing; and (b) the Promissory Note would be extended until CoEfficient/TelEfficient received sufficient funds to pay the balance.

41.     In the end, none of the deals closed with TelEfficient financing. TelEfficient and CoEfficient were left with more than $600,000 in principal debt to GENBAND and more than $3 million in equity investment, debt, and operational obligations incurred from TelEfficient's projects with GENBAND. TelEfficient and CoEfficient relied on GENBAND's representations in raising these funds and incurring these debts and would not have done so if GENBAND had accurately portrayed the status of the various projects. Because of this detrimental reliance on GENBAND, TelEfficient was in a precarious financial position in mid-2015.

42.     The Notes provided for a potential to extend the maturity date to August 8, 2015, which TelEfficient and CoEfficient requested and received. In July 2015, TelEfficient and CoEfficient requested another extension of the Notes. GENBAND initially agreed to the extension. But then, sensing an opportunity to leverage its bargaining position, GENBAND demanded onerous concessions in exchange for considering an extension of the Notes. For example, GENBAND asked TelEfficient to execute an amendment to the Teaming Agreement that would have required continued exclusivity on the part of TelEfficient but abandoned GENBAND's exclusivity obligations. This was important to GENBAND because GENBAND wanted the ability to work with other financing companies, but it was essential to prevent TelEfficient from working with

GENBAND's competitors, particularly Metaswitch.  In fact, GENBAND's President told a TelEfficient employee that GENBAND would do everything in its power to put Metaswitch out of business.

43.    Thus, GENBAND had no intention of ever permitting TelEfficient to work with competitors like Metaswitch but had every intention of GENBAND working with TelEfficient's competitors.  GENBAND wanted to amend the Teaming Agreement to allow it to have TelEfficient present its proprietary financial models and expertise to GENBAND customers and then use that information to secure financing from a third party behind TelEfficient's back.  Of course, TelEfficient could not agree to these unreasonable terms.

44.    Unable to extract these concessions, GENBAND refused to extend the maturity date of the Notes, despite its prior representations that it would not call the Notes and would extend them until a deal funded that enabled CoEfficient/TelEfficient to repay the outstanding balance.  Despite refusing the requested extension, GENBAND continued to engage TelEfficient and derive benefits from TelEfficient's knowledge and expertise even after the Notes matured in August 2015.  For example, in September 2015, GENBAND's President of Global Sales, Mark Pugerude, represented that GENBAND was having "good meetings with AT&T" about another switch project and requested TelEfficient's assistance on the project.  GENBAND continued to use TelEfficient for GENBAND's benefit throughout the rest of 2015 on several deals potentially valued at more than $100 million to GENBAND.

45.    In January 2016, while GENBAND was still using TelEfficient to present financial solutions to its customers, GENBAND's Chief Financial Officer, Daryl Raiford,

sent a letter declaring the Notes in default and demanding immediate payment. Mr. Armbruster, the CEO of CoEfficient and head of TelEfficient, attempted to contact Mr. Raiford to discuss his letter, but Mr. Raiford never responded. Mr. Armbruster was able to reach Mr. Bruny, GENBAND's Chief Operating Officer, to discuss the letter. Mr. Bruny assured Mr. Armbruster that the letter was merely a formality and should not affect the ongoing work that TelEfficient was doing on behalf of GENBAND. Mr. Bruny also told Mr. Armbruster that he would speak with Mr. Raiford on behalf of TelEfficient and CoEfficient to avoid any further issues. Relying on Mr. Bruny's assurances, as well as his prior representations that GENBAND would not call the Notes and would continue to extend them, TelEfficient continued to work with GENBAND on several projects well into 2016. GENBAND even flew Mr. Armbruster to Puerto Rico twice in two weeks to meet with the CEO of one of GENBAND's potential customers in August 2016.

46.     After years of stringing TelEfficient and CoEfficient along with misrepresentations and having leveraged maximum value from TelEfficient's proprietary financial models and expertise, GENBAND engaged outside counsel to send a demand letter on the Notes to TelEfficient and CoEfficient in August 2016. The letter came completely out of the blue, arriving shortly after Mr. Armbruster's trip to Puerto Rico to help GENBAND. Contrary to numerous representations by Mr. Bruny and other GENBAND employees that GENBAND would continue to extend the Notes and would not make demand on them, the August 2016 letter demanded immediate payment of the Notes and threatened suit if CoEfficient and TelEfficient failed to comply. When CoEfficient and TelEfficient were unable to comply, GENBAND filed this lawsuit.

## CAUSES OF ACTION

### COUNT I: FRAUD

47.     Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

48.     GENBAND made numerous misrepresentations to Counter-Plaintiffs over the course of the parties' relationship.  GENBAND represented that deals with customers (including AT&T, Verizon, Hawaiian Telecom, CenturyLink, Vodafone, Telecom New Zealand, Claro Puerto Rico, TelePacific, and others) would close using TelEfficient financing.  These representations were false.  GENBAND's customers closed without using financing from TelEfficient, contrary to GENBAND's representations.  GENBAND knew or should have known that its representations were false.  For example, GENBAND was aware that AT&T and Verizon almost never used outside financing for projects like the GENBAND switch deal, yet GENBAND never disclosed that fact to TelEfficient or CoEfficient and, in fact, continued to represent that these deals would close with TelEfficient financing.

49.     GENBAND also represented that it would not call the Notes with TelEfficient and CoEfficient and that the Notes would be extended until deals had closed and funded with TelEfficient such that TelEfficient/CoEfficient had sufficient funds to pay the balance of the Notes.  These representations were false.  GENBAND reserved its right to call the Notes and, in fact, did call the Notes and refused to extend them without receiving onerous and unreasonable concessions from TelEfficient and CoEfficient.  GENBAND never intended to honor the representation that it would extend the Notes,

instead intending to call the Notes after extracting maximum value from TelEfficient's proprietary models and expertise.

50. GENBAND also withheld material facts from Counter-Plaintiffs, including information about the likelihood of deals closing with TelEfficient financing. In fact, GENBAND employees were regularly instructed not to share complete information with Counter-Plaintiffs. GENBAND had a duty to disclose these material facts to Counter-Plaintiffs because (a) GENBAND created a false impression by making a partial disclosure of information; (b) GENBAND discovered new facts that made its prior representations misleading or untrue; (c) GENBAND voluntarily disclosed some information but failed to disclose the whole true; and/or (d) GENBAND had a duty to disclose material facts to Counter-Plaintiffs because GENBAND maintained the customer relationships and had primary communications with the customers.

51. These misrepresentations and omissions were material in that they caused Counter-Plaintiffs to (a) continue working with GENBAND for the benefit of GENBAND and its customers; (b) invest substantial sums of money and man-hours in GENBAND projects; (c) incur millions of dollars in debt in connection with GENBAND projects; and (d) enter into Promissory Notes with GENBAND. Counter-Plaintiffs would not have performed these actions but for GENBAND's misrepresentations.

52. Counter-Plaintiffs detrimentally relied on GENBAND's misrepresentations and omissions by undertaking the above-described actions. If Counter-Plaintiffs had known the truth, they would not have entered into the Promissory Notes or expended millions of dollars and thousands of hours in connection with GENBAND projects.

Counter-Plaintiffs' reliance on GENBAND's misrepresentations and omissions was justifiable because, among other things GENBAND controlled the relationship with its customers and maintained primary contact with the customers.

53.     GENBAND's misrepresentations and omissions caused injury to Counter-Plaintiffs by causing them to take the above-described actions, including the expenditure of millions of dollars.    Counter-Plaintiffs seek the actual damages, lost profits, and/or reliance/out-of-pocket damages caused by GENBAND's misrepresentations and omissions. Counter-Plaintiffs also seek disgorgement of GENBAND's ill-gotten profits and/or the imposition of a constructive trust over GENBAND's fraudulently obtained profits to prevent GENBAND from being unjustly enriched by actual fraud.    Because Counter-Plaintiff's injuries were caused by GENBAND's fraud, Counter-Plaintiffs also are entitled to exemplary damages.

### COUNT II: FRAUDULENT INDUCEMENT

54.     Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

55.     GENBAND made numerous misrepresentations to Counter-Plaintiffs over the course of the parties' relationship.    GENBAND represented that deals with customers (including AT&T, Verizon, Hawaiian Telecom, CenturyLink, Vodafone, Telecom New Zealand, Claro Puerto Rico, TelePacific, and others) would close using TelEfficient financing.    These representations were false.    GENBAND's customers closed without using financing from TelEfficient, contrary to GENBAND's representations.    GENBAND knew or should have known that its representations were false.    For example, GENBAND was

aware that AT&T and Verizon almost never used outside financing for projects like the GENBAND switch deal, yet GENBAND never disclosed that fact to TelEfficient or CoEfficient and, in fact, continued to represent that these deals would close with TelEfficient financing.

56.     GENBAND also represented that it would not call the Notes with TelEfficient and CoEfficient and that the Notes would be extended until deals had closed and funded with TelEfficient such that TelEfficient/CoEfficient had sufficient funds to pay the balance of the Notes.  These representations were false.  GENBAND reserved its right to call the Notes and, in fact, did call the Notes and refused to extend them without receiving onerous and unreasonable concessions from TelEfficient and CoEfficient. GENBAND never intended to honor the representation that it would extend the Notes, instead intending to call the Notes after extracting maximum value from TelEfficient's proprietary models and expertise.

57.     These misrepresentations were material in that they caused Counter-Plaintiffs to (a) continue working with GENBAND for the benefit of GENBAND and its customers; (b) invest substantial sums of money and man-hours in GENBAND projects; (c) incur millions of dollars in debt in connection with GENBAND projects; and (d) enter into Promissory Notes with GENBAND.  Counter-Plaintiffs would not have performed these actions but for GENBAND's misrepresentations.

58.     Counter-Plaintiffs detrimentally relied on GENBAND's misrepresentations by entering into the Notes with GENBAND and incurring more than $600,000 in principal debt.  GENBAND's misrepresentations caused Counter-Plaintiffs to enter into

the Notes, which, according to GENBAND's pleadings, are binding contracts. If Counter-Plaintiffs had known the truth, they would not have entered into the Notes. Counter-Plaintiffs' reliance on GENBAND's misrepresentations was justifiable because, among other things GENBAND controlled the relationship with its customers and maintained primary contact with the customers.

59.    GENBAND's misrepresentations caused injury to Counter-Plaintiffs by causing them to incur more than $600,000 in principal debt that they would not have otherwise incurred. Counter-Plaintiffs seek the actual damages, including consequential damages, caused by GENBAND's misrepresentations. Because Counter-Plaintiff's injuries were caused by GENBAND's fraud, Counter-Plaintiffs also are entitled to exemplary damages.

### COUNT III: NEGLIGENT MISREPRESENTATION

60.    Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

61.    GENBAND made numerous misrepresentations to Counter-Plaintiffs in connection with GENBAND's business and various transactions in which GENBAND had an interest. GENBAND represented that deals with customers (including AT&T, Verizon, Hawaiian Telecom, CenturyLink, Vodafone, Telecom New Zealand, Claro Puerto Rico, TelePacific, and others) would close using TelEfficient financing. GENBAND made these representations to provide guidance and assurances to CoEfficient and TelEfficient in determining whether to enter into the Notes. These representations were false. GENBAND's customers closed without using financing from TelEfficient, contrary to

GENBAND's representations. GENBAND failed to exercise reasonable care or competence in obtaining and communicating these representations. For example, GENBAND was aware, or should have been aware, that AT&T and Verizon almost never used outside financing for projects like the GENBAND switch deal, yet GENBAND never disclosed that fact to TelEfficient or CoEfficient and, in fact, continued to represent that these deals would close with TelEfficient financing.

62. GENBAND also represented that it would not call the Notes with TelEfficient and CoEfficient and that the Notes would be extended until deals had closed and funded with TelEfficient such that TelEfficient/CoEfficient had sufficient funds to pay the balance of the Notes. GENBAND made these representations to provide guidance and assurances to CoEfficient and TelEfficient in determining whether to enter into the Notes. These representations were false. GENBAND failed to exercise reasonable care or competence in obtaining and communicating these representations. GENBAND reserved its right to call the Notes and, in fact, did call the Notes and refused to extend them without receiving onerous and unreasonable concessions from TelEfficient and CoEfficient. GENBAND never intended to honor the representation that it would extend the Notes, instead intending to call the Notes after extracting maximum value from TelEfficient's proprietary models and expertise.

63. These misrepresentations were material in that they caused Counter-Plaintiffs to (a) continue working with GENBAND for the benefit of GENBAND and its customers; (b) invest substantial sums of money and man-hours in GENBAND projects; (c) incur millions of dollars in debt in connection with GENBAND projects; and (d) enter into

Promissory Notes with GENBAND. Counter-Plaintiffs would not have performed these actions but for GENBAND's misrepresentations.

64. Counter-Plaintiffs detrimentally relied on GENBAND's misrepresentations by taking the above-described actions. In fact, Counter-Plaintiffs had no choice but to rely on GENBAND because GENBAND maintained the customer relationships and had primary communications with the customers. Based on this relationship, GENBAND had a duty to disclose material facts to Counter-Plaintiffs, which GENBAND failed to do. If Counter-Plaintiffs had known the truth, they would not have entered into the Promissory Notes or expended millions of dollars and thousands of hours in connection with GENBAND projects. Counter-Plaintiffs' reliance on GENBAND's misrepresentations was justifiable because, among other things GENBAND controlled the relationship with its customers and maintained primary contact with the customers.

65. GENBAND's misrepresentations caused injury to Counter-Plaintiffs by causing them to take the above-described actions, including the expenditure of millions of dollars. Counter-Plaintiffs seek the actual damages, lost profits, and/or reliance/out-of-pocket damages caused by GENBAND's misrepresentations. Because Counter-Plaintiff's injuries were caused by GENBAND's fraud and malicious conduct, Counter-Plaintiffs also are entitled to exemplary damages.

<div align="center">COUNT IV: MISAPPROPRIATION OF TRADE SECRETS</div>

66. Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

67.     Counter-Plaintiffs bring this claim for relief under the Texas Uniform Trade Secrets Act, Texas Civil Practice and Remedies Code §§ 134A.001, et seq. ("TUTSA").

68.     Counter-Plaintiffs' financial models and expertise are "trade secrets" under TUTSA.  They comprise information, including a compilation, program, device, method, technique, process, or financial data by which Counter-Plaintiffs operate their business.

69.     Counter-Plaintiffs' trade secrets were the subject of efforts that were reasonable under the circumstances to maintain their secrecy, including that they were disclosed only to those individuals who needed the information to perform their duties, it was made known to these individuals that the information was to be kept confidential, and reasonable security and confidentiality measures were maintained to protect the trade secrets.  Counter-Plaintiffs also executed non-disclosure agreements with GENBAND and with each customer to whom Counter-Plaintiffs disclosed their proprietary information.

70.     Counter-Plaintiffs' trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, Counter-Plaintiffs' competitors and others who can obtain economic value from the use of the information.  It would competitively harm Counter-Plaintiffs if their trade secrets were disclosed or otherwise made public.

71.     GENBAND was provided access to Counter-Plaintiffs' trade secrets under a Non-Disclosure Agreement but accessed and/or used Counter-Plaintiffs' trade secrets in violation of the Non-Disclosure Agreement.  Counter-Plaintiffs have not effectively consented to nor received sufficient consideration for GENBAND's misappropriations. GENBAND knows or has reason to know that it acquired and/or used Counter-Plaintiffs'

trade secrets by improper means, including misrepresentations and breach of a duty to maintain secrecy.

72.     GENBAND's misappropriation of Counter-Plaintiffs' trade secrets was willful and malicious. GENBAND knew that the trade secrets rightfully belonged to Counter-Plaintiffs, and yet misappropriated the trade secrets for its own material gain.

73.     As a direct and proximate result of GENBAND's misappropriation, Counter-Plaintiffs have already suffered, and will continue to suffer, injury and damages, while GENBAND enjoys ill-gotten profits. Counter-Plaintiffs seek an award of damages consisting of Counter-Plaintiffs' lost profits and/or GENBAND's unjust enrichment. Because GENBAND's misappropriation of Counter-Plaintiffs' trade secrets was willful and malicious, Counter-Plaintiffs are entitled to exemplary damages of twice the amount of damages awarded for GENBAND's misappropriation. Additionally, Counter-Plaintiffs are entitled to their reasonable and necessary attorneys' fees pursuant to TUFTA.

## COUNT V: BREACH OF CONTRACT

74.     Counter-Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

75.     Counter-Plaintiffs and GB US entered into binding and enforceable contracts, including a Teaming Agreement, Non-Disclosure Agreement, and Fee Structure Agreement.

76.     GB US breached the contracts by, among other things, disclosing Counter-Plaintiffs' proprietary information and/or using Counter-Plaintiffs' proprietary information outside of the scope contemplated in the contracts and failing to compensate Counter-

Plaintiffs pursuant to the Fee Structure Agreement. Any use of or referral to any other financing company by GENBAND also is a breach of the parties' contracts.

77. GB US's breach of contracts caused injury to Counter-Plaintiffs by depriving Counter-Plaintiffs of the benefits of the contracts and disclosing and/or using Counter-Plaintiffs' valuable proprietary information. Counter-Plaintiffs seek the actual damages, lost profits, and/or reliance/out-of-pocket damages caused by GB US's breach of contract.

78. As a result of GB US's breach of contracts, Counter-Plaintiffs were required to engage counsel and file this action. Pursuant to the terms of the contracts and Texas Civil Practice and Remedies Code § 38.001, Counter-Plaintiffs are entitled to their reasonable and necessary attorneys' fees and costs incurred in prosecuting this action.

## CONDITIONS PRECEDENT

79. All conditions precedent to Counter-Plaintiffs' recovery of the relief requested herein have been performed, have occurred, or have been waived.

## JURY DEMAND

80. Counter-Plaintiffs demand a jury trial on all claims in this Counterclaim on which a jury trial is available.

## PRAYER

Counter-Plaintiffs respectfully requests that this Court:

    i.    award to Counter-Plaintiffs actual and consequential damages, including lost profits and reliance/out-of-pocket damages;

    ii.    award to Counter-Plaintiffs exemplary damages for GENBAND's actual fraud and/or malicious conduct;

    iii.    impose a constructive trust over GENBAND's fraudulently obtained profits, require GENBAND to disgorge its wrongful profits, and /or award

to Counter-Plaintiffs a sum equal to the amount of GENBAND's unjust enrichment from use of Counter-Plaintiffs' trade secrets;

iv.    award to Counter-Plaintiffs pre- and post-judgment interest;

v.    award to Counter-Plaintiffs their costs and attorneys' fees; and

vi.    award to Counter-Plaintiffs such further relief to which they are entitled.


Respectfully submitted,

**REESE MARKETOS LLP**


By: _s/ Tyler J. Bexley_
       Tyler J. Bexley
        State Bar No. 24073923
        tyler.bexley@rm-firm.com
       750 N. Saint Paul St., Suite 600
       Dallas, Texas 75201-3201
       214.382.9810 telephone
       214.501.0731 facsimile

**ATTORNEYS FOR DEFENDANTS/ COUNTER-PLAINTIFFS COEFFICIENT, LLC and TELEFFICIENT, LLC**


## CERTIFICATE OF SERVICE

    I hereby certify that on July 26, 2018, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.


       _s/ Tyler J. Bexley_
       Tyler J. Bexley